679 S.E.2d 223

Hugh M. CAPERTON, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc., Plaintiffs Below, Appellees,

v.

A.T. MASSEY COAL COMPANY, INC., Elk Run Coal Company, Inc., Independence Coal Company, Inc., Marfork Coal Company, Inc., Performance Coal Company, and Massey Coal Sales Company, Inc., Defendants Below, Appellants.

No. 33350.

Supreme Court of Appeals of West Virginia.

Submitted on Rehearing March 12, 2008.

Decided April 3, 2008.

Concurring Opinion of Chief Justice Benjamin July 28, 2008.

D.C. Offutt, Jr., Stephen Burchett, Perry W. Oxley, David E. Rich, Offutt, Fisher & Nord, Huntington, for the Appellants.

Bruce E. Stanley, Tarek F. Abdalla, Reed Smith LLP, Pittsburgh, PA, for the Appellee, Hugh M. Caperton.

Robert V. Berthold, Jr., Christina L. Smith, Berthold, Tiano & O'Dell, Charleston, David B. Fawcett, Buchanan Ingersoll & Rooney, Pittsburgh, PA, for the Appellees, Harman Development Corporation, Harman Mining Corporation, and Sovereign Coal Sales, Inc.

Bradley J. Pyles, Pyles, Turner & Mick, LLP, Logan, for Amicus Curiae United Mine Workers of America.

DAVIS, Justice:

The Appellants herein and defendants below, A.T. Massey Coal Company, Inc., and various of its subsidiaries, appeal from a March 15, 2005, order entered in the Circuit Court of Boone County, which denied their post-judgment motions for judgment as a matter of law, a new trial, or remittitur, in response to the entry of a judgment of more than $50 million in favor of the appellees herein, and plaintiffs below, Hugh M. Caperton, Harman Development Corporation, Harman Mining Corporation and Sovereign Coal Sales, Inc. In this appeal, A.T. Massey Coal Company and its subsidiaries allege numerous errors that purportedly occurred throughout the proceedings below.

This case is presently before this Court on rehearing.[1] Based upon our thorough consideration of the parties' arguments on rehearing, the relevant case law and the record on appeal, we again conclude that this case may be resolved on two separate and mutually exclusive grounds. First, we find that the circuit court erred in denying a motion to dismiss filed by A.T. Massey Coal Company and its subsidiaries, based upon the existence of a forum-selection clause contained in a contract that directly related to the conflict giving rise to the instant lawsuit. Assuming, *arguendo*, that the circuit court's denial of the motion to dismiss was not in error, we further conclude that the judgment should be reversed based upon the doctrine of res judicata due to an earlier action that had been litigated in Buchanan County, Virginia. Accordingly, we reverse the judgment in this case and remand for the circuit court to enter an order dismissing, with prejudice, this case against A.T. Massey Coal Company and its subsidiaries.

---

1. The opinion formerly filed in connection with this appeal has been vacated based upon the subsequent voluntary disqualification of two of the justices who participated in the earlier proceedings in this Court.

## I.

## FACTUAL AND PROCEDURAL HISTORY

Central to the dispute underlying this appeal is the Harman Mine, an underground coal mine located in Buchanan County, Virginia, that produced very high quality metallurgical coal. Prior to 1993, Harman Mine was owned by Inspiration Coal Corporation (hereinafter referred to as "Inspiration") through three subsidiaries: Harman Mining Corporation (hereinafter referred to as "Harman Mining"), Sovereign Coal Sales, Inc. (hereinafter referred to as "Sovereign"), and Southern Kentucky Energy Company (hereinafter referred to as "Southern"). For many years, all of the coal from the Harman Mine had been sold to Wellmore Coal Corporation (hereinafter referred to as "Wellmore"), a subsidiary of United Coal Corporation. In April 1992, Sovereign and Southern entered a coal supply agreement (hereinafter referred to as "the 1992 CSA") with Wellmore. Under the 1992 CSA, Wellmore was to purchase from Sovereign and Southern approximately 750,000 tons of coal per year for a period of ten years.

In 1993, Hugh M. Caperton (hereinafter referred to as "Mr. Caperton"), a plaintiff below and appellee herein, formed Harman

Development Corporation[2] (hereinafter referred to as "Harman Development").[3] In that same year, Harman Development purchased the three previously mentioned subsidiaries of Inspiration: Harman Mining,[4] Sovereign[5] and Southern, and thereby became the owner of the Harman Mine.[6] Harman Development, Harman Mining and Sovereign are all plaintiffs to this action below, and are appellees herein (hereinafter collectively referred to as "the Harman Companies"). In 1997, in order to fund improvements to the Harman Mine, the Harman Companies sold all the Harman Mine reserves to Penn Virginia Corporation, and then leased back those reserves that could be mined in a cost-effective manner.

From the time the Harman Companies became owners of the Harman Mine until 1997, coal from the Harman Mine was purchased by Wellmore in accordance with the 1992 CSA. Prior to the expiration of the 1992 CSA, in March of 1997, a new CSA with a higher price per ton of coal (hereinafter referred to as "the 1997 CSA") was negotiated between Sovereign, Wellmore and Harman Mining.[7] The 1997 CSA was to be in effect for a period of five years, commencing retroactively on January 1, 1997. However, the 1997 CSA included, among other things, a *force majeure* clause,[8] and a forum-selection

---

**2.** Harman Development Corporation is a Virginia corporation that has its principal place of business in Beckley, West Virginia.

**3.** Mr. Caperton had worked for Sovereign when it was a subsidiary of Inspiration. As Sovereign's employee, Mr. Caperton sold coal on behalf of Sovereign, including coal from the Harman Mine. Mr. Caperton left Sovereign to form his own coal brokerage company, Dominion Energy. Through Dominion Energy, Mr. Caperton continued to broker coal from the Harman Mine on behalf of Inspiration. In 1993, Dominion Energy became Harman Development Corporation.

**4.** Harman Mining is a Virginia corporation that transacts business in West Virginia and is a wholly-owned subsidiary of Harman Development.

**5.** Sovereign is a Delaware corporation that has its principal place of business in Beckley, West Virginia. Sovereign is a wholly-owned subsidiary of Harman Development.

**6.** The plan Harman Development established for the Harman Mine was to mine the reserves in a

way that would allow convenient access to adjoining reserves owned by Pittston Coal Company. The appellees explain that it is commonplace in the mining industry for coal companies to sell or lease their properties to other operators when it makes economic sense to allow someone else to mine their coal. Due to the topography of the area, the Harman Mine provided better access to the Pittston reserves than Pittston itself had. Thus, Mr. Caperton hoped to one day lease the Pittston reserves. However, no lease agreement was ever executed between Pittston and any of the Harman Companies.

**7.** The 1997 CSA specified that Wellmore would purchase a minimum tonnage of coal, 573,000 tons per year, and also gave Wellmore the option to purchase all of the Harman Mine's production. Historically, Wellmore had purchased all of the coal that the Harman Mine produced.

**8.** The *force majeure* clause was nearly identical to one that had been included in the 1992 CSA, and stated, in relevant part,

The term "force majeure" as used herein shall mean any and all causes reasonably be-

clause requiring that "[a]ll actions brought in connection with this Agreement shall be filed in and decided by the Circuit Court of Buchanan County, Virginia." [9]

During the course of the 1992 CSA, and at the time the 1997 CSA was executed, one of Wellmore's primary customers was LTV Steel (hereinafter referred to as "LTV"). Wellmore sold and shipped nearly two-thirds of the coal it purchased from the Harman Companies to LTV's coke plant located in Pittsburgh, Pennsylvania.[10] On July 19, 1997, LTV announced that it intended to close its Pittsburgh coke plant due to a change in emissions regulations promulgated by the Environmental Protection Agency.

A.T. Massey Coal Company (hereinafter referred to as "Massey"), a defendant below and appellant herein, had tried unsuccessfully for several years to sell its West Virginia mined coal directly to LTV.[11] Due to its lack of success in selling to LTV on its own, Massey determined to acquire LTV's suppli-

er, Wellmore, and its parent corporation, United Coal Corporation (hereinafter referred to as "United").[12] Massey purchased Wellmore and United on July 31, 1997. Since there was no long-term agreement between LTV and Wellmore, Massey hoped to substitute its own coal for the Harman Mine coal that Wellmore had been supplying to LTV. An internal Massey memorandum admitted during trial revealed that Massey understood there were risks to its plan, most notably the possibility that the relationship between LTV and Wellmore might not continue under Massey ownership of Wellmore. The circuit court found that, in spite of this risk, and despite the knowledge that LTV was "extremely reluctant to change a long-established, successful coal blend" that included coal from the Harman Mine, Massey nevertheless "provided LTV with firm price quotes for coal mainly from Massey Mines, not Harman coal, and insisted that LTV make Massey its sole-source provider via a

yond the control of SELLER or BUYER, as applicable, which cause SELLER or BUYER to fail to perform hereunder, such as, but not limited to, acts of God, acts of the public enemy, epidemics, insurrections, riots, labor disputes and strikes, government closures, boycotts, labor and material shortages, fires, explosions, floods, breakdowns or outages of or damage to coal preparation plants, equipment or facilities, interruptions or reduction to power supplies or coal transportation (including, but not limited to, railroad car shortages) embargoes, and acts of military or civil authorities, which wholly or partly prevent the mining, processing, loading and/or delivering of the coal by SELLER, or which wholly or partly prevent the receiving, accepting, storing, processing or shipment of the coal by BUYER.... Pertaining to BUYER, the term "force majeure" as used herein shall further include occurrence(s) of a force majeure event at any of BUYER's customer's plants and facilities, except that the effects of any such force majeure event shall not justify BUYER in reducing its purchase of coal hereunder in greater proportion than the coal to be purchased hereunder bears to all BUYER's sources of supply, including BUYER's own mines, for BUYER's metallurgical coal sold to domestic coke producers. SELLER and BUYER shall promptly notify the other following commencement of a force majeure. If because of a force majeure SELLER or BUYER, respectively, is unable to carry out its obligations under this Agreement and if such Party shall promptly give to the other Party written notice of such force majeure,

then the obligations of the Party giving such notice and the corresponding obligations of the other Party shall be suspended to the extent made necessary by such force majeure and during its continuance; provided however, (i) that such obligations shall be suspended only to the extent made necessary by such force majeure and only during its continuance, and (ii) that the Party giving such notice shall act promptly in [sic] reasonable manner to eliminate such force majeure....

9. This forum-selection clause is identical to one that had been included in the 1992 CSA.

10. LTV purchased from Wellmore a premium blend of coal from the Harman Mine mixed with other, lesser quality coals. The circuit court expressly found that "[c]oal from the Harman Mine is metallurgical coal with very favorable coking characteristics prized by steelmakers like LTV."

11. This coal was inferior in quality to the coal obtained from the Harman Mine and sold to LTV through Wellmore.

12. The Harman Companies and Mr. Caperton presented evidence at trial to establish that Massey had for some time desired to sell coal to LTV, and opined that it was this desire that motivated Massey's acquisition of Wellmore, and further motivated Massey to eliminate the Harman Companies as its competitors via the destruction of those companies.

long-term coal contract." [13] As a consequence of Massey's actions, LTV ceased buying coal from Wellmore. Thereafter, on August 5, 1997, Wellmore, at the direction of Massey, gave notice to the Harman Companies by letter stating that if LTV did in fact close its Pittsburgh plant, then Wellmore anticipated a pro rata reduction in tonnage under the *force majeure* clause of the 1997 CSA.

Subsequent to Wellmore's August 5th letter, Massey entered into negotiations with the Harman Companies for the purchase of the Harman Mine. During the course of these negotiations, confidential information regarding the Harman Mine's operations, including its desire to eventually mine adjoining Pittston reserves,[14] as well as confidential information pertaining to the finances of the Harman Companies and of Mr. Caperton, personally, was shared with Massey. The Harman Companies also expressed to Massey their disagreement that the LTV closure of its Pittsburgh coke plant constituted a *force majeure* event.

Thereafter, on December 1, 1997, Wellmore, at Massey's direction, declared *force majeure* based on LTV's closure of its Pittsburgh coke plant, and advised the Harman Companies that it would purchase only 205,707 tons of the 573,000 minimum tons of coal required under the 1997 CSA. According to the express findings of the circuit court on this point,

> [o]nly after Massey's marketing efforts caused the loss of LTV's business did Massey direct Wellmore to declare "force majeure" against Harman, a declaration which Massey knew would put Harman out of

business. Massey acknowledged Wellmore was readily able to purchase and sell the Harman coal, but instead chose to have Wellmore declare "force majeure" based upon a cost benefit analysis Massey performed which indicated that it would increase its profits by doing so. Furthermore, before Massey directed the declaration of "force majeure", Massey concealed the fact that the LTV business was lost and Massey delayed Wellmore's termination of Harman's contract until late in the year, knowing it would be virtually impossible for Harman to find alternate buyers for its coal at that point in time. Once Wellmore suddenly stopped purchasing Harman's output, Harman had no ability to stay in business. In the meantime, Massey sold Wellmore.

Massey continued in negotiations with the Harman Companies and Mr. Caperton for Massey's purchase of the Harman Mine, and the parties agreed to close the transaction on January 31, 1998. However, Massey delayed and, as the circuit court found, "ultimately collapsed the transaction in such a manner so as to increase [the Harman Companies'] financial distress." [15] In addition, Massey utilized the confidential information it had obtained from the Harman Companies to take further actions, such as purchasing a narrow band of the Pittston coal reserves surrounding the Harman Mine in order to make the Harman Mine unattractive to others and thereby decrease its value. During the negotiations for the sale of the Harman Mine to Massey, Massey had also learned that Mr. Caperton had personally guaranteed a number of the Harman Companies' obligations.[16]

---

**13.** Massey made these demands notwithstanding its knowledge that LTV had historically demonstrated a preference for multiple suppliers and had not entered multi-year coal supply contracts. Additionally, the firm price for its coal that Massey quoted to LTV represented "a handsome improvement" over the prices at which Massey had been selling its coal.

**14.** *See supra* note 6.

**15.** According to testimony presented at trial, during the negotiations of Massey's potential purchase of the Harman Mine, Massey represented that it would assume the Harman coal reserves lease from Penn Virginia "as-is." However, just

prior to the scheduled closing of Massey's purchase of the Harman Mine, Massey demanded changes to numerous material terms of the Harman Companies' lease agreement with Penn Virginia. Massey and Penn Virginia could not agree on terms; therefore, Massey's purchase of the Harman Mine was never completed.

**16.** Mr. Caperton had personal obligations to Inspiration Coal (now known as Terra Industries), Senstar Financial, Grundy National Bank, and Vision Financial, among others. The circuit court expressly found that many of the steps Massey took were directed at Mr. Caperton personally, and that Mr. Caperton had relied to his detriment on numerous false representations

Subsequently, the Harman Companies filed for bankruptcy.

Thereafter, in May 1998, Harman Mining and Sovereign sued Wellmore in the Circuit Court of Buchanan County, Virginia, alleging causes of action for breach of contract and for breach of the covenant of good faith and fair dealing arising from Wellmore's declaration of *force majeure*. However, Harman Mining and Sovereign voluntarily withdrew their tort claim prior to trial. Following trial on the contract claim, a jury found in favor of Harman Mining and Sovereign and awarded $6 million in damages.[17]

Shortly after the Virginia action was filed, on October 29, 1998, Harman Development, Harman Mining, Sovereign and Mr. Caperton, individually, filed the instant action in the Circuit Court of Boone County, West Virginia, against A.T. Massey Coal Company, Inc., Elk Run Coal Company, Inc., Independence Coal Company, Inc., Mar Fork Coal Company, Inc., Performance Coal Company, and Massey Coal Sales Company, Inc. (hereinafter collectively referred to as "the Massey Defendants").[18] The first amended complaint in this action was filed on December 10, 1998, and asserted claims of tortious interference with existing contractual relations, tortious interference with prospective contractual relations, fraudulent misrepresentation, civil conspiracy, negligent misrepresentation, and punitive damages. Though numerous pre-trial motions were filed in the underlying action, two in particular are relevant to our resolution of this matter. First, in December 1998, the Massey Defendants filed a motion to dismiss. In their memorandum in support of the motion, the Massey Defendants argued, *inter alia*, that the forum-selection clause of the 1997 CSA re-

quired this action to be filed in Buchanan County, Virginia. The circuit court denied the Massey Defendants' motion to dismiss. Thereafter, in April 2002, the Massey Defendants filed a motion for summary judgment, arguing, in relevant part, that the instant action was barred under the legal principal of res judicata. The circuit court denied this motion as well.

Ultimately, only three of the theories of liability asserted in this action were presented to the jury for a verdict: [19] tortious interference, fraudulent misrepresentation and fraudulent concealment. On August 1, 2002, the jury found in favor of all plaintiffs on all three grounds and returned a verdict, including punitive damages, of $50,038,406.00. On August 30, 2002, the Massey Defendants filed a motion seeking judgment as a matter of law, a new trial, or, in the alternative, remittitur. Following a lengthy delay, by order entered March 17, 2005, the circuit court denied the post-trial motions. This appeal followed.[20]

## II.

## STANDARD OF REVIEW

Our analysis of this case will consider two issues: first, whether the circuit court erred in denying the Massey Defendants' motion to dismiss on the issue of the forum-selection clause, and, in the alternative, whether the circuit court erred in denying the Massey Defendants' motion for summary judgment on the issue of res judicata.

■ We first review the correctness of the circuit court's denial of the Massey Defendants' motion to dismiss for improper venue in light of the forum-selection clause con-

---

made by Massey. One example of such false representations made by Massey was that it lead Mr. Caperton to believe that it intended to close its purchase of the Harman Mine on January 31, 1998, when, in fact, Massey had already determined not to close the transaction.

17. Wellmore appealed the verdict to the Supreme Court of Virginia, however the appeal was refused on technical grounds. *See Wellmore Coal Corp. v. Harman Mining Corp.*, 264 Va. 279, 568 S.E.2d 671 (2002).

18. Elk Run Coal Company, Inc., Independence Coal Company, Inc., Mar Fork Coal Company, Inc., Performance Coal Company, and Massey Coal Sales Company, Inc., are all subsidiaries of A.T. Massey Coal Company, Inc.

19. The punitive damages claim was presented also.

20. There were additional delays in this case involving the trial transcript. The circuit court certified the transcript on August 25, 2006. This appeal was then filed on October 24, 2006.

tained in the 1997 CSA. "This Court's review of a trial court's decision on a motion to dismiss for improper venue is for abuse of discretion." Syl. pt. 1, *United Bank, Inc. v. Blosser,* 218 W.Va. 378, 624 S.E.2d 815 (2005).[21] However, we now hold that "[o]ur review of the applicability and enforceability of [a] forum[-]selection clause is *de novo.*" *Hugel v. Corporation of Lloyd's,* 999 F.2d 206, 207 (7th Cir.1993) (citing *Northwestern Nat'l Ins. Co. v. Donovan,* 916 F.2d 372, 375 (7th Cir.1990); *Riley v. Kingsley Underwriting Agencies, Ltd.,* 969 F.2d 953, 956 (10th Cir.1992)). *Cf.* Syllabus point 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review.").

■ We next consider the circuit court's denial of the Massey Defendants' motion for summary judgment on the issue of res judicata. "A circuit court's entry of summary judgment is reviewed *de novo.*" Syl. pt. 1, *Painter v. Peavy,* 192 W.Va. 189, 451 S.E.2d 755 (1994). For purposes of our *de novo* review, we further note that

"'[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law.' Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Insurance Co. of New York,* 148 W.Va. 160, 133 S.E.2d 770 (1963)." Syllabus Point 1, *Andrick v. Town of Buckhannon,* 187 W.Va. 706, 421 S.E.2d 247 (1992).

Syl. pt. 2, *Painter.* Finally, we note that "[t]he circuit court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter, but is to determine whether there is a genuine issue for trial." Syl. pt. 3, *Painter.* With

these considerations in mind, we proceed to address the dispositive issues raised in this appeal.

## III.

### DISCUSSION

Although numerous issues have been raised on appeal in this case, we find that the instant matter may be resolved on the issue of the forum-selection clause contained in the 1997 CSA between Sovereign Coal Sales, Inc., Wellmore Coal Corporation and Harman Mining Corporation. In the alternative, this case may be resolved based on the doctrine of res judicata. We address each of these issues in turn.

### A. Forum–Selection Clause

■ The 1997 CSA between Sovereign, Wellmore and Harman Mining provided that the "[a]greement, in all respects, shall be governed, construed and enforced in accordance with the substantive laws of the Commonwealth of Virginia. All actions brought in connection with this Agreement shall be filed in and decided by the Circuit Court of Buchanan County, Virginia...." In the proceeding below, the Massey Defendants filed a motion to dismiss alleging, in relevant part, that the forum-selection clause in the 1997 CSA required that any action related to that agreement be brought in the Circuit Court of Buchanan County, Virginia. Accordingly, the Massey Defendants argued that the action was improperly before the Circuit Court of Boone County, West Virginia, and that the instant action should therefore be dismissed.[22] The circuit court denied the motion to dismiss.

This case presents the first opportunity for this Court to address substantive issues involving forum-selection clauses. By way of definition, it has been recognized that "[a] 'forum selection' provision in a contract designates a particular state or court as the jurisdiction in which the parties will litigate

---

21. "Courts generally consider a motion to dismiss, based upon a forum selection clause, as a motion to dismiss for improper venue." Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure,* § 12(b)(3)[5], at 376 (2d ed.2006).

22. "A motion to dismiss is the proper procedural mechanism for enforcing a forum-selection clause that a party to the agreement has violated in filing suit." *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,* 234 S.W.3d 679, 687 (Tex.App.2007) (citations omitted).

disputes arising out of the contract and their contractual relationship." 17A Am.Jur.2d *Contracts* § 259, at 255 (2004) (footnote omitted). While forum-selection clauses historically were disfavored, such is no longer the case, so long as the clause is fair and reasonable:

The right of an injured party to legal redress is jealously guarded by the courts. Formerly, no agreement confining the right of a party to sue in a particular court or tribunal or in the courts or tribunals of a certain jurisdiction, or to determine the venue of a suit in such a way as to deprive the defendant of his statutory privileges as to place of trial was enforced, unless perhaps where the agreement was made after the cause of action had arisen and was part of a fair compromise. A minority of courts still follow this older rule.

During the past two decades, the rules governing the validity of various "forum selection" clauses have been relaxed considerably, the courts following a pattern similar to that which has already been discussed in connection with arbitration clauses. Thus, while it remains true today that a clause or provision *unreasonably or improperly* attempting to deprive a court of its jurisdiction will not be enforced, the modern trend is to respect the enforceability of contracts containing clauses limiting judicial jurisdiction, if there is nothing unfair or unreasonable about them. This trend is directly traceable to the landmark case of *M/S Bremen v. Zapata Off-Shore Co.,* [407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972) ], in which the United States Supreme Court upheld the validity of a freely negotiated forum selection clause in a commercial contract between an American firm and a German concern, which specified that any dispute must be determined by the English courts. . . .

7 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 15:15, at 290–301 (4th ed.1997) (footnotes omitted). *See also* 17A Am.Jur.2d *Contracts* § 259, at 255–56 ("While there is contrary authority, generally modern courts will enforce forum-selection clauses entered into by parties to a contract provided that the clauses are not

unfair, unreasonable, or unjust under [the] circumstances." (footnotes omitted)).

Although this Court has not had occasion to address substantive issues involving forum-selection clauses, we have previously indicated our general approval of forum-selection clauses by noting that they are not contrary to public policy:

Unquestionably, forum selection clauses are not contrary to public policy in and of themselves for they are sanctioned in commercial sales agreements under W. Va. Code § 46–1–105(2). Although an early case in our jurisprudence held void a clause in a stock certificate requiring that stockholders bring suit in New York, *Savage v. People's Building, Loan and Savings Association,* 45 W.Va. 275, 31 S.E. 991 (1898), later cases have sanctioned, at least implicitly, forum selection clauses. *Axelrod v. Premier Photo Service, Inc.,* 154 W.Va. 137, 173 S.E.2d 383 (1970). *Board of Education v. W. Harley Miller, Inc.,* 159 W.Va. 120, 221 S.E.2d 882 (1975). . . .

As the Federal court observed, West Virginia appears not to subscribe to the rule that choice of forum clauses are void per se. "Rather the rule of most jurisdictions and the rule that this Court believes that West Virginia should and would adopt is that such clauses will be enforced only when found to be reasonable and just". *Leasewell, Ltd. v. Jake Shelton Ford Inc.,* 423 F.Supp. 1011, 1015 (S.D.W.Va.1976). *See also, Kolendo v. Jerell, Inc.,* 489 F.Supp. 983 (S.D.W.Va.1980).

*General Elec. Co. v. Keyser,* 166 W.Va. 456, 461–62 n. 2, 275 S.E.2d 289, 292–93 n. 2 (1981). *See also* Franklin D. Cleckley, Robin J. Davis, & Louis J. Palmer, Jr., *Litigation Handbook on West Virginia Rules of Civil Procedure* § 12(b)(3)[5], at 376–77 (2d ed.2006) (hereinafter referred to as "*Litigation Handbook* ") ("The Supreme Court has indicated in passing that forum selection clauses are not contrary to public policy." (citing *General Electric Co. v. Keyser* )).

Having found no impediment to the enforcement of forum-selection clauses in general, we now must endeavor to specifically determine whether the forum-selection

clause of the 1997 CSA should have been enforced in the instant case.

In *Phillips v. Audio Active Limited*, 494 F.3d 378 (2d Cir.2007), the United States Court of Appeals for the Second Circuit articulated a four-part test for determining whether a claim should be dismissed based upon a forum-selection clause. We find this test supported by reason and logic, and by the manner in which such cases have been resolved in other courts; therefore, we now hold that

[d]etermining whether to dismiss a claim based on a forum[-]selection clause involves a four-part analysis. The first inquiry is whether the clause was reasonably communicated to the party resisting enforcement. . . . The second step requires [classification of] the clause as mandatory or permissive, *i.e.*, . . . whether the parties are *required* to bring any dispute to the designated forum or [are] simply *permitted* to do so. [The third query] asks whether the claims and parties involved in the suit are subject to the forum selection clause. . . .

If the [forum-selection] clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in the dispute, it is presumptively enforceable. . . . The fourth, and final, step is to ascertain whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that "enforcement would be unreasonable [and] unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*Phillips*, 494 F.3d at 383–84 (internal citations omitted) (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513 (1972)). *See also Dexter Axle Co. v. Baan USA, Inc.*, 833 N.E.2d 43, 49 (Ind.Ct.App.2005) ("Having found that the forum selection clause in the Consulting Agreement is valid, binding, and enforceable, we must next consider whether it applies to any or all of Dexter's claims against Baan."); *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.*, 234 S.W.3d 679, 687 (Tex.App.2007) ("In deciding whether to enforce a mandatory fo-

rum-selection clause, courts must determine whether the claims in the case at hand fall within the scope of the forum-selection clause and whether the court should enforce the clause. In addition to resolving issues of scope and enforceability, courts also may have to decide issues as to whether nonsignatories to the contract can enforce the forum-selection clause contained therein."). We now follow this analysis to ascertain whether the instant case should have been dismissed pursuant to the forum selection clause.

**1. Reasonably Communicated.** The first question we must answer is whether the forum-selection clause was reasonably communicated to Mr. Caperton and the Harman Companies. "Although a strong presumption of enforceability attaches to forum selection clauses, *see M/S Bremen*, 407 U.S. at 15, 92 S.Ct. 1907, 32 L.Ed.2d 513, '[t]he legal effect of a forum-selection clause depends in the first instance upon whether its existence was reasonably communicated to the plaintiff. . . .'" *Electroplated Metal Solutions, Inc. v. American Servs., Inc.*, 500 F.Supp.2d 974, 976 (N.D.Ill.2007) (internal citation omitted) (quoting *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir.1995)). *See also* 17A C.J.S. *Contracts* § 237, at 211 (1999) ("A forum selection clause is unenforceable as to a plaintiff who did not have sufficient notice of the forum selection clause prior to entering the contract.").

This prong of the analysis is easily resolved as Mr. Caperton and the Harman Companies have not argued that the forum-selection clause was not reasonably communicated to them. Furthermore, Sovereign and Harman Mining were parties to the agreement, and Mr. Caperton signed the contract in his capacity as president of Sovereign. Therefore, these parties cannot claim ignorance of the plainly worded forum-selection clause, which "clearly convey[ed] to any reader that any action regarding the [CSA] must be brought in a specific court, and the location of that court [was] readily ascertainable. . . ." *Klotz v. Xerox Corp.*, 519 F.Supp.2d 430, 433 (S.D.N.Y. 2007). Moreover, though Harman Development, the parent company of Sovereign and Harman Mining, was not a party to the 1997 CSA, Mr.

Caperton is the sole owner of Harman Development. Since Mr. Caperton had knowledge of the clause, Harman Development is deemed to have knowledge of the clause. *See Clark v. Milam,* 192 W.Va. 398, 402, 452 S.E.2d 714, 718 (1994) ("Generally, a corporation 'knows,' or 'discovers,' what its officers and directors know."). Thus, we find sufficient evidence in the record of this case to establish that the forum-selection clause was reasonably communicated to those who now resist its application.

**2. Mandatory or Permissive.** The second step in our analysis is to determine whether the forum-selection clause is mandatory or permissive. It has been widely recognized, and we now expressly hold that "[t]here are two types of forum[-]selection clauses: mandatory and permissive. A mandatory forum[-]selection clause contains clear language indicating that jurisdiction is appropriate only in a designated forum. A permissive forum[-]selection clause authorizes litigation in a designated forum, but does not prohibit litigation elsewhere." *Litigation Handbook* § 12(b)(3)[5], at 376 (footnote omitted) (citing *K. & V. Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW"),* 314 F.3d 494 (10th Cir. 2002)). *See also Weisser v. PNC Bank, N.A.,* 967 So.2d 327, 330 (Fla.Dist.Ct.App.2007) (" 'Permissive [forum selection] clauses constitute nothing more than a consent to jurisdiction and venue in the named forum and do not exclude jurisdiction or venue in any other forum.' ... In contrast, mandatory forum selection clauses provide 'for a mandatory and exclusive place for future litigation.' " (citations omitted)); *Great N. Ins. Co. v. Constab Polymer–Chemie GmbH & Co.,* No. 5:01–CV–0882 (NAM)(GJD), 2007 WL 2891981, at *8 (N.D.N.Y.2007) ("A mandatory forum selection clause grants exclusive jurisdiction to a selected forum and should control absent a strong showing that it should be set aside.... In contrast, 'a permissive forum selection clause indicates the contracting parties' consent to resolve their dispute in a given forum, but does not require the dispute to be resolved in that forum ....' " (internal citations omitted)).

Resolution of the question of whether a forum-selection clause is mandatory or permissive requires scrutiny of the particular language used.

In determining whether a forum selection clause is mandatory or permissive, the language of the clause must be examined. For example, in *Quinones,* the Florida Supreme Court found that the forum selection clause was permissive, not mandatory, because it provided that the creditor **"may"** institute legal proceedings in specified courts, not that it **"shall"** do so. [*Quinones v. Swiss Bank Corp. (Overseas), S.A.,* 509 So.2d 273, 275 (Fla.1987) ] (emphasis added).... "Conversely forum selection clauses which state or clearly indicate that any litigation **must** or **shall** be initiated in a specified forum are mandatory." *Shoppes Ltd.[ P'ship v. Conn,* 829 So.2d 356, 358 (Fla.Dist.Ct.App.2002) ] (emphasis added) (citing *Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc.,* 743 So.2d 627 (Fla. 1st DCA 1999)). *Weisser,* 967 So.2d at 329–30. The *Weisser* Court also cited *Regal Kitchens, Inc. v. O'Connor & Taylor Condominium Construction, Inc.,* 894 So.2d 288, 290 (Fla.Dist.Ct. App.2005), wherein the court examined a forum-selection clause which stated that "[a]ny litigation concerning this contract shall be governed by the law of the State of Florida, *with proper venue in Palm Beach County.*" (Emphasis added). The *Regal Kitchens* Court observed that the clause was mandatory as to the law to be applied, but permissive as to the forum, commenting that,

[i]n the instant case, although the venue clause unequivocally states that Florida law shall apply to any litigation of the subcontract, it lacks mandatory language or words of exclusivity to show that venue is proper only in Palm Beach County. *See Shoppes Ltd. P'ship v. Conn.,* 829 So.2d at 357–58. That is to say, this clause does not unequivocally mandate that a controversy or dispute be litigated in Palm Beach County, nor does it waive any other territorial jurisdiction. The language merely allows a party to file suit in Palm Beach County.

894 So.2d at 291–92.

Thus, to be enforced as mandatory, a forum-selection clause must do more

than simply mention or list a jurisdiction; in addition, it must either specify venue in mandatory language, or contain other language demonstrating the parties' intent to make jurisdiction exclusive.

A forum selection clause is mandatory if jurisdiction and venue are specified with mandatory or exclusive language. *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imp. & Distribs., Inc.*, 22 F.3d 51, 53 (2d Cir.1994). In *Boutari*, the Second Circuit held that "[t]he general rule in cases containing forum selection clauses is that [w]hen only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive." *Boutari*, 22 F.3d at 52. . . .

*Great N. Ins. Co.*, 2007 WL 2891981, at *8 (additional citations omitted). *See also K & V Scientific Co., Inc. v. Bayerische Motoren Werke Aktiengesellschaft ("BMW")*, 314 F.3d 494, 499 (10th Cir.2002) (" '[W]here venue is specified [in a forum-selection clause] with mandatory or obligatory language, the clause will be enforced; where only jurisdiction is specified [in a forum-selection clause], the clause will generally not be enforced unless there is some further language indicating the parties' intent to make venue exclusive." (quoting *Paper Express, Ltd. v. Pfankuch Maschinen GmbH*, 972 F.2d 753, 757 (7th Cir.1992)). *See also Printing Servs. of Greensboro, Inc. v. American Capital Group, Inc.*, 180 N.C.App. 70, 637 S.E.2d 230, 232 (2006) (" '[T]he general rule is when a jurisdiction is specified in a provision of contract, the provision generally will not be enforced as a mandatory selection clause without some further language that indicates the parties' intent to make jurisdiction exclusive. Indeed, mandatory forum selection clauses recognized by our appellate courts have contained words such as "exclusive" or "sole" or "only" which indicate that the contracting parties intended to make jurisdiction exclusive.)" (quoting *Mark Group Int'l, Inc. v. Still*, 151 N.C.App. 565, 566 S.E.2d 160, 161 (2002))).

An example of a case illustrating a forum-selection clause that used mandatory language is *Docksider, Ltd. v. Sea Technology,*

*Ltd.*, 875 F.2d 762 (9th Cir.1989). In that case, the plaintiff entered into a contract with the defendant to distribute equipment manufactured by the defendant. The contract contained a forum-selection clause that contained the following pertinent language: "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia. Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia." *Docksider*, 875 F.2d at 763. A dispute arose over the contract that resulted in the plaintiff filing an action against the defendant in a federal district court in California. The district court dismissed the action on the grounds that the forum-selection clause required the case be filed in a Virginia court. The plaintiff appealed on the grounds that the forum-selection clause was permissive, not mandatory. The Court of Appeals for the Ninth Circuit disagreed with the plaintiff, ruling as follows:

The critical language in [the clause] is the final sentence: "Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia." The district judge concluded that this language represented the parties' intent to pursue any litigation that arose only in Virginia. [Plaintiff] contends that this interpretation is erroneous because the contractual language does not contain any express mandatory term such as "exclusively" that would indicate the parties' intent to vest Virginia with exclusive jurisdiction. [Plaintiff] has cited numerous cases as support for this position, relying principally on *Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75 (9th Cir.1987).

. . . .

*Hunt Wesson* is distinguishable because the forum selection clause underlying this action contains the additional sentence stating that "[v]enue of any action brought hereunder shall be deemed to be in ... Virginia." This language requires enforcement of the clause because [plaintiff] not only consented to the jurisdiction of the state courts of Virginia, but further agreed by mandatory language that the venue for all actions arising out of the license agreement would be Gloucester County, Virginia. This mandatory language makes

clear that venue, the place of suit, lies exclusively in the designated county. Thus, whether or not several states might otherwise have jurisdiction over actions stemming from the agreement, all actions must be filed and prosecuted in Virginia. *Docksider,* 875 F.2d at 763–64.

In accordance with the foregoing authorities, we now hold that the determination of whether a forum-selection clause is mandatory or permissive requires an examination of the particular language contained therein. If jurisdiction is specified with mandatory terms such as "shall," [23] or exclusive terms such as "sole," "only," or "exclusive," the clause will be enforced as a mandatory forum-selection clause. However, if jurisdiction is not modified by mandatory or exclusive language, the clause will be deemed permissive only.

Turning to the instant case, the forum-selection clause utilized mandatory language that identified the jurisdiction wherein disputes would be tried: "[a]ll actions brought in connection with this Agreement *shall* be filed in and decided by the Circuit Court of Buchanan County, Virginia." (Emphasis added). Accordingly, we are presented with a mandatory forum-selection clause. *See Ex parte Bad Toys Holdings, Inc.,* 958 So.2d 852, 856 (Ala.2006) ("The forum-selection clause in the purchase agreement provides that '[v]enue for any legal action which may be brought hereunder *shall* be deemed to lie in Sullivan County, Tennessee' (emphasis added). The ... use of the word 'shall' in the forum-selection clause makes the clause mandatory, not permissive."); *Town of Homer v. United Healthcare of Louisiana, Inc.,* 948 So.2d 1163, 1167 (La.Ct.App.2007) ("We find the forum selection clause at issue to be clear and explicit. The clause expressly states that the proper venue for *any legal action shall* be East Baton Rouge Parish. There is no ambiguity in this mandatory provision."); *Polk County Recreational Ass'n v. Susquehanna Patriot Commercial Leas-*

*ing Co., Inc.,* 273 Neb. 1026, 734 N.W.2d 750, 758 (2007) ("The forum selection clause in the Thornridge lease provides that any action concerning the lease 'shall be' brought in Pennsylvania. We read this forum selection clause to be a mandatory clause...."); *General Elec. Co. v. G. Siempelkamp GmbH & Co.,* 29 F.3d 1095, 1099 (6th Cir.1994) ("Because the clause states that 'all' disputes 'shall' be at Siempelkamp's principal place of business, it selects German court jurisdiction exclusively and is mandatory."). Having determined that the forum-selection clause at issue in this case is a mandatory clause, we must now determine whether the claims and parties involved in the suit are governed by said clause.

**3. Claims and Parties.** The third part of our analysis is to determine whether the claims and parties involved in the suit are governed by the forum-selection clause. We address these questions separately.

**a. Are the claims asserted in the instant suit subject to the forum-selection clause?** Mr. Caperton and the Harman Companies have argued that the claims asserted in this action are not governed by the forum-selection clause because they are tort, as opposed to contract, claims. We disagree.

It has been recognized that,

[w]hen a party seeks to enforce a mandatory forum-selection clause, a court must determine whether the claims in question fall within the scope of that clause.... The court bases this determination on the language of the clause and the nature of the claims that are allegedly subject to the clause.

*Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod., Inc.,* 234 S.W.3d 679, 687–88 (Tex.App.2007) (citing *Marinechance Shipping, Ltd. v. Sebastian,* 143 F.3d 216, 221–22 (5th Cir.1998)). *See also Phillips v. Audio Active Ltd.,* 494 F.3d 378, 388 (2d Cir.2007) ("[W]hen ascertaining the applica-

---

**23.** This Court has often recognized that " '[i]t is well established that the word "shall," in the absence of language ... showing a contrary intent ..., should be afforded a mandatory connotation.' " Syl. pt. 1, in part, *E.H. v. Matin,* 201 W.Va. 463, 498 S.E.2d 35 (1997) (internal cita-

tion omitted). *See also State v. Allen,* 208 W.Va. 144, 153, 539 S.E.2d 87, 96 (1999) ("Generally, 'shall' commands a mandatory connotation and denotes that the described behavior is directory, rather than discretionary." (citations omitted)).

bility of a contractual provision to particular claims, we examine the substance of those claims, shorn of their labels."). Accordingly, we expressly hold that, to determine whether certain claims fall within the scope of a mandatory forum-selection clause, the deciding court must base its determination on the language of the clause and the nature of the claims that are allegedly subject to the clause.

Turning to the case at hand, we must first examine the language of the mandatory forum-selection clause at issue. Because the 1997 CSA expressly states that it "shall be ... construed ... in accordance with the substantive laws of the Commonwealth of Virginia," we will scrutinize the language of the clause pursuant to Virginia law. Notably, under Virginia law, "[w]ritten contracts are construed as written, without adding terms that were not included by the parties. When the terms in a contract are plain and unambiguous, the contract is construed according to its plain meaning. The words that the parties used are normally given their usual, ordinary and popular meaning." *Heron v. Transportation Cas. Ins. Co.*, 274 Va. 534, 650 S.E.2d 699, 702 (2007).

The forum-selection clause of the 1997 CSA states in plain language that it applies to "[a]ll actions brought in connection with this Agreement." Due to the inclusion of the phrase "all actions," we perceive no intent by the parties to this agreement to limit in any way the type of actions to which it applies. Thus, for example, it would apply equally to contract claims, tort claims and statutory claims, so long as such claims are "brought in connection with" the 1997 CSA.

Considering next the "usual, ordinary and popular meaning" of the phrase "in connection with," we find the intended scope of the forum-selection clause to be quite broad. *Heron*, 650 S.E.2d at 702. The word "connection" in the context herein used, is generally understood to mean "[t]he condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in another." II The Oxford English Dictionary 838–39 (1970 re-issue). *See also*

Random House Webster's Unabridged Dictionary 431–32 (2d ed.1998) (defining "connection" in part as "association; relationship ..."); Webster's Third New International Dictionary 481 (1993) (defining "connection" in relevant part as "the state of being connected or linked ... relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement)"). Thus, so long as the claims asserted in this action bear a logical relationship to the 1997 CSA, they fall within its scope, regardless of whether they sound in contract, tort, or some other area of the law.

Other courts considering forum-selection clauses that contained broad language such as that used in the instant clause have similarly determined that the clauses were not intended to apply merely to breach of contract claims, but rather were intended to apply to other claims as well. For example, the United States Court of Appeals for the Second Circuit was asked to determine the scope of a forum-selection clause that stated: " 'any legal proceedings that may arise out of [the agreement] are to be brought in England.' " *Phillips*, 494 F.3d at 382. In determining the meaning of "arise out of," the court contrasted language such as "in connection with" as being more expansive: "[w]e do not understand the words 'arise out of' as encompassing all claims that have some possible relationship with the contract, including claims that may only 'relate to,' be 'associated with,' or '*arise in connection with* ' the contract." *Id.*, 494 F.3d at 389 (emphasis added) (citations omitted). In a different case, the Second Circuit also rejected an interpretation of a forum-selection clause that utilized the phrase "in connection with" as applying only to breach of contract claims:

> There is ample precedent that the scope of clauses similar to those at issue here is not restricted to pure breaches of the contracts containing the clauses. The Managing and Members' Agent's Agreements speak, ... with respect to the forum selection clauses, in terms of submission for "all purposes of and *in connection with* " the agreements (emphasis added). In *Bense v. Interstate Battery System of America*, 683 F.2d 718, 720 (2d Cir.1982), we held that a

forum selection clause that applied to "causes of action arising directly or indirectly from [the agreement]" covered federal antitrust actions. Similarly, the Supreme Court in *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270, *reh'g denied,* 419 U.S. 885, 95 S.Ct. 157, 42 L.Ed.2d 129 (1974), held that controversies and claims "arising out of" a contract for the sale of a business covered securities violations related to that sale. *Id.,* 417 U.S. at 519–20, 94 S.Ct. at 2457. We find no substantive difference in the present context between the phrases "relating to," "in connection with" or "arising from." We therefore reject the [Appellants'] contention that only allegations of contractual violations fall within the scope of the clauses.

*Roby v. Corporation of Lloyd's,* 996 F.2d 1353, 1361 (2d Cir.1993).

Given the similarities between the phrases "in connection with" and "in relation to," we also note that the Third Circuit has reasoned,

> In this case, we must interpret the provision in the forum selection clause that gives the English courts exclusive jurisdiction over "any dispute arising ... in relation to" the 1990 Agreement. The ordinary meaning of the phrase "arising in relation to" is simple. To say that a dispute "arise[s] ... in relation to" the 1990 Agreement is to say that the origin of the dispute is related to that agreement, *i.e.,* that the origin of the dispute has some "logical or causal connection" to the 1990 Agreement. *Webster's Third New International Dictionary,* 1916 (1971).

*John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.,* 119 F.3d 1070, 1074 (3d Cir.1997). *See also Klotz v. Xerox Corp.,* 519 F.Supp.2d 430, 434 & n. 4 (S.D.N.Y. Oct.22, 2007) (concluding that "[p]laintiff raises no challenge to the scope of the forum selection clause, nor could she, since the expansive language of the provision-covering '[a]ny action in connection with the Plan by an Employee'-plainly encompasses her claims"; and further commenting that "[p]laintiff's state law tort and contract claims are also part of an 'action in connection with the Plan' and are covered by the clause" (footnote omitted)); *Doe v. Sea-*

*camp Assoc., Inc.,* 276 F.Supp.2d 222, 227 (D.Mass.2003) ("A review of the case law leads me to conclude that the tort claims, too, are covered by the forum selection clause. The forum selection clause was worded to indicate that it governed any claim related to or arising from a contract, the subject of which were the terms and conditions of John Doe's enrollment at Seacamp."); *Dexter Axle Co. v. Baan USA, Inc.,* 833 N.E.2d 43, 49 (Ind.Ct.App.2005) (finding tort and statutory claims were subject to forum-selection clause).

Turning to the instant case, we note that the forum-selection clause issue was addressed below in the context of a motion to dismiss; therefore, we consider the claims as they were asserted in the amended complaint. Notably, though, only three of the claims asserted in the amended complaint were ultimately presented to the jury for a verdict, indicating that there was insufficient evidence to support the remaining claims. Accordingly, in deciding whether the claims asserted below were "brought in connection with" the 1997 CSA, we will limit our consideration to only those three claims that ultimately went to the jury. Those three claims, all sounding in tort, were: (1) tortious interference; (2) fraudulent misrepresentation; and (3) fraudulent concealment. Based upon our review of these tort claims, we conclude that they were indeed "brought in connection with" the 1997 CSA.

All of the injuries alleged in connection with the three aforementioned tort claims flow directly from Wellmore's declaration of *force majeure,* an event that is inextricably connected to the 1997 CSA. While the amended complaint methodically sets out numerous details of purported pre-*force majeure* wrongful conduct, no injury resulted from any of that alleged conduct without the declaration of *force majeure* under the 1997 CSA.

For example, "Count I" of the amended complaint alleges tortious interference with existing contractual relations, and specifically identifies existing contracts with Wellmore (the 1997 CSA), Penn Virginia (the lease of the Harman Coal reserves), and the UMWA (a labor contract). Certainly a claim of inter-

ference with the 1997 CSA itself is related to that contract. With respect to the Penn Virginia and UMWA contracts, it was Wellmore's declaration of *force majeure* that placed the Harman Companies and Mr. Caperton in the position of being unable to fulfill their contractual obligations. Without the *force majeure*, those contractual relations would have been unaffected by the actions of the Massey Defendants. Thus, this claim is "brought in connection with" the 1997 CSA.

"Count II" of the amended complaint alleged tortious interference with prospective contractual relations, again involving Wellmore, Penn Virginia and the UMWA. As with Count I, the key to these claims remains Wellmore's wrongful declaration of *force majeure*. In the absence of the declaration of *force majeure*, the Harman Companies would not have been forced into bankruptcy and their prospective contractual relationships would not have been impeded by Massey. Therefore this claim is "brought in connection with" the 1997 CSA.

Finally, "Count III" alleges fraudulent misrepresentation, deceit and concealment either related to the declaration of *force majeure* itself or related to subsequent negotiations between the Harman Companies and the Massey Defendants "regarding their intentions to enter into a settlement agreement with Harman in connection with the 1997 CSA." Insofar as this claim either relates directly to the declaration of *force majeure* under the 1997 CSA, or to the parties' efforts to reach a settlement with respect to the 1997 CSA, it is "brought in connection with" the 1997 CSA.

Accordingly, because none of the relevant claims asserted in the amended complaint would have existed in the absence of Well-more's declaration of *force majeure* under the 1997 CSA, these claims are all "brought in connection with" the 1997 CSA and, as a consequence, are within the scope of the forum-selection clause contained therein.[24]

**b. Are the parties involved in the suit subject to the forum-selection clause?**
The Harman Companies and Mr. Caperton have argued that, as strangers to the 1997 CSA, the Massey Defendants are precluded from enforcing its terms as they are not third-party beneficiaries of the contract. The Harman Companies and Mr. Caperton further argued that two of the plaintiffs to this action, Harman Development and Mr. Caperton (in his individual capacity), are not signatories to the 1997 CSA and, therefore, may not be bound by its terms. We disagree.

Other courts addressing the issue of whether non-signatories to a contract may enforce, or be subject to, a forum-selection clause have found the clauses to be enforceable under certain circumstances. One such case is *Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509 (9th Cir.1988). The *Manetti–Farrow* case involved a contract between a California corporation, Manetti–Farrow, and Gucci Parfums, an Italian corporation that was a subsidiary of another Italian corporation, Guccio Gucci, S.p.A. (hereinafter referred to as "Guccio Gucci"). The contract included a forum-selection clause that stated: "[f]or any controversy regarding interpretation or fulfillment of the present contract, the Court of Florence has sole jurisdiction." *Manetti–Farrow*, 858 F.2d at 511. Another company, Gucci America, signed a consent and ratification agreement, in which it consented to the contract between Manetti–Farrow and Gucci Parfums. Ultimately a dis-

---

**24.** Some courts have concluded that a forum-selection clause is applicable to tort claims only where the resolution of the claim requires interpretation of the contract. *See Manetti–Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 514 (9th Cir.1988) ("Whether a forum selection clause applies to tort claims depends on whether resolution of the claims relates to interpretation of the contract." (citing *Weidner Communications, Inc. v. Faisal*, 671 F.Supp. 531, 537 (N.D.Ill.1987); *Berrett v. Life Ins. Co.*, 623 F.Supp. 946, 948–49 (D.Utah 1985); *Clinton v. Janger*, 583 F.Supp. 284, 288 (N.D.Ill.1984))).

While we might agree with this proposition were we presented with a more narrowly tailored forum-selection clause applying to claims "arising under" or "arising out of" the contract, we see no need for such a narrow rule in the context of a broadly worded forum-selection clause such as the one presently before us. Nevertheless, we do note that, insofar as the claims asserted in this action all flow from the allegedly wrongful declaration of *force majeure*, they would require interpretation of the contract to determine whether the declaration was indeed wrongful.

pute arose, and Manetti–Farrow filed suit in California alleging numerous causes of action, not only against Gucci Parfums and Gucci America, but also against the parent company, Guccio Gucci, as well as numerous officers of these companies. *Manetti–Farrow*, 858 F.2d at 511–12. Upholding the district court's dismissal based upon the forum-selection clause, the Ninth Circuit found that a forum-selection clause was applicable to "a range of transaction participants" who were "closely related to the contractual relationship":

> Manetti–Farrow argues the forum selection clause can only apply to Gucci Parfums, which was the only defendant to sign the contract. However, "a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." *Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D.Ill.1984) (citing *Coastal Steel Corp. v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 202–03 (3d Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983)). We agree with the district court that the alleged conduct of the non-parties is so closely related to the contractual relationship that the forum selection clause applies to all defendants.

858 F.2d at 514 n. 5.

Similarly, in *Hugel v. Corporation of Lloyd's*, 999 F.2d 206 (7th Cir.1993), it was argued that two corporate plaintiffs to a lawsuit, GCM and OMI, were not parties to the contract containing the forum-selection clause (which plaintiff Hugel had signed), and therefore, were not bound by the clause. In rejecting the argument, the court relied on the companies' close relationship to the agreement and the foreseeability that they would be bound by the forum-selection clause:[25]

> In order to bind a non-party to a forum selection clause, the party must be "closely related" to the dispute such that it becomes "foreseeable" that it will be bound. . . . Hugel is President and Chairman of the Board of both GCM and OMI. In addition, Hugel owns 99% of the stock of GCM which, in turn, owns 100% of the stock of OMI. The alleged assurances of confidentiality were made to Hugel alone and Hugel alone decided that his corporations would participate in Lloyd's investigation.
>
> Hugel and Lloyd's contracted to settle all of their disputes in England. Although GCM and OMI were not members of Lloyd's, in the course of a dispute between Hugel and Lloyd's, Hugel alone involved his two controlled corporations and supplied information allegedly belonging to those corporations. The district court found that the corporations owned and controlled by Hugel are so closely related to the dispute that they are equally bound by the forum selection clause and must sue in the same court in which Hugel agreed to sue. We hold these findings are not clearly erroneous.

999 F.2d at 209–10. Furthermore, the *Hugel* court made clear that a non-party to a contract need not be a third-party beneficiary in order for the forum-selection clause to be binding against such non-party:

> Plaintiffs argue that the court must make a threshold finding that a non-party to a contract is a third-party beneficiary before binding him to a forum selection clause. While it may be true that third-party beneficiaries of a contract would, by definition, satisfy the "closely related" and "foreseeability" requirements, *see e.g.*, *Coastal Steel*, 709 F.2d at 203 (refusing to absolve a third-party beneficiary from the strictures of a forum selection clause which was foreseeable); *Clinton v. Janger*, 583 F.Supp. 284, 290 (N.D.Ill.1984), *a third-party beneficiary status is not required.*

---

**25.** The contract dispute in the *Hugel* case arose after plaintiff Dieter Hugel became a member of the Corporation of Lloyd's. *Hugel v. Corporation of Lloyd's*, 999 F.2d 206, 207 (7th Cir.1993). Hugel signed a membership contract that included the forum-selection clause. *Id.* Thereafter, Lloyd's became suspicious that Hugel and GCM were involved in criminal misconduct and initiated an investigation. *Id.* Hugel cooperated with the investigation and provided confidential information pertaining to GCM and OMI. In the subsequent lawsuit, plaintiffs Hugel, GCM and OMI claimed that "they lost business as the result of Lloyd's breach of confidentiality relating to the investigation." *Id.*

*Hugel,* 999 F.2d at 209–10 n. 7 (emphasis added).[26]

In another case, *Great Northern Insurance Co. v. Constab Polymer–Chemie GmbH & Co.,* No. 5:01–CV–0882 NAM GJD, 2007 WL 2891981 (N.D.N.Y. Sept.28, 2007), two German companies entered into a supply agreement whereby Constab Polymer–Chemie (hereinafter referred to as "Constab") would supply products used to produce photo paper to Feliz Schoeller GmbH & Co. and its subsidiaries, one of which was Schoeller–USA. 2007 WL 2891981, at *1. The contract included a forum-selection clause specifying that jurisdiction of certain disputes would be in Warstein, Germany. *Id.,* 2007 WL 2891981, at *7. Constab provided defective products to Schoeller USA, and Schoeller USA, through its insurer, filed suit in California.[27] In rejecting the argument that, as non-parties to the contract Great Northern and Schoeller–USA could not enforce the forum-selection clause, the court reasoned,

> [n]either Great Northern nor [its insured] Schoeller–USA are signatories to the Agreement. However, the enforcement of the forum selection clause is clearly "foreseeable" given the relationships between the parties and the basis upon which plaintiff has commenced this suit. Therefore, the Court finds that the forum selection clause may be invoked against plaintiff....

2007 WL 2891981, at *8. *See also Hellenic Inv. Fund, Inc. v. Det Norske Veritas,* 464 F.3d 514, 517 (5th Cir.2006) (enforcing forum selection clause against a non-signatory to the contract on the basis that the non-signatory benefitted from the performance of the contract); *Marano Enters. of Kansas v. Z–Teca Rests., L.P.,* 254 F.3d 753, 757 (8th Cir.2001) (concluding non-signatory to contract was "closely related to the disputes arising out of the agreements and properly

bound by the forum-selection provisions" due to his status of "shareholder, officer and director" of corporate signatory (internal quotations and citation omitted)); *Medtronic, Inc. v. Endologix, Inc.,* 530 F.Supp.2d 1054, 1056–57 (D.Minn.2008) ("[A] third party may be bound by a forum-selection clause where it is closely related to the dispute such that it becomes foreseeable that it will be bound.... It is true that the majority of cases binding a third party to a forum-selection clause under the closely-related-party doctrine involved third parties *suing* as plaintiffs, rather than those *being sued* as defendants.... But the Court does not believe that the closely-related-party doctrine is limited to third-party plaintiffs. Indeed, when deciding whether the doctrine applies, a court must answer only the following question: should the third party reasonably foresee being bound by the forum-selection clause because of its relationships to the cause of action and the signatory to the forum-selection clause?" (internal quotations and citations omitted)); *Compana LLC v. Mondial Assistance SAS,* No. 3:07–CV–1293–D, 2008 WL 190522, at *4 (N.D.Tex. Jan. 23, 2008) ("The Fifth Circuit recognizes two theories of estoppel that can bind a nonparty of a contract to the contract's arbitration or forum selection clause. The first is called an 'intertwined claims theory' of equitable estoppel, which grants a non-signatory to a contract the right to enforce a provision of the contract against a signatory.... The Fifth Circuit recognizes another form of estoppel-'direct benefits estoppel'-which grants a signatory to a contract the right to enforce a contract provision against a non-signatory." (internal citations omitted)); *Aspitz v. Witness Sys., Inc.,* No. C 07–02068 RS, 2007 WL 2318004, at *3 (N.D.Cal. Aug.10, 2007) (observing fact that party did not sign agreement is not controlling as to

---

**26.** *But see Pixel Enhancement Labs., Inc. v. McGee,* 1998 WL 518187, at *2 (D.Mass.1998) ("As McGee is not a third party beneficiary of the License Agreement, he has no standing to assert its forum selection clause." *McCarthy v. Azure,* 22 F.3d 351, 362 (1st Cir.1994) ("[T]hird party beneficiary status constitutes an exception to the general rule that a contract does not grant enforceable rights to non-signatories).").

**27.** Great Northern provided indemnity insurance to Schoeller–USA and, in accordance with the insurance policy, compensated Schoeller–USA for its losses resulting from the defective product and became subrogated to Schoeller–USA's rights.

whether forum-selection clause would be enforced); *Affiliated Mortg. Prot., LLC v. Tareen,* Civ. A. No. 06 4908(DRD), 2007 WL 203947, at *4 (D.N.J. Jan.24, 2007) ("[W]here a third party's conduct is closely related to the contractual relationship, the forum selection clause applies to the third party." (internal quotations and citation omitted)); *Novak v. Tucows, Inc.,* No. 06CV1909 (JFB)(ARL), 2007 WL 922306, at *13 (E.D.N.Y. March 26, 2007) ("[A]t least two courts within this Circuit have held that [i]t is well established that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. . . . A non-party to an agreement may be bound by a forum selection clause where the party is closely related to the dispute such that it becomes foreseeable that it will be bound." (internal quotations and citations omitted)); *First Specialty Ins. Corp. v. Admiral Ins. Co.,* No. CV 07 408 MO, 2007 WL 1876516, at *3 (D.Or. June 22, 2007) ("[A] range of transaction participants, including non-parties, should be bound by forum selection clauses of an underlying agreement if their conduct is 'closely related to the contractual relationship.' . . . The fact that either one or both parties was not a signatory to the underlying contract is not dispositive." (internal citations omitted)); *Hasler Aviation, L.L.C. v. Aircenter, Inc.,* No. 1:06–CV–180, 2007 WL 2463283, at *6 (E.D.Tenn. Aug.27, 2007) ("Other courts have enforced a contractual forum selection clause against non-signatories to the contract, so long as those parties were closely related to the dispute and it was foreseeable they might be bound." (internal quotations and citations omitted)); *Weingard v. Telepathy, Inc.,* No. 05 Civ.2024(MBM), 2005 WL 2990645, at *5 (S.D.N.Y. Nov.7, 2005) ("Other Circuits have held that a contractually-based forum selection clause also covers tort claims against non-signatories if the tort claims ultimately depend on the existence of a contractual relationship between the signatory parties, . . . or if resolution of the claims relates to interpretation of the contract, or if the tort claims involve the same operative facts as a parallel claim for a breach of contract." . . . (internal quotations and citations omitted)); *Graham Tech. Solutions, Inc. v. Thinking Pictures, Inc.,* 949 F.Supp. 1427, 1434 (N.D.Cal.1997) ("It is well established that a range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses. . . . [T]he conduct of GTSI and Mr. Fuller are closely related [to] the contractual relationship between Mr. Graham and TPI, and the forum selection clause applies to both GTSI and Mr. Fuller in spite of the fact that they are not signatories to the PSA." (internal quotations and citations omitted)); *Beck v. CIT Group/Credit Fin., Inc.,* Civ. A. No. 94–5513, 1995 WL 394067, at *6 (E.D.Pa. June 29, 1995) ("That Mr. Beck signed the Security Agreement as president of Beck Co. is of little consequence given his intimate relationship to Beck Co., the benefit to him from the funding provided, the circumstances giving rise to his claims that he was personally injured by the manner in which defendant performed under the agreement and his request to be credited personally for amounts allegedly overcharged to Beck Co. . . . Assuming that Mrs. Beck has standing on the claims asserted, she is similarly subject to the forum selection provisions. Moreover, given the relationship of the Becks and the circumstances presented, it would be wholly inappropriate to permit Mr. Beck to evade the forum provision in his guaranty and elsewhere by initiating suit jointly with Mrs. Beck." (internal citations and footnote omitted)); *Sparks Tune–Up Ctrs., Inc. v. Strong,* No. 92 C 5902, 1994 WL 188211, at *5 (N.D.Ill. May 12, 1994) ("The binding thread in cases which hold that a non-signatory party should 'benefit from and be subject to' a forum selection clause is an overriding concern to prevent a contracting party from escaping contractual obligations which he bargained for and/or agreed upon."); *Lu v. Dryclean–U.S.A. of California, Inc.,* 11 Cal.App.4th 1490, 1493–94, 14 Cal.Rptr.2d 906, 908 (1992) ("[P]laintiffs argue enforcement of the forum selection clause would be unreasonable because two of the defendants, Dryclean Franchise and Dryclean U.S.A., did not sign the Agreement containing the clause. Again, we are compelled to disagree. A range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses." (internal

quotations and citation omitted)); *Citigroup Inc. v. Caputo,* 957 So.2d 98, 102 (Fla.Ct.App. 2007) ("Even assuming Citigroup were not covered by the Citibank Agreement, a non-signatory may invoke a signatory's forum selection clause where the non-signatory and signatory are related."); *Deloitte & Touche v. Gencor Indus., Inc.,* 929 So.2d 678, 684 (Fla.Dist.Ct.App.2006) (observing that "where the interests of a non-party are directly related to or completely derivative of those of the contracting party, the non-signatory is bound by the contract's forum selection clause."); *Tuttle's Design–Build, Inc. v. Florida Fancy, Inc.,* 604 So.2d 873, 873–74 (Fla.Dist.Ct.App.1992) (recognizing that reasonable forum-selection clause would be enforced against non-signatory); *Brinson v. Martin,* 220 Ga.App. 638, 640, 469 S.E.2d 537, 539–40 (Ga.Ct.App.1996) ("[Plaintiff] Brinson also contends the court erred in dismissing his claims against Martin. He argues that regardless of whether the venue clause is applicable to Woodmen, the clause would not apply to his claims against Martin for tortious interference with economic relations and unjust enrichment because those claims do not arise out of the contract and involve parties who were not signatories to the contract.... [D]espite Brinson's attempt to characterize his claims against Martin as falling outside the business relationship he had with Woodmen, it is clear from his complaint that the claims arose either directly or indirectly from his contract with Woodmen. Under these circumstances, we are persuaded that if Martin were not entitled to rely on the clause, separate actions would likely be brought, possibly resulting in varying decisions, inconsistent with the administration of justice. For these reasons, we conclude that the trial court did not err in ruling that Martin may rely on the forum selection clause in this case."); *Grott v. Jim Barna Log Sys.-Midwest, Inc.,* 794 N.E.2d 1098, 1104–05 (Ind.Ct.App.2003) ("The Texas Court of Appeals has applied forum-selection clauses to nonsignatories to a contract who are transaction participants[,] ... mean[ing] an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum-selection clause." (internal quotations, citations, and footnotes omitted)); *Titan Indem. Co. v. Hood,* 895 So.2d 138, 148 (Miss.2004) (quoting approvingly comment from *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d 66, 75 (Tex.Ct.App.1996), stating "[w]e agree with the federal court that a valid forum selection clause governs all transaction participants, regardless of whether the participants were actual signatories to the contract ..."); *Dogmoch Int'l Corp. v. Dresdner Bank AG,* 304 A.D.2d 396, 397, 757 N.Y.S.2d 557, (N.Y.App.Div.2003) ("Although defendant was a nonsignatory to the account agreements, it was reasonably foreseeable that it would seek to enforce the forum selection clause given the close relationship between itself and its subsidiary...."); *Kelly v. Bear, Stearns & Co. Inc.,* No. CONTROL 080832, 2001 WL 1807360, at *2 (Pa. Commw.Ct. Dec. 18, 2001) ("[P]laintiffs argue that as non-signatories to the Engagement Letters, the forum selection clause does not apply to them. This court disagrees. This dispute is governed by the forum selection clause because the claims asserted clearly arise out of the only possible relationship plaintiffs had with Bear Stearns-the Engagement Letters."); *Sevier County Bank v. Paymentech Merch. Servs., Inc.,* No. E2005–02420–COA–R3–CV, 2006 WL 2423547, at *9 (Tenn.Ct.App. Aug.23, 2006) ("We agree with the federal court that a valid forum selection clause governs all transaction participants, regardless of whether the participants were actual signatories to the contract. By transaction participant, we mean an employee of one of the contracting parties who is individually named by another contracting party in a suit arising out of the contract containing the forum selection clause. To hold otherwise would allow a nonsignatory employee, who was a transaction participant, to defeat his company's agreed-to forum by refusing to be bound by the employer's contract. This cannot be. We conclude the trial court may apply a valid forum selection clause to all transaction participants. To conclude otherwise would enable a party to bypass a valid forum selection clause by naming in its petition a closely-related party who was not a party to the contract."); *Accelerated Christian Educ., Inc. v. Oracle Corp.,* 925 S.W.2d

66, 75 (Tex.Ct.App.1996) ("We conclude the trial court may apply a valid forum selection clause to all transaction participants. To conclude otherwise would enable a party to bypass a valid forum selection clause by naming in its petition a closely-related party who was not a party to the contract." (footnote omitted)).

■■■ Based upon the foregoing, we now hold that a plaintiff who is a non-signatory to a contract containing a forum-selection clause may be bound by that clause when it is shown that his or her claims are closely related to the contract. We further hold that a defendant who is a non-signatory to a contract containing a forum-selection clause may enforce that clause when it is shown that the claims against him or her are closely related to the contract.

■■ Applying the foregoing holdings to the facts of the instant case, we first note that, as to the plaintiffs, Sovereign; Mr. Caperton, as president of Sovereign; and Harman Mining were signatories to the 1997 CSA; Harman Development and Mr. Caperton, in his individual capacity, were not. However, Sovereign and Harman are wholly-owned subsidiaries of Harman Development, and Mr. Caperton is the sole owner of Harman Development. Under these facts, any claim brought by Mr. Caperton and Harman Development in connection with the 1997 CSA are closely related to the contract and are, therefore, subject to the forum-selection clause contained therein. As we determined in the preceding section of this opinion, the three factually-supported claims asserted in the first amended complaint [28] all flowed from the wrongful declaration of *force majeure* under the 1997 CSA, and were brought in connection with that contract. Accordingly, we find that Mr. Caperton and Harman

Development are bound by the forum-selection clause of the 1997 CSA.

■■ Turning to the Massey Defendants, we note that none of them were signatories to the 1997 CSA. However, Defendant Massey subsequently became the parent company to Wellmore, who is a signatory of the 1997 CSA, and Wellmore was Massey's subsidiary at the time it declared *force majeure*. [29] All the other Massey Defendants are also subsidiaries of Massey. The complaint plainly alleges that Massey, along with all its subsidiaries who are defendants in this action, exercised "domination and control" over Wellmore and directed Wellmore to wrongfully declare *force majeure*. Because, as we previously determined, all of the claims in this action flow directly from the declaration of *force majeure*, and the complaint alleges that the Massey Defendants controlled Wellmore's declaration of *force majeure*, the complaint plainly demonstrates that the claims against the Massey Defendants are closely related to the contract. Therefore, we find that the Massey Defendants are entitled to enforce the forum-selection clause of the 1997 CSA.

■■ **4. Rebuttal.** Because the forum-selection clause was communicated to the resisting party, has mandatory force and covers the claims and parties involved in this dispute, it is presumptively enforceable. Thus, the final step to our analysis is to ascertain whether the Harman Companies and Mr. Caperton have rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.

■■ In this regard, it has been recognized that

**28.** As we noted in the preceding section of this opinion, the forum-selection clause issue was addressed below in the context of a motion to dismiss; therefore, we consider the claims as they were asserted in the first amended complaint. Notably, though, only three of the claims asserted in the amended complaint were ultimately presented to the jury for a verdict, indicating that there was insufficient evidence to support the remaining claims. Therefore, we

limit our consideration to only those three claims that ultimately went to the jury.

**29.** The 1997 CSA was executed in March 1997, and was made retroactively effective to January 1, 1997. Massey acquired Wellmore on July 31, 1997, when it purchased United Coal Corporation and United's subsidiary Wellmore. Wellmore declared *force majeure* on December 1, 1997.

[m]andatory choice of forum clauses will be enforced unless they are "unreasonable." *Davis Media Group,* deprived of his day in " 'court' because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) their enforcement would contravene a strong public policy of the forum state." *Allen v. Lloyd's of London,* 94 F.3d 923, 928 (4th Cir.1996). *Belfiore v. Summit Fed. Credit Union,* 452 F.Supp.2d 629, 631–32 (D.Md.2006) (footnotes omitted). Moreover,

[a] party trying to defeat a mandatory choice of forum clause bears a "heavy burden." *See Davis Media Group v. Best Western Int'l, Inc.,* 302 F.Supp.2d 464, 469–70 (D.Md.2004); *see also, e.g., Sarmiento v. BMG Entm't,* 326 F.Supp.2d 1108, 1111 (C.D.Cal.2003) ("[I]f the resist-

ing party fails to come forward with anything beyond general and conclusory allegations of fraud and inconvenience, the court must uphold the agreement").

*Id.* at 631 n. 1. In this case, the Harman Companies and Mr. Caperton have not argued, either below or before this Court, that enforcement of the forum-selection clause of the 1997 CSA, i.e. requiring that this case be litigated in Virginia, was unreasonable or unjust at the time of the Massey Defendants' motion to dismiss,[30] or that the clause was invalid for such reasons as fraud or overreaching. Accordingly, the forum-selection clause should have been enforced by the circuit court, and that court's failure to grant the Massey Defendants' motion to dismiss based upon the forum-selection clause was an abuse of discretion.[31]

■ **5. Retroactivity of the New Forum–Selection Clause.** On rehearing, the

---

**30.** On rehearing, the Harman Companies and Mr. Caperton argue, in part, that it is unjust to apply the forum-selection clause to deprive them of the large jury verdict awarded below. The proper question, however, is whether enforcement of the forum-selection clause was unjust or unreasonable *at the time of the Massey Defendants' motion to dismiss based upon the forum-selection clause.* The Harman Companies and Mr. Caperton have not come forth with any facts or argument that enforcement of the forum-selection clause was unreasonable or unjust at that time. In addition, Mr. Caperton asserts that because this action has been fully litigated in West Virginia, and because a remedy may no longer be available in Virginia due to the running of the limitations period, it is unjust to enforce the forum selection clause. We reject this reasoning as it would effectively divest appellate courts of their appellate jurisdiction over a lower court's denial of a motion to dismiss based upon a forum selection clause as it relates to tort claims. First, because of the lengthy time involved in prosecuting a case to a final judgment and in pursuing the appellate process, the limitations period for filing a tort action in the proper forum is likely to have always run by the time of this Court's review, thus, there may never be a tort remedy available in the proper forum. Next, the defendants in this action are entitled to seek review of the lower court's decision on appeal. *See* Syllabus point 5, *State ex rel. Davis v. Inman Mining Co.,* 144 W.Va. 46, 106 S.E.2d 97 (1958) (" 'Where an appeal is properly obtained from an appealable decree either final or interlocutory, such appeal will bring with it for review all preceding non-appealable decrees or orders, from which have arisen any of the errors complained of in the decree appealed from, no mat-

ter how long they may have been rendered before the appeal was taken.' Point 2, syllabus, *Lloyd v. Kyle,* 26 W.Va. 534 [1885]."). Finally, the cases cited by Mr. Caperton in support of his argument that it would be unjust to apply the forum-selection clause where the case is now likely time-barred in the contractual forum are unpersuasive. For example, Mr. Caperton cites *Ernest and Norman Hart Brothers, Inc. v. Town Contractors, Inc.* 18 Mass.App.Ct. 60, 65, 463 N.E.2d 355, 359 (1984). Notably, however, that court's decision was not based solely on the lack of a remedy in the contractual forum state. Rather, the court concluded that the contract at issue was a contract of adhesion. More importantly, the court discussed at length the fact that forum-selection clauses had long been viewed as invalid in Massachusetts, and, at that time, there was no clear indication that Massachusetts would follow the modern view of reasonable and just forum-selection clauses being valid and enforceable. As noted above, in 1981 this Court indicated its approval of reasonable and just forum-selection clauses. *General Elec. Co. v. Keyser,* 166 W.Va. 456, 461–62 n. 2, 275 S.E.2d 289, 292–93 n. 2 (1981).

**31.** We would be remiss if we did not acknowledge that the motivating factor for the Harman Companies and Mr. Caperton to bring the tort claims in West Virginia may have been due to the fact that Virginia has a cap on punitive damages and West Virginia does not. *See* Va.Code § 8.01–38.1 (1987) ("In no event shall the total amount awarded for punitive damages exceed $350,000.00."). Virginia also does not allow punitive damages for contract claims. *See Kamlar Corp. v. Haley,* 224 Va. 699, 705, 299 S.E.2d 514, 517 (Va.1983).

Harman Companies and Mr. Caperton have argued that the new forum-selection clause principles of law developed in this case should not be applied retroactively to them.[32] They contend, among other things, that due process principles prohibit such application. We disagree.

■ To begin, we should make clear that, notwithstanding the due process argument made by the Harman Companies and Mr. Caperton, "[i]t is within the inherent power of a state's highest court to give a decision prospective or retrospective application without offending [federal] constitutional principles." *Lopez v. Maez,* 98 N.M. 625, 632, 651 P.2d 1269, 1276 (1982). Stated another way,

> [t]he United States Constitution neither prohibits nor requires retroactive application of a judicial decision, and the question of retrospective or prospective application of a state judicial decision to civil litigation in the state courts is a matter of state law when, as here, the rule in question involves a matter of a common-law tort and is not based on federal constitutional or statutory law.

*Martin Marietta Corp. v. Lorenz,* 823 P.2d 100, 112 (Colo.1992). *See also Harper v. Virginia Dep't of Taxation,* 509 U.S. 86, 94, 113 S.Ct. 2510, 2516, 125 L.Ed.2d 74 (1993) ("Nothing in the Constitution alters the fundamental rule of 'retrospective operation' that has governed 'judicial decisions for near a thousand years.'" (citation omitted)); *Great N. Ry. v. Sunburst Oil & Ref. Co.,* 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) ("We think the federal constitution has no voice upon the subject. A state in defining the limits of adherence to precedent may make a choice for itself between the principle of forward operation and that of relation backward."). In addition to there being no federal constitutional impediment to a judicial decision being applied retroactively, there is likewise no state constitutional impediment. *See Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 347, 256 S.E.2d 879, 887 (1979) ("We do not find any provision in

the West Virginia Constitution which addresses this point.").

■ The Supreme Court of Appeals of West Virginia, like all courts in the country, adheres to the common law principle that, "[a]s a general rule, judicial decisions are retroactive in the sense that they apply both to the parties in the case before the court and to all other parties in pending cases." *Crowe v. Bolduc,* 365 F.3d 86, 93 (1st Cir. 2004). *See also Alaskan Vill., Inc. v. Smalley,* 720 P.2d 945, 949 (Alaska 1986) ("Absent special circumstances, a new rule of law will apply in the case before the court and in all subsequent cases."); *Citicorp N. Am., Inc. v. Franchise Tax Bd.,* 83 Cal.App.4th 1403, 1422, 100 Cal.Rptr.2d 509, 525 (2000) ("[T]he general rule as to judicial opinions is that they are fully retroactive."); *Findley v. Findley,* 280 Ga. 454, 460, 629 S.E.2d 222, 228 (2006) ("[W]e shall continue to apply the general rule that a judicial decision announcing a new rule is retroactive[.]"); *Aleckson v. Village of Round Lake Park,* 176 Ill.2d 82, 86, 223 Ill.Dec. 451, 679 N.E.2d 1224, 1226 (1997) ("Generally, when a court issues an opinion, the decision is presumed to apply ... retroactively[.]"); *Dempsey v. Allstate Ins. Co.,* 325 Mont. 207, 217 104 P.3d 483, 489 (2004) ("Therefore today we reaffirm our general rule that [w]e give retroactive effect to judicial decisions." (internal quotations and citation omitted)); *Ireland v. Worcester Ins. Co.,* 149 N.H. 656, 658, 826 A.2d 577, 580–81 (2003) ("At common law, appellate decisions in civil cases are presumed to apply retroactively."); *Montells v. Haynes,* 133 N.J. 282, 295, 627 A.2d 654, 660 (1993) ("The final issue is whether our decision should follow the general rule of retroactive application[.]"); *Beavers v. Johnson Controls World Servs., Inc.,* 118 N.M. 391, 398, 881 P.2d 1376, 1383 (1994) ("[W]e believe there should be a presumption that a new rule adopted by a judicial decision in a civil case will operate retroactively."); *Christy v. Cranberry Volunteer Ambulance Corps, Inc.,* 579 Pa. 404, 418, 856 A.2d 43, 51 (2004) ("Our general principle is that we apply decisions involving changes of law in civil cases retroactively[.]"); *Carrollton–Farmers Branch Indep. Sch. Dist. v.

---

**32.** The Harman Companies briefed this issue in terms of applying the new principles prospective-
ly.

*Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 515 (Tex.1992) ("Generally, judicial decisions apply retroactively."); *State v. Styles,* 166 Vt. 615, 616, 693 A.2d 734, 735 (1997) ("We have previously adopted the common law rule that a change in law will be given effect while a case is on direct review, except in extraordinary cases. This rule applies whether the proceedings are civil or criminal."); *In re Commitment of Thiel,* 241 Wis.2d 439, 449, 625 N.W.2d 321, 326 (Ct.App.2001) ("Wisconsin generally adheres to the 'Blackstonian Doctrine,' which provides that a decision that clarifies, overrules, creates or changes a rule of law is to be applied retroactively.").

Although the common law rule presumes that appellate judicial decisions apply retroactively, "[t]he courts of this country long have recognized exceptions to the rule of retroactivity[.]" *Ashland Oil, Inc. v. Rose,* 177 W.Va. 20, 23, 350 S.E.2d 531, 534 (1986). The seminal case by this Court addressing the issue of an exception to retroactivity is *Bradley v. Appalachian Power Co.,* 163 W.Va. 332, 256 S.E.2d 879 (1979).

In *Bradley,* this Court was asked to decide whether or not our contributory negligence rule should be modified to allow for comparative negligence. After an exhaustive examination of the history of the contributory negligence doctrine, *Bradley* found that modification of the doctrine was warranted. In doing so the opinion held,

> [o]ur present judicial rule of contributory negligence is therefore modified to provide that a party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident. To the extent that our prior contributory negligence cases are inconsistent with this rule, they are overruled.

*Bradley,* 163 W.Va. at 342, 256 S.E.2d at 885.

Insofar as *Bradley* overruled prior contributory negligence case law, the opinion addressed the issue of whether or not the new comparative negligence rule would be applied retroactively to cases pending at the time of the decision. To resolve the issue of retroactivity, in the context of new law that overruled prior case law, *Bradley* looked for guidance from the United States Supreme Court's decision in *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971), *overruled by Harper v. Virginia Department of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993).[33] After examining relevant language from the opinion in *Chevron, Bradley* fashioned the following test:

> In determining whether to extend full retroactivity, the following factors are to be considered: First, the nature of the substantive issue overruled must be determined. If the issue involves a traditionally settled area of law, such as contracts or property as distinguished from torts, and the new rule was not clearly foreshadowed, then retroactivity is less justified. Second, where the overruled decision deals with procedural law rather than substantive, retroactivity ordinarily will be more readily accorded. Third, common law decisions, when overruled, may result in the overruling decision being given retroactive effect, since the substantive issue usually has a narrower impact and is likely to involve fewer parties. Fourth, where, on the other hand, substantial public issues are involved, arising from statutory or constitutional interpretations that represent a clear departure from prior precedent, prospective application will ordinarily be favored. Fifth, the more radically the new decision departs from previous substantive law, the greater the need for limiting retroactivity. Finally, this Court will also look to the precedent of other courts which have determined the retroactive/prospective question in the same area of the law in their overruling decisions.

Syl. pt. 5, *Bradley.*

The retroactivity test announced in *Bradley* has been relied upon by this Court when-

---

**33.** The *Bradley* decision acknowledged a prior principle of law created by the Court that involved retroactivity, but found that prior principle was too narrow. *See* Syl. pt. 2, *Falconer v. Simmons,* 51 W.Va. 172, 41 S.E. 193 (1902) ("An overruled decision is regarded not law, as never having been the law, but the law as given in the later case is regarded as having been the law, even at the date of the erroneous decision. To this rule there is one exception,—that where there is a statute, and a decision giving it a certain construction, and there is a contract valid under such construction, the later decision does not retroact so as to invalidate such contract.").

ever the issue of retroactivity has arisen in a civil case. However, the *Bradley* test is narrowly confined to deciding whether to retroactively apply a new principle of law that was created in a case that overruled prior precedent. The narrow constraints of *Bradley* have proved to be problematic whenever this Court has examined retroactivity in the context of a new principle of law created in a case that did not overrule prior precedent. *See, e.g., Richmond v. Levin,* 219 W.Va. 512, 517, 637 S.E.2d 610, 615 (2006) ("[T]he analysis established by *Bradley* is not directly on point since the question in the case before us does not involve overruling any prior authority[.]" (internal quotations and citation omitted)); *Adkins v. Cline,* 216 W.Va. 504, 510, 607 S.E.2d 833, 839 (2004) ("The *Bradley* formula does not give specific guidance to our current situation[.]"); *Kincaid v. Mangum,* 189 W.Va. 404, 414, 432 S.E.2d 74, 84 (1993) ("[T]he plaintiffs correctly point out that the analysis established by *Bradley* is not directly on point since the question in the case before us does not involve overruling any prior authority[.]"). Because of the limitations imposed by *Bradley* on the issue of retroactivity, we believe that another test, designed to compliment *Bradley,* must be utilized whenever this Court is called upon to examine the issue of retroactively applying a new rule of law from a case that did not overrule any prior decision of this Court. In formulating such a test, we need look no further than the *Bradley* opinion itself.

■ The retroactivity test created in *Bradley* was fashioned from the following language that appeared in *Chevron* and was quoted in *Bradley:*

In our cases dealing with the nonretroactivity question, we have generally considered three separate factors. First, the decision to be applied nonretroactively must establish a new principle of law, ... by deciding an issue of first impression whose resolution was not clearly foreshadowed. Second, it has been stressed that we must ... weigh the merits and demerits in each case by looking to the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation. Finally, we have weighed the inequity imposed by retroactive application, for where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the injustice or hardship by a holding of nonretroactivity.

*Bradley,* 163 W.Va. at 347, 256 S.E.2d at 888 (quoting *Chevron,* 404 U.S. at 106–07, 92 S.Ct. at 355 (internal quotations and additional citations omitted)).[34] With the *Chevron* factors as a guide, we now hold that in determining whether to extend full retroactivity to a new principle of law, established in a civil case that did not overrule any prior precedent, the following factors will be considered. First, we will determine whether the new principle of law was an issue of first impression whose resolution was clearly foreshadowed. Second, we must determine whether or not the purpose and effect of the new rule will be enhanced or retarded by applying the rule retroactively. Finally, we will determine whether full retroactivity of the new rule would produce substantial inequitable results.

**34.** The *Chevron* test was overruled in *Harper v. Virginia Department of Taxation,* 509 U.S. 86, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). In *Harper,* the Supreme Court held that new federal judicial rules would no longer be open for selective retroactivity. The Supreme Court addressed the issue succinctly as follows:

When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate our announcement of the rule. The rule extends *Griffith's* ban against selective ap-

plication of new rules. Mindful of the basic norms of constitutional adjudication that animated our view of retroactivity in the criminal context, we now prohibit the erection of selective temporal barriers to the application of federal law in noncriminal cases.

*Harper,* 509 U.S. at 97, 113 S.Ct. at 2517 (internal quotations and citations omitted). It has been correctly noted that "although the United States Supreme Court has rejected *Chevron,* the states are free to continue employing the *Chevron* criteria in deciding questions of retroactivity of state law." *Dempsey v. Allstate Ins. Co.,* 325 Mont. 207, 104 P.3d 483, 488 (2004).

In the instant proceeding, we are called upon to decide whether or not the principles of law developed in this opinion, involving forum-selection clauses, should be applied retroactively to the parties. Under the test set out above, we find no impediment to applying the new forum-selection clause principles to the parties in this case.

**a. The new forum-selection clause principles were clearly foreshadowed.** The Harman Companies and Mr. Caperton argue that the new forum-selection clause principles applied in this case were not foreshadowed by any prior decision of this Court. We disagree.

■ To begin, the Harman Companies and Mr. Caperton misunderstand the meaning of "foreshadowed," as that term is applied in the present context. Foreshadowing does not mean that "there has to be clear precedent before a holding can be considered clearly foreshadowed." *Collins v. Department of Corr.,* 167 Mich.App. 263, 267, 421 N.W.2d 657, 659 (1988). All that is required is some indication by a prior decision of this Court or a national trend that would "put persons on notice that [this Court] could resolve the issue either way[.]" *Id. See also Founder v. Cabinet for Human Res.,* 23 S.W.3d 221, 224 (Ky.Ct.App.1999) (holding that prior judicial decision put plaintiff "on notice that it was possible that the filing of the complaint with the Commission would bar a separate action in circuit court. Thus, it was not error for the court to retroactively apply [a new decision]."). A case which helps illustrate the broad meaning of "foreshadowing" is *Professional Insurance Corp. v. Sutherland,* 700 So.2d 347 (Ala.1997).

In *Sutherland,* the plaintiffs sued several defendant insurance companies in an Alabama trial court for tort and breach of contract claims. The defendants filed a motion to dismiss on the grounds that, under the terms of contractual forum-selection clauses between the parties, all causes of action had to be filed in Florida. The trial court denied the motion to dismiss on the grounds that prior Alabama case law held that "outbound" forum-selection clauses were against public policy. The defendants appealed to the Alabama Supreme Court. That Court apparent-ly issued an opinion that was withdrawn after a rehearing was granted. In the rehearing opinion, the Court held that it was overruling prior case law that barred "outbound" forum-selection clauses. More important to the case at hand, the Court addressed the issue of whether or not the new rule would be applied retroactively to the parties before the Court. In finding that the decision would be applied to the parties, *Sutherland* addressed the issue of foreshadowing as follows:

> The plaintiffs contend that when they were negotiating their contracts they relied upon the rule making forum selection provisions invalid in Alabama and that the rule we adopt today represents a fundamental change in the substantive law of this state. Therefore, they claim, an application of the "new" rule against them would be an unfair retroactive application. We disagree.
>
> . . . .
>
> We conclude that it is fair to apply the rule enforcing forum selection clauses to the parties in this case. As noted previously, while American courts traditionally disfavored outbound forum selection clauses, the overwhelming trend, following the United States Supreme Court's decision in *M/S Bremen, supra,* has been toward allowing enforcement of those clauses. *That nationwide trend foreshadowed our adoption today of the rule that such clauses are not per se void, providing notice that Alabama might follow suit and thereby reducing the reliance these plaintiffs could reasonably have placed upon the continued viability of the traditional rule in Alabama.*

*Sutherland,* 700 So.2d at 351–52 (emphasis added).

Although the Alabama Supreme Court relied upon a nationwide trend as foreshadowing its new rule in *Sutherland,* we need not look to a national trend to find that the new forum-selection clause principles developed in this case were foreshadowed. As previously pointed out in this opinion, over twenty-five years ago in *General Electric Co. v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981), this Court indicated that forum-selection

**654**

clauses were not against the public policy of this State. Specifically, we stated in *Keyser*,

> We have had occasion, however, to discuss, indirectly, forum selection clauses. Although our law on this point is skeletal, it does indicate that contract clauses which affect matters such as jurisdiction and the like should be carefully analyzed. Unquestionably, forum selection clauses are not contrary to public policy in and of themselves for they are sanctioned in commercial sales agreements[.]

*Keyser*, 166 W.Va. at 461 n. 2, 275 S.E.2d at 291 n. 2. Clearly, *Keyser* placed the parties in this action on notice that, when presented with an opportunity, this Court would "carefully" analyze all matters relevant to the forum-selection clause presented on appeal. Contrary to the arguments of the Harman Companies and Mr. Caperton, there is no requirement that there must exist specific precedent that foreshadowed exactly how this Court would resolve new issues involving a forum-selection clause. If such a situation was the law in this State or any jurisdiction in the country, there would be very few cases decided on appeal that created new law which could be applied to the parties before the appellate court. This is not the law in the country nor in West Virginia. Consequently, we find that the new forum-selection clause principles created in this opinion were foreshadowed by *Keyser*.

**b. The purpose and effect of the new rules will be enhanced by applying the rules retroactively to the parties.** In other parts of this opinion we have discussed the general purpose and effect of forum-selection clauses. The new forum-selection clause principles announced in this decision simply provide parameters for the enforcement of forum-selection clauses. To deny application of those principles to the parties in this litigation would undermine the very essence of forum-selection clauses, which is to require parties and those in privity thereto to litigate claims in a forum voluntarily chosen by them.

**c. No substantial inequitable results would flow from applying the new forum-selection clause principles retroactively.** We have not been presented with any valid reason to show that applying the new principles would bring about a substantial inequitable result. "Indeed, limiting this decision to prospective application would produce inequitable results[.]" *Cundiff v. State Farm Mut. Auto. Ins. Co.*, 217 Ariz. 358, 362, 174 P.3d 270, 274 (2008). This is true because there is no evidence in the record to show that the forum-selection clause involved in this case was not freely bargained for by the actual signatories to the agreement. To allow one signatory to the agreement to escape its effects through prospective application of our new principles would simply be inequitable.

Accordingly, we conclude that the forum-selection clause principles of law adopted by this opinion may properly be applied to the parties to the instant proceeding.

■ **6. The bankruptcy court's order did not have any preclusive effect on the forum selection clause issue.** The final matter we must address in this area concerns Mr. Caperton's argument "that the United States Bankruptcy Court for the Western District of Virginia has rendered a final, uncontested ruling specifically finding West Virginia to be the proper forum for this Action." [35] As a result of this alleged final decision, Mr. Caperton contends that the doctrine of collateral estoppel precludes relitigation of the issue in the state court proceedings.[36]

■ To begin, we note that "[t]here is no question that the doctrines of res judicata and collateral estoppel apply to decisions rendered in Federal Bankruptcy Courts." *Je-*

---

**35.** We have previously noted that the Massey Defendants attempted to intervene in the bankruptcy proceeding filed by the Harman Companies. The purpose of this attempted intervention was "to determine whether the Caperton's (sic) and Harman Development's claims were actually assets of the bankruptcy estates and whether Hugh Caperton was attempting to deprive the bankruptcy estates of those assets improperly."

*Caperton v. A.T. Massey Coal Co., Inc.*, 270 B.R. 654, 655 (S.D.W.Va.2001).

**36.** Mr. Caperton also contends that the doctrine of res judicata applies. Insofar as Mr. Caperton is only attacking the disposition of the forum selection clause issue, we need not separately address the res judicata claim. The result would be the same under an analysis of either doctrine.

*rome J. Steiker Co., Inc. v. Eccelston Props. Ltd.*, 593 N.Y.S.2d 394, 398 (1992). Further, because Mr. Caperton contends that the bankruptcy proceeding adjudicated the forum selection clause issue, "the federal rules of preclusion must be applied." *Sea Quest Int'l, Inc. v. Trident Shipworks, Inc.*, 958 So.2d 1115, 1119 (Fla.Dist.Ct.App.2007). Under federal law, a party asserting collateral estoppel as a bar to relitigating an issue must establish

> (1) the issue to be precluded is identical to the issue already litigated, (2) the issue was actually determined in the prior proceeding, (3) the determination of the issue was an essential part of the decision in the prior proceeding, (4) the prior judgment was final and valid, and (5) the party against whom estoppel is asserted had a full and fair opportunity to litigate the issue.

*In re Coleman*, 426 F.3d 719, 729 (4th Cir. 2005).[37]

We need not labor long on this issue. The second element of collateral estoppel is dispositive of the matter. In order for collateral estoppel to apply to the forum selection clause issue, the matter had to actually be determined in the bankruptcy proceeding. As we shall demonstrate below, it was not.

■■■ As previously indicated in this opinion, the Massey Defendants attempted to have the instant case removed to a federal district court in the Southern District of West Virginia. In response to the removal, the Harman Companies and Mr. Caperton asked the federal district court to remand the case to state court. The federal district court issued a written opinion indicating that it would hold in abeyance any ruling about the propriety of the case being in federal court until the bankruptcy court made a ruling on the claims asserted by Massey as an intervenor. *See Caperton v. A.T. Massey Coal Co., Inc.*, 251 B.R. 322 (S.D.W.Va. 2000).[38] Subsequent to the bankruptcy court

issuing an order that involved Massey's intervention claims, the federal district court issued another written order that interpreted the bankruptcy court's order regarding Massey's claims. The federal district court made the following findings:

> As set forth in its November 28, 2000 Joint Memorandum Opinion, the Bankruptcy Court attempted to respond to this Court's Memorandum Opinion and Order and determined the crucial question was whether Caperton and/or Harman Development have any independent causes of action under West Virginia law. The Bankruptcy Court then clarified what possible claims Caperton and Harman Development might have that are independent and non-derivative of the bankrupt estates' claims. It declined, however, to decide whether such claims have actual, legal validity under West Virginia state law. Instead, the Bankruptcy Court opined this question was better addressed by a West Virginia court, either state or federal, and abstained from deciding the questions presented by the declaratory judgment/adversary proceedings. *Integral to its decision to abstain and dismiss the adversary proceedings, the Bankruptcy Court determined the claims of all parties, and defenses thereto, can be adjudicated satisfactorily in the West Virginia action.*

*Caperton v. A.T. Massey Coal Co., Inc.*, 270 B.R. 654, 655–56 (S.D.W.Va.2001) (emphasis added). As a result of the federal district court's determination that the bankruptcy court abstained from deciding *any* issue involving the Massey intervention claims, the federal district court declined a motion by the Massey Defendants to transfer the case to a federal district court in Virginia. Specifically, the federal district court held that the Massey Defendants' "motion for transfer of venue to the District Court of the Western District of Virginia is DENIED as moot, leaving the Circuit Court of Boone County to

---

37. The elements required to prove collateral estoppel under West Virginia law are almost identical to the federal elements. *See* Syl. pt. 1, *Haba v. Big Arm Bar & Grill, Inc.*, 196 W.Va. 129, 468 S.E.2d 915 (1996).

38. It appears that the federal district court entertained the Massey Defendants' removal petition under its bankruptcy jurisdiction, because of the bankruptcy proceeding that was pending in Virginia.

decide whether transfer of venue remains for determination." *Caperton,* 270 B.R. at 656.[39]

 It is generally acknowledged that "the lower federal courts do not have appellate jurisdiction over the state courts and their decisions are not conclusive on state courts, even on questions of federal law." *State v. Robinson,* 82 P.3d 27, 30 (2003). *See also Cash Distrib. Co., Inc. v. Neely,* 947 So.2d 286, 292 n. 5 (Miss.2007) ("[S]tate supreme courts are not duty-bound to follow a federal court of appeals' interpretation of federal law."). Thus, the federal district court's interpretation of the bankruptcy court's order is not binding on this Court. Even so, we agree with the federal district court that the bankruptcy court's order did not address the merits of any issue or claim raised by Massey's attempted intervention in the bankruptcy proceeding.[40] The bankruptcy court's Joint Memorandum Opinion made the following findings:

> By this adversary proceeding, Massey seeks a determination of the respective ownership interests of Caperton and the bankruptcy estates of the Debtors in causes of action currently being pursued jointly by Caperton and the Debtors in the West Virginia Action. . . .
>
> . . . .
>
> . . . Massey alleges that Caperton and Harman Development are seeking to enforce for their own benefit alleged claims which are assests solely of the bankruptcy estates of Harman Mining and Sovereign. However, in these proceedings, Massey's real object appears to be to obtain a judicial determination that under West Virginia law Caperton and Harman Development have no independent claims of their own which they can pursue against Massey for its alleged wrongful conduct. Because such a determination can be better rendered in the West Virginia Action, this Court chooses to abstain from hearing these declaratory judgment actions in favor of resolution by an appropriate West Virginia forum, whether state or federal.
>
> . . .

---

**39.** In a footnote in Mr. Caperton's supplemental brief he attempts to suggest that the federal district court "found it appropriate for the case to ultimately proceed in West Virginia." The footnote is disingenuous in trying to suggest that the federal district court found that West Virginia had to allow the case to be fully litigated on the merits. The federal district court's order, like the bankruptcy court's order, left it up to the West Virginia courts to decide the merits of all claims and defenses asserted in the state court proceeding.

We should point out that the federal district court abstained from hearing any claim or defense asserted in the state court proceeding under the *mandatory* abstention provision of bankruptcy law, because the state law litigation was not a core proceeding for bankruptcy purposes. Specifically, the federal district court held,

> The Court holds [the Harman Companies' and Mr. Caperton's] claims are non-core because: 1) the claims are not specifically identified as core proceedings under 28 U.S.C. § 157(b)(2); 2) the claims existed prior to the filing of the [Harman Companies'] bankruptcy petitions; 3) the claims are based solely on state law and therefore exist independent of the provisions of Chapter 11; and 4) the parties' rights are not affected by the outcome of the bankruptcy proceedings.

*Caperton,* 270 B.R. at 657. It is generally recognized that res judicata and collateral estoppel "bar[ ] only claims that would constitute a core claim in an earlier bankruptcy action." *Cabrera*

*v. First Nat'l Bank of Wheaton,* 324 Ill.App.3d 85, 257 Ill.Dec. 512, 753 N.E.2d 1138, 1147 (2001). *See also I.A. Durbin, Inc. v. Jefferson Nat'l Bank,* 793 F.2d 1541, 1548 (11th Cir.1986) (In "a non-core proceeding, the bankruptcy court could only issue proposed findings of fact and conclusions of law, which would be subject to de novo review by the district court, and such proposed findings would not be entitled to res judicata effect in subsequent litigation because there would have been no final judgment on the merits." (internal citations omitted)); *SMI/USA, Inc. v. Profile Tech., Inc.,* 38 S.W.3d 205, 211 (Tex.Ct.App. 2001) ("Although a bankruptcy judge may hear non-core proceedings and make proposed Findings of Fact and Conclusions of Law to the District Court, the judge may not render a final judgment on such claims. As a result, a bankruptcy court's disposition of non-core proceedings is not res judicata as to subsequent state court proceedings regarding the same claims.").

**40.** Mr. Caperton's res judicata claim would fail because the bankruptcy court did not enter a final judgment on the merits of Massey's intervention claims. *See Israel Disc. Bank Ltd. v. Entin,* 951 F.2d 311, 314 (11th Cir.1992) ("Res judicata . . . will bar a subsequent action if: (1) the prior decision was rendered by a court of competent jurisdiction; (2) there was a final judgment on the merits; (3) the parties were identical in both suits; and (4) the prior and present causes of action are the same.").

... Most important to this Court's decision to abstain in these adversary proceedings is that the viability of Caperton's and Harman Development's claims is determined by West Virginia state law and not federal bankruptcy law. Accordingly, all of these issues can be addressed satisfactorily and most appropriately in the West Virginia Action.

Additionally, the bankruptcy court's Joint Order filed with the Joint Memorandum Opinion made the following conclusions of law:

> For the reasons expressed in this Court's Joint Memorandum Opinion entered contemporaneously herewith, in the event that Hugh Caperton and/or Harman Development Corporation are determined to have alleged independent, non-derivative claims pursuant to West Virginia law, those causes of action are hereby DECLARED not to be property of the bankruptcy estate of either Harman Mining Corporation or Sovereign Coal Sales, Incorporated. However, also for the reasons stated in such Joint Memorandum Opinion, this Court ABSTAINS from deciding whether any such claims are properly alleged or have legal validity. Accordingly, it is ORDERED that these adversary proceedings are DISMISSED.

Clearly it is evident that the bankruptcy court's Joint Memorandum Opinion and Joint Order did not address the merits of any claim, issue or defense involved in the state court proceeding. Further, "[b]ecause the [forum selection clause] issue ... was neither decided on the merits nor necessary to support the bankruptcy court's judgment, we agree with [the Massey Defendants] that the doctrines of collateral estoppel and res judicata do not bar [raising the defense] in this case." *Cousatte v. Lucas*, 35 Kan.App.2d 858, 136 P.3d 484, 491 (2006). *See also Kennedy v. First Nat'l Bank of Decatur*, 129 Ill.App.3d 633, 85 Ill.Dec. 236, 473 N.E.2d 604, 608 (1985) ("[T]he doctrine of collateral estoppel does not bar the issue of whether [plaintiff] was injured individually because (1) such issue was not actually or necessarily decided in the bankruptcy proceeding, and (2) the Bankruptcy Court expressly determined that it had no jurisdiction over such issue."); *Eicher v. Mid Am. Fin. Inv. Corp.*, 270 Neb. 370, 702 N.W.2d 792, 810 (2005) ("Because [plaintiff's] claim in this case was not barred by the judgment in the prior bankruptcy action under the doctrines of either res judicata or collateral estoppel, the district court erred in granting the motion for partial summary judgment dismissing his claim.").

### B. Res Judicata

Although the forum-selection clause is dispositive of this case, we further conclude that, assuming *arguendo* the forum-selection clause did not apply here, this case is nevertheless barred by the doctrine of res judicata.

In addressing this issue, we are called upon to decide the res judicata effect of the Virginia judgment on the instant West Virginia proceeding. We have previously held that "[u]nder Article IV, Section 1, of the Constitution of the United States, a valid judgment of a court of another state is entitled to full faith and credit in the courts of this State." Syl. pt. 1, *State ex rel. Lynn v. Eddy*, 152 W.Va. 345, 163 S.E.2d 472 (1968). Further, "[b]y virtue of the full faith and credit clause of the Constitution of the United States, a judgment of a court of another state has the same force and effect in this State as it has in the state in which it was pronounced." Syl. pt. 3, *id.* "In order to ensure that another state's judgment is given the same force and effect it would have in that state, the general rule appears to be that '[t]he validity and effect of a judgment must be determined by reference to the laws of the state where it was rendered.'" *Jordache Enters., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.*, 204 W.Va. 465, 474, 513 S.E.2d 692, 701 (1998) (quoting 50 C.J.S. § 969, at 563). Further, "the full faith and credit clause generally requires the courts of this State to give [a foreign] judgment at least the res judicata effect which it would be accorded by [the foreign] courts." *Jordache Enterprises*, 204 W.Va. at 476, 513 S.E.2d at 703. *See also Martin v. SAIF Corp.*, 339 Mont. 167, 167 P.3d 916, 918–19 (2007) ("Full faith and credit generally requires every State to give to a judgment at

least the *res judicata* effect which the judgment would be accorded in the State which rendered it." (internal quotations and citation omitted)).

■ Before discussing the specific elements that must be established in order for the preclusive effect of res judicata to apply under Virginia law, we must first address a preliminary issue. Under the laws of Virginia, "a judgment is not final for the purposes of res judicata ... when it is being appealed or when the time limits fixed for perfecting the appeal have not expired." *Faison v. Hudson*, 243 Va. 413, 419, 417 S.E.2d 302, 305 (1992). In the instant case, it appears that a trial court judgment in the Virginia proceeding was entered on May 7, 2001. Subsequently, on April 1, 2002, Massey filed a motion for summary judgment with the West Virginia circuit court, arguing that principles of res judicata required dismissal of the West Virginia case as a result of the judgment in the Virginia case. On June 17, 2002, the circuit court denied the motion. The circuit court was correct in denying summary judgment on res judicata grounds because, at the time Massey filed its motion and the circuit court decided the matter, the Virginia judgment was being appealed by Wellmore. As we have pointed out, under Virginia law "a judgment is not final for *res judicata* purposes if it is being appealed." *CDM Enters., Inc. v. Commonwealth/Manufactured Hous. Bd.*, 32 Va.App. 702, 709, 530 S.E.2d 441, 445 (2000) (emphasis in original).

■ The Virginia judgment did not become final for purposes of res judicata until September 13, 2002, when the Supreme Court of Virginia dismissed Wellmore's appeal. *See Wellmore Coal Corp. v. Harman Mining Corp.*, 264 Va. 279, 568 S.E.2d 671 (2002) (dismissing appeal). Consequently, the issue we now confront is whether or not this Court may recognize the finality of the Virginia judgment, for purposes of addressing the res judicata issue on appeal. A case squarely addressing this issue is *Aronow v. Lacroix*, 268 Cal.Rptr. 866, 219 Cal.App.3d 1039 (1990).

The facts of *Aronow* involved two separate lawsuits filed by different plaintiffs against the same law firm for malicious prosecution.[41] One lawsuit was filed by Dr. Ann Fitzsimmons, and the other was filed by Betty Aronow. In the case brought by Dr. Fitzsimmons, a judgment was rendered in favor of the law firm on January 27, 1981. However, as a result of an appeal, the case was not finally disposed of until June 24, 1987. The action brought by Ms. Aronow went to trial on October 5, 1982. Prior to trial the law firm raised the issue of res judicata, but the trial court found that res judicata did not apply because Dr. Fitzsimmons' case was pending an appeal and therefore had not become final. A jury ultimately returned a verdict in favor of Ms. Aronow and awarded her damages. The law firm appealed the judgment. While the case was pending on appeal, Dr. Fitzsimmons' case became final after an appellate court rendered a decision affirming the verdict in favor of the law firm. As a result of Dr. Fitzsimmons' case becoming final, the law firm raised the issue of res judicata in the appeal of Ms. Aronow's case. The appellate court in *Aronow* found that the issue could be raised on appeal:

> First, we consider the question of a final judgment on the merits. At the time the court trial of [Ms. Aronow] began, [Dr. Fitzsimmons' case] was on appeal, so there was no final judgment ... on which [the law firm] could rely to raise a res judicata defense in the trial court.... However, ... our affirmance of the judgment in [the law firm's] favor [became] final, ... on September 28, 1987, while the present appeal was pending.

> Under these circumstances, [the law firm] now ha[s] a final judgment on which to base a claim of res judicata, and they can raise the issue on appeal. Although normally the res judicata effect of a prior judgment must be pleaded and proven at trial, when the judgment becomes final during the pendency of an appeal in another action, the first final judgment may be brought to the attention of the appellate

---

**41.** Both plaintiffs had been sued by the law firm in a previous action.

court in which the appeal is pending and may there be relied on as res judicata. *Aronow*, 268 Cal.Rptr. at 870, 219 Cal.App.3d at 1046 (internal quotations, citations, and footnote omitted). The appellate Court in *Aronow* went on to analyze the case under res judicata principles and found that the doctrine applied "to preclude [Ms.] Aronow from a judgment in her favor in her own case." *Aronow*, 268 Cal.Rptr. at 875, 219 Cal.App.3d at 1053.

In accordance with *Aronow*, we now hold that a party may raise the defense of res judicata on appeal when the prior judgment relied upon becomes final during the pendency of his/her appeal. Although our holding on this issue permits us to exercise our inherent authority to consider Massey's res judicata argument, we believe the decisions of the Supreme Court of Virginia demonstrate that that Court would also exercise its inherent authority to address the issue under the facts presented.

The decision by the Supreme Court of Virginia in *Ward v. Charlton*, 177 Va. 101, 12 S.E.2d 791 (1941), is instructive of how we believe that Court would respond to the issue of res judicata raised in this case. The facts of *Ward* show that James R. Ward drove his car into the rear of a tractor being driven by Henry Harper. The tractor was owned by Sidney Charlton. Mr. Ward sued Mr. Charlton, and, in a separate action, Mr. Harper sued Mr. Ward. Mr. Ward also brought a counter-claim against Mr. Harper.

In Mr. Ward's suit against Mr. Charlton, a jury returned a verdict in favor of Mr. Ward. However, the trial court set aside the verdict and granted judgment to Mr. Charlton. Mr. Ward appealed. While Mr. Ward's appeal was pending, a jury decided the case brought by Mr. Harper. In that case, the jury determined Mr. Harper was not entitled to recover from Mr. Ward, and Mr. Ward was not entitled to recover from Mr. Harper on the counter-claim.

As a result of the disposition of the Harper–Ward lawsuit, Mr. Charlton asked the Supreme Court of Virginia to dismiss Mr. Ward's appeal on res judicata grounds. Mr. Charlton took the position "that since it has been adjudicated by a court of competent jurisdiction that Ward ... can not recover of Harper, the original tort feasor, *a fortiori* Ward can not recover of Harper's master, Charlton, whose liability, if any, depends entirely upon the liability of Harper, under the doctrine of respondeat superior." *Ward*, 177 Va. at 106, 12 S.E.2d at 792. In response, Mr. Ward argued, among other things, that Mr. Charlton could not raise the defense of res judicata for the first time on appeal. The Supreme Court of Virginia disagreed:

> The present [appeal] presents the sole question as to whether Ward is entitled to a judgment against Charlton by reason of the alleged negligent acts of Charlton's servant, Harper. The petition for a writ of error prays that the verdict which Ward obtained against Charlton and which the trial court set aside, be restored, and that this court enter a final judgment on said verdict against Charlton. It conclusively appears from extrinsic evidence, which is not controverted, that subsequent to the closing of the record in the instant case a court of competent jurisdiction has determined that Ward is not entitled to recover the judgment which he here seeks.[42]
>
> Must this court shut its eyes to these admitted facts and sagely proceed to consider an issue which has already been decided by a court of competent jurisdiction, and possibly enter a final judgment directly in conflict with that already rendered? We think not. In our opinion this court has the jurisdiction and it is its duty to examine this extrinsic evidence in determining whether it will proceed to hear the pending matter or dismiss it because the issue between the parties has been settled.
>
> . . . .
>
> It is true, as argued by the learned counsel for [Ward], that an appellate court in reviewing the record of the proceedings in the court below will not entertain the

---

**42.** It should be pointed out that, at the time of this case, the Supreme Court of Virginia had not adopted the rule that a judgment is not final for the purposes of res judicata when it is being appealed. This rule was first adopted in 1992, in *Faison v. Hudson*, 243 Va. 413, 417 S.E.2d 302 (1992).

defense of res judicata if it was available and was not made below. This is so because the defense is an affirmative one and if not asserted below is deemed to have been waived....

But this principle does not apply to the instant case where the defense was not available and could not have been asserted during the trial below.

. . . .

The doctrine of res judicata or estoppel by judgment is based on public policy.... It proceeds upon the principle that one person shall not the second time litigate, with the same person or with another so identified in interest with such person that he represents the same legal right, precisely the same question, particular controversy, or issue which has been necessarily tried and finally determined, upon the merits, by a court of competent jurisdiction, in a judgment in personam in a former suit....

The doctrine is firmly established in our jurisprudence and should be maintained where applicable....

Here it has been brought to our attention by undisputed evidence that since the trial below another court of competent jurisdiction has finally adjudicated that the plaintiff in error, Ward, is not entitled to a judgment against Charlton, the defendant in error. Hence, the plaintiff in error is estopped to ask this court to review the record before it and to enter in his favor a judgment....

*Ward,* 177 Va. at 110–15, 12 S.E.2d at 793–96 (internal quotations and citations omitted) (footnote added).

Clearly, under the decision in *Ward,* the Supreme Court of Virginia would address the issue of res judicata presented in this case, even though the doctrine did not become ripe until the case was presented on appeal. Consequently, we find that, although the circuit court was correct in denying summary judgment to Massey on res judicata grounds because the Virginia judgment was pending appeal, this Court may now address the issue anew because a final judgment was rendered in the Virginia case by the time this appeal was prosecuted.

The Supreme Court of Virginia has described the doctrine of res judicata, and its purpose, as follows:

the rationale for this judicially created doctrine [is that] it "rests upon public policy considerations which favor certainty in the establishment of legal relations, demand an end to litigation, and seek to prevent the harassment of parties.... The doctrine prevents 'relitigation of the same cause of action, or any part thereof which could have been litigated, between the same parties and their privies.' "

*City of Virginia Beach v. Harris,* 259 Va. 220, 229, 523 S.E.2d 239, 243 (2000) (quoting *Bill Greever Corp. v. Tazewell Nat'l Bank,* 256 Va. 250, 254, 504 S.E.2d 854, 856 (1998)) (additional citation omitted). *See also Smith v. Ware,* 244 Va. 374, 376, 421 S.E.2d 444, 445 (1992). ("The bar of *res judicata* precludes relitigation of the same cause of action, or any part thereof, which could have been litigated between the same parties and their privies." (citing *Bates v. Devers,* 214 Va. 667, 670–71, 202 S.E.2d 917, 920–21 (1974); *Flora, Flora & Montague, Inc. v. Saunders,* 235 Va. 306, 310, 367 S.E.2d 493, 495 (1988); *Brown v. Haley,* 233 Va. 210, 215, 355 S.E.2d 563, 567 (1987); and *Worrie v. Boze,* 198 Va. 533, 537–38, 95 S.E.2d 192, 196–97 (1956), *aff'd on reh'g,* 198 Va. 891, 96 S.E.2d 799 (1957))).

With respect to the application of res judicata, the Virginia Court has been consistent in holding that

[f]our elements must be present before *res judicata* can be asserted to bar a subsequent proceeding: "(1) identity of the remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality of the persons for or against whom the claim is made." *Wright v. Castles,* 232 Va. 218, 222, 349 S.E.2d 125, 128 (1986). *See also Mowry v. City of Virginia Beach,* 198 Va. 205, 211, 93 S.E.2d 323, 327 (1956).

*Smith v. Ware,* 244 Va. at 376, 421 S.E.2d at 445. *See also State Water Control Bd. v. Smithfield Foods, Inc.* 261 Va. 209, 214, 542 S.E.2d 766, 769 (2001) (same); *Balbir Brar Assoc., Inc. v. Consolidated Trading & Servs. Corp.,* 252 Va. 341, 346, 477 S.E.2d 743, 746

(1996) (same). We will address each of these elements in turn.

■ **1. Identity of the remedies sought.** The Harman Companies argue that because the Virginia proceeding awarded damages for breach of contract, while the instant action awarded damages in tort, the remedies sought in these two actions are not the same. We disagree.

The Supreme Court of Virginia has not squarely defined what is meant by "identity of the remedies sought" for purposes of the res judicata test. *Ware*, 244 Va. at 376, 421 S.E.2d at 445. However, in the *Ware* case, the Court addressed the issue of whether there was identity of remedies, and concluded that because the earlier action sought relief in the court of law, while the latter action sought equitable relief in the court of chancery, there was no identity of remedy: "Mrs. Smith, in her motion for judgment for unlawful detainer, sought the remedy of possession and damages.... Mrs. Smith, in her bill of complaint, does not seek possession of the property. Rather, she seeks a commutation of her dower interest, which is a different remedy." *Ware*, 244 Va. at 377, 421 S.E.2d at 446.[43] Thus, it appears that the "remedy" element of res judicata refers, at least in significant part, to the distinction between legal and equitable remedies. The legal definition of the term "remedy" supports this view. *See, e.g., Black's Law Dictionary* 1296 (7th ed.1999) (defining "remedy" as "[t]he means of enforcing a right or preventing or redressing a wrong; legal or equitable relief").

Our conclusion is further supported by the opinion in *Cherokee Corp. of Linden, Virginia, Inc. v. Richardson*, Chancery No. 95–130, Chancery No. 96–34, now Law No. L–96–148, 1996 WL 1065553, at *1 (Va.Cir.Ct. June 5, 1996), wherein the Circuit Court of Virginia explained the concept in this way:

> At first brush [*Wright v. Castles*, 232 Va. 218, 222, 349 S.E.2d 125, 128 (1986),] appears to [be] a retrenchment in the scope

of the doctrine of res judicata by its addition of the requirement of "identity of remedies," because if remedy were synonymous with "right of action," the implication is that the aggrieved party, confronted with a judgment for the defendant, may simply successively file actions based on different remedies or rights of action until he receives a favorable verdict. If this were true, the doctrine of Res Judicata would be substantially emasculated.

> Black's Law Dictionary (5th ed.1979) defines remedy as "the rights given to a party by law or by contract which that party may exercise upon a default by the other party, or upon the commission of a wrong (a tort) by another party," so remedy in this context is actually consonant with the broader concept of "cause of action." Moreover, the Supreme Court in *Smith v. Ware*, [244 Va. 374, 421 S.E.2d 444 (1992) ], noted that the causes of action were different and relied upon *Bates v. Devers*, 214 Va. 667, 670–71, 202 S.E.2d 917, 920–21 (1974), which clearly held:

>> Res judicata-bar, is the particular preclusive effect commonly meant by the use of the term "res judicata." A valid, personal judgment on the merits in favor of a defendant bars relitigation of the same cause of action, or any part thereof which could have been litigated, between the same parties and their privies. *See* Restatement of Judgments 47, 62, 83 (1942).

> Collateral estoppel is the preclusive effect impacting in a subsequent action based upon a collateral and different cause of action.

> *The ostensibly inconsistent rule of this case derives from the fact that Virginia still recognizes a distinction between law and equity, and this legal relic affects the court's res judicata decisions.* In *Smith v. Ware supra; Brown v. Haley*, 233 Va. 210, 219, 355 S.E.2d 563 (1987) (equitable claim for easement arose from different transaction and could not be asserted in

---

**43.** Until January 2006, Virginia continued to separately recognize actions at law and actions in chancery. However, that distinction was abolished as of January 1, 2006. *See Williams & Connolly, L.L.P. v. People for Ethical Treatment of*

*Animals, Inc.*, 273 Va. 498, 517 n. 6, 643 S.E.2d 136, 145 n. 6 (2007) ("As of January 1, 2006, Virginia abolished the procedural distinctions between actions at law and suits in chancery.").

earlier ejectment action at law between the same parties); and *Wright v. Castles,* 232 Va. 218, 349 S.E.2d 125 (prior chancery suit for injunction does not bar later suit for monetary damages, the court was confronted by later cases being filed on a different side of the court, because of the dichotomy between law and equity[) ].... 1996 WL 1065553, at *10 (emphasis added). *See also Davis v. Marshall Homes, Inc.,* 265 Va. 159, 175, 576 S.E.2d 504, 512 (2003) (Kinser, J., dissenting) ("Nor was there an identity of remedies [in *Brown v. Haley,* 233 Va. 210, 355 S.E.2d 563 (1987),] because the two claims could not have been brought in one proceeding. If the Haleys had asserted what would have been a counterclaim in the ejectment action, the court could not have granted the requested relief regarding the easement in that action *since the relief was equitable in nature and the ejectment action was at law.* [*Brown* ] at 218, 355 S.E.2d at 568." (emphasis added)).

With respect to the case presently before us, both the Virginia proceeding and the instant proceeding sought the legal remedy of monetary damages stemming from Wellmore's wrongful declaration of *force majeure* under the 1997 CSA. Accordingly, the identity of remedy element of Virginia's res judicata test has been met.

■ **2. Identity of the cause of action.** The Harman Companies contend that the breach of contract cause of action litigated in Virginia differs from the tort claims asserted in the instant action. In reaching this conclusion, the Harman Companies argue that the proper standard to be applied is the "same evidence" test set out in *Davis v. Marshall Homes, Inc.,* 265 Va. 159, 166, 576 S.E.2d 504, 507 (2003). We disagree.

To decide the proper rule to be applied in addressing this issue, we look to the Virginia law in effect at the time the complaint was filed in the Circuit Court of Boone County in October, 1998.[44] At that time, Virginia applied the transactional approach to determine whether there was identity of the cause of

action for purposes of res judicata. *See Allstar Towing, Inc. v. City of Alexandria,* 231 Va. 421, 344 S.E.2d 903 (1986). In *Allstar,* the City of Alexandria, Virginia, had initiated a bidding process to procure a contract to tow vehicles in the City. Allstar Towing, Inc., was the only company to submit a bid, but the company was declared ineligible because Allstar "was not a registered corporation" on the bid opening date. *Id.* at 422, 344 S.E.2d at 904. Allstar's certificate of incorporation was issued by the State Corporation Commission the following day. Allstar petitioned the circuit court for an appeal of the determination of ineligibility, or in the alternative, an award of the " 'reasonable profits' which it would have earned 'over the course of the prospective agreement.' " *Id.* Allstar also sought a temporary injunction to prevent the city from awarding a towing contract. The circuit court denied both the petition for appeal and the motion seeking injunctive relief. Meanwhile, the City requested and accepted bids for a towing contract a second time. Allstar again submitted a bid, but the contract was awarded to another company, Franconia Towing & Storage. Allstar then filed a second action against the city in the circuit court alleging that Franconia had failed to meet the city's specifications, which Allstar had met. Allstar sought damages "representing 'lost income that it would have received ... had the contract been awarded to it.' " *Id.* at 423, 344 S.E.2d at 905. The circuit court ruled that, under the principles of res judicata, the second action was barred by the earlier action. Allstar appealed the case to the Supreme Court of Virginia, where that court found that the second action was not barred, as "the same cause of action was not involved in the two cases." *Id.* at 425, 344 S.E.2d at 906. The Supreme Court of Virginia found that "[i]n the first case, Allstar sought relief because the City had determined it to be a 'non-responsible' bidder," based on its lack of a certificate of incorporation; while in the second action Allstar sought relief in connection with a second invitation to bid, which it claimed was im-

**44.** We believe the Virginia Supreme Court would likewise apply the procedural rule in existence at the time the complaint was filed. *See, e.g.,* Rule 1:6 of the Rules of the Supreme Court of Virginia (making new res judicata rule applicable to "all Virginia judgments entered in civil actions *commenced* after July 1, 2006" (emphasis added)).

properly awarded to a contractor who failed to meet the city's specifications. *Id.* The Allstar Court then concluded that the second action asserted by Allstar was not barred by the first because "the facts giving rise to the second cause of action were not even in existence when the first action was heard and decided on the merits on December 31, 1984." *Id.* In reaching its conclusion, the Supreme Court of Virginia adopted the transactional approach when it announced that "[f]or the purposes of res judicata, a 'cause of action' may be defined broadly 'as an assertion of particular legal rights which have arisen out of a definable factual transaction.'" *Id.* (internal citation omitted).[45]

The transactional approach has also been explained as follows:

As can be seen, Virginia follows the transaction rule set forth in the Restatement of Judgments 2d, '24 for purposes of defining "cause of action." The importance of understanding the broad concept of "cause of action" is essential to understanding the application of res judicata. One "cause of action" may give rise to myriad rights of action, *e.g.*, breach of contract, breach of warranty, negligence, and statutory claims; however, *if the rights of action arise from the same opera-*

*tive set of facts and could legally be asserted therein, they are all the same "cause of action" for purposes of the application of the doctrine of res judicata.* "There can be no right of action until there is a cause of action." *Stone v. Ethan Allen,* 232 Va. 365, 368–369, 350 S.E.2d 629 (1986), citing *Caudill v. Wise Rambler,* 210 Va. 11, 13 168 S.E.2d 257, 259 (1969). However, as broad as the application of the doctrine of res judicata is, it applies only to rights of action which have accrued from the cause of action and could have been asserted in the proceeding upon which the plea is based. As the Supreme Court of Virginia noted in *Southern. R. Co. v. Wash. & C.R. Co.,* 102 Va. 483, 491, 46 S.E. 784 (1904):

[R]es judicata applies, except in special cases, *not only to points upon which the court was actually required, by the parties, to form an opinion and pronounce a judgment, but to every point which properly belonged to the subject of the litigation, and which the parties, exercising reasonable diligence, might have brought forward at the time. Diamond State Iron Co. v. Rarig Co.,* 93 Va. 595, 25 S.E. 894, and authorities cited. But it cannot be applied to a matter not adjudicated in a former action and which

---

**45.** Subsequently, in 2003, the Supreme Court of Virginia handed down an opinion that significantly changed how that Court defined the term "cause of action" for purposes of *res judicata. See Davis v. Marshall Homes, Inc.,* 265 Va. 159, 166, 576 S.E.2d 504, 507 (2003) (adopting the "same evidence test" by concluding that fraud claim did not bar subsequent breach of contract claim involving same deed of trust notes, and commenting that "[t]he mere fact that some evidence relevant in plaintiff's action for fraud may be relevant to prove her distinct and separate contract claim for nonpayment of the deed of trust notes does not, for purposes of res judicata, mean that plaintiff only has one cause of action. Evidence of defendants' failure to satisfy the deed of trust notes does not prove that defendants made false representations of the values of the real properties intentionally and knowingly, with the intent to mislead plaintiff. Evidence of defendants' failure to satisfy the deed of trust notes does not establish plaintiff's reliance upon defendants' alleged misrepresentations."). The Harman Companies' assertion that we should apply the *Davis* case in resolving this issue is misplaced, as the *Davis* opinion had not yet been handed down at the time the Harman Companies filed their complaint in this action. Moreover,

we believe that the *Davis* opinion was a temporary aberration in Virginia law that rejected the existing transactional approach and developed a new "same evidence" rule. *See Davis,* 265 Va. at 180, 576 S.E.2d at 515 (Kinser, J., dissenting) ("In truth, the effect of the majority's explicit rejection of a transactional approach is to overrule our decision in *Allstar Towing.* However, the majority does not explain why this precedent should be cas[t] aside. Despite rejecting a transactional approach and overruling *Allstar Towing,* the majority, nevertheless, utilizes the *Allstar* Towing definition of the term 'cause of action,' and the majority states that its decision is supported by the holding in that case."). In 2006, the Supreme Court of Virginia adopted Rule 1:6, through which the Virginia Supreme Court rejected the *Davis* "same evidence" rule and returned to the transactional approach previously applied in Virginia when addressing the element of res judicata requiring identity of the cause of action. *See Virginia Imports, Ltd. v. Kirin Brewery of America, LLC,* 50 Va.App. 395, 410 n. 6, 650 S.E.2d 554, 561 n. 6 (2007) (observing that the transactional approach adopted by Rule 1:6 was promulgated to supersede the holding in *Davis* ).

could not have been brought forward for adjudication upon the pleadings in the cause; nor to a matter arising after the former adjudication, even in a second suit between the parties to the former or their privies, if the causes of action are not the same. (cites omitted).

*Cherokee Corp.*, 1996 WL 1065553, at *8 (emphasis added). *See also Virginia Imports,* 50 Va.App. at 410 n. 6, 650 S.E.2d at 561 n. 6 ("Under settled principles, the 'effect of a final decree is not only to conclude the parties as to every question actually raised and decided, but as to every claim which *properly belonged to the subject of litigation* and which the parties, by the exercise of reasonable diligence, *might have raised at the time.*' *Smith v. Holland,* 124 Va. 663, 666, 98 S.E. 676, 676 (1919) (emphasis added).").

Turning to the case at bar, although the Virginia proceeding addressed contract claims, while the instant proceeding addressed tort claims, this distinction is of no moment. Both the tort claims asserted in the case *sub judice* and the earlier contract claims asserted in the Virginia proceeding arise from the same "conduct, transaction or occurrence," namely the wrongful declaration of *force majeure* by Wellmore, which was carried out under the direction and control of the Massey Defendants. Thus, the tort claims asserted in this action arise from the same transactional facts as the Virginia proceeding and should have been asserted in that proceeding.

██ **3. Identity of the parties.** Mr. Caperton and Harman Development were not parties to the Virginia action, and neither were any of the Massey Defendants named in the instant suit. The Harman Companies argue that there is no identity of the parties as there is no privity between the Massey Defendants and Wellmore. We disagree, finding there is identity of the parties between the Virginia proceeding and the instant proceeding under the doctrine of privity.

██ Pursuant to Virginia law,

[t]he doctrine of *res judicata* applies not only to the actual parties in a case but also to those in privity with them. *See City of*

*Virginia Beach v. Harris,* 259 Va. 220, 229, 523 S.E.2d 239, 243 (2000). In other words, res judicata applies to anyone " 'so identified in interest with [a party] that he represents the same legal right, precisely the same question, particular controversy, or issue.' " *Johnson,* 7 Va.App. at 618, 376 S.E.2d at 788 (citation omitted).

*CDM Enters., Inc. v. Commonwealth/Manufactured Housing Bd.,* 32 Va.App. 702, 710, 530 S.E.2d 441, 445 (2000). One Virginia court has explained the requirement for the identity of parties in this way:

"One of the fundamental prerequisites to the application of the doctrine of *res judicata* is that there must be an identity of the parties between the present suit and prior litigation asserted as a bar. A party to the present suit, to be barred by the doctrine, must have been a party to the prior litigation, or represented by another so identified in interest that he represents the same legal right." *Dotson,* 232 Va. at 404–405, 350 S.E.2d at 644.

There is no fixed definition of privity that automatically can be applied in all cases involving *res judicata* issues. While privity generally involves a party so identified in interest with another that he represents the same legal right, a determination of ... who are privies requires a careful examination of the circumstances of each case.

*Nero v. Ferris,* 222 Va. 807, 813, 284 S.E.2d 828, 831 (1981).

In *Patterson v. Saunders,* the Supreme Court stated:

It is generally held that " 'privity' means a mutual or successive relationship to the same rights of property, or such an identification in interest of one person with another as to represent the same legal rights, and the term 'privy,' when applied to a judgment or decree refers to one whose interest has been legally represented at the trial."

194 Va. at 613, 74 S.E.2d at 208 (citation omitted).

*Commonwealth ex rel. Gray v. Johnson,* 7 Va.App. 614, 619, 376 S.E.2d 787, 789 (1989).

Turning to the case *sub judice,* we find that the parties to the Virginia proceeding "are so identified in interest" with the parties to the instant proceeding that they "represent the same legal right[s]." *CDM Enters., Inc.,* 32 Va.App. at 710, 530 S.E.2d at 445 (internal quotations and citations omitted). In the Virginia proceeding, Harman Mining and Sovereign sued Wellmore for breach of contract related to the wrongful declaration of *force majeure* under the 1997 CSA. It bears reiterating that all of the harm that has been claimed by Mr. Caperton and the Harman Companies in the instant action has stemmed directly from that wrongful declaration of *force majeure* under the 1997 CSA. Because the question of whether the declaration of *force majeure* was wrongful was the exact issue addressed in the Virginia proceeding, the interests of the various parties to the instant suit, which also depends upon the propriety of the declaration of *force majeure,* is directly aligned with the interests of the related corporate entities who participated in the Virginia action.

Moreover, it has been recognized that a parent company is in privity with its subsidiary. *See Mullins v. Daily New Leader,* 2001 WL 1772679, at *2 (Va.Cir.Ct. Oct.24, 2001) ("The Daily News Leader and Gannett Co., Inc., are in privity as Gannett is the parent company of the Daily News Leader."). Thus, Harman Development is plainly in privity with its susidiaries, Harman Mining and Sovereign, who were parties to the Virginia action. Mr. Caperton is also in privity with Harman Mining and Sovereign to the extent that he signed the 1997 CSA in his capacity as president of Sovereign, and insofar as Harman Mining and Sovereign are wholly-owned subsidiaries of Harman Development, and Mr. Caperton is the sole owner of Harman Development. Likewise, A.T. Massey Coal Company is in privity with its subsidiary Wellmore, as are the remaining Massey Defendants, who are also subsidiaries of Massey and sister corporations to Wellmore.

4. **Identity of the quality of the persons for or against whom the claim is made.** As previously indicated, for purposes of res judicata, Virginia requires a determination be made of the identity of the quality of the persons for or against whom the claim was made. As explained by a Virginia trial court, "[t]he 'identity of quality' element is a requirement that the parties in conflict appear in the identical capacities or on 'the same side of the versus' in both proceedings." *Winchester Homes, Inc. v. Hoover Universal, Inc.,* LAW NO. 122509, 1994 WL 1031408, at *2 (Va.Cir.Ct. Nov.2, 1994) (citing *Greene v. Warrenton Prod. Credit Ass'n,* 223 Va. 462, 291 S.E.2d 209 (1982)). The facts of the instant case clearly establish that this element has been met. The original plaintiffs in the Virginia suit are plaintiffs in the West Virginia proceeding, and they sued in the same capacity in both litigations. None of the Massey Defendants in the instant proceeding was a plaintiff in the Virginia proceeding. *See Byrum v. Ames & Webb, Inc.,* 196 Va. 597, 85 S.E.2d 364 (1955) (finding that prior litigation was not res judicata to subsequent litigation because plaintiff and defendant were both non-adversarial defendants in the prior litigation); *Ezrin v. Stack,* 281 F.Supp.2d 67 (D.D.C. 2003) (applying Virginia law to find that res judicata applied where both parties were on opposite sides of the "v." in prior litigation).

5. **Preclusive Effect of Res Judiciata.** Because the four elements of res judicata have been met in this case, as demonstrated above, we conclude that the instant action is barred.

## IV.

## CONCLUSION

For the reasons stated in the body of this opinion, we reverse the judgment in this case and remand for the circuit court to enter an order dismissing this case against A.T. Massey Coal Company and its subsidiaries with prejudice.

Reversed and remanded.

Chief Justice MAYNARD and Justice STARCHER, deeming themselves disqualified, did not participate in the decision of this case.

Judge COOKMAN and Judge FOX, sitting by temporary assignment.

Justice ALBRIGHT and Judge COOKMAN dissent and reserve the right to file dissenting opinions.

Acting Chief Justice BENJAMIN and Judge FOX concur and reserve the right to file concurring opinions.

ALBRIGHT, Justice, and COOKMAN, Judge, sitting by special assignment, dissenting.

This case is before the Court on rehearing granted after the five elected Justices on the Court, while disagreeing about the proper ultimate outcome of the case, unanimously agreed that defendant "**Massey's conduct warranted the type of judgment rendered [below] in this case.**" *Caperton v. A.T. Massey Coal Co., Inc.,* 2007 WL 4150960, Slip Op. at 13 (No. 33350, filed November 21, 2007), *withdrawn.*

Nevertheless, on a vote of three for and two against, the original Court reversed the judgment of the Circuit Court of Boone County, which awarded Plaintiffs (Appellees here) over $50 million, plus interest and costs, on account of that egregious conduct. The majority explained its rejection of the lower court's judgment by saying "**we simply cannot compromise the law in order to reach a result that clearly appears to be justified.**" *Id.*

After that opinion was filed, two of the elected Justices recused themselves from further consideration of the case. A motion to rehear the case was granted by this Court on the unanimous vote of the remaining three Justices and two circuit judges, Judge Cookman and Judge Fox, appointed by acting Chief Justice Benjamin. Now, the reconstituted Court has again reversed the lower court by a vote of three (Davis, J.; Benjamin, J., and Fox, J.) to two (Albright, J. and Cookman, J.)

Today's "new" opinion of the Court rests on the same indefensible legal grounds as the original opinion—supplemented by even more extended discussion of some of the points—but, strangely, omitting the clearly correct assertion in the original majority opinion that "**Massey's conduct warranted the type of judgment rendered [below] in this case.**" *Id.* This time the majority stands silent regarding any disdain of Massey's conduct. Once again it bends the law to deny Plaintiffs the proper "**result that clearly appears to be justified.**" *Id.*

For the record, we wholeheartedly embrace the determination of this Court in the original, now withdrawn, opinion that "**Massey's conduct warranted the type of judgment rendered [below] in this case.**" *Id.* Likewise, we do not shrink from saying without reservation that this Court should now affirm the judgment against the Massey Defendants for the reasons outlined in this dissent. Moreover, the failure of the Court now to even acknowledge the justice of Plaintiffs' case below, as it had in the previous opinion, underlines the result-driven nature of the current majority opinion. *Id.*

In terms of the law, the errors of the majority opinion are not complex or difficult to explain. They are few in number.

First, under our law as it existed before the majority decision in this case, the proper inquiry regarding the enforceability of a forum selection clause in a contract was whether, with careful analysis, its enforcement was reasonable and just in the circumstances of the case. In this case it was not.

Second, under the law of Virginia as it existed at all times relevant to the case before us, res judicata applied when, under the facts of the case, all of the issues fairly arising under the facts pled, or which could have been pled, could have been proved with the same evidence. In the case before us, several occurrences and transactions between the parties to this case, which were not involved in the original Virginia contract action, required substantial amounts of evidence which would not have been relevant in the Virginia contract action.

Finally, under West Virginia law as it existed before the majority opinion was filed in this case, the decision of a lower court on the venue questions raised by a plea of res judicata were to be reviewed under an abuse of discretion standard, evaluating the lower

court's application of the law to the facts, not *de novo,* as the majority has now ruled.

The more narrow and focused legal arguments and supporting facts of the rehearing process make it all the more clear that (1) Massey's conduct was outside the bounds of human decency and respectable business practices, and (2) the law poses no barrier to upholding the Boone County jury verdict finding such behavior repugnant and deserving of redress. As opposed to simply deciding the case on the facts and law as they existed at the time the events complained of occurred, the majority kneads the facts so that they better fit the new law the majority finds necessary to create not only for West Virginia but also for Virginia. As we explain in detail below, neither res judicata principles nor the presence of a forum selection clause serve as an impediment to upholding the lower court's actions and jury verdict. Instead, the majority decision now ignores the admitted injustice done to Plaintiffs. It fashions no less than nine new points of law to achieve the result desired by the majority. To accomplish this goal, the majority:

1. Broadly endorses forum selection clauses, makes them applicable to persons not party to the contracts containing such clauses, removes any hint of the cautious, limited approval of such clauses in our jurisprudence, extends their effect to causes of action in which the related contract is but one of several factors justifying recovery, and charges those who would resist their application with the obligation of proving them unreasonable-even when the time for adducing evidence to meet that new requirement has irretrievably passed-making it impossible for Plaintiffs to defend their $50 million judgment.

2. With respect to the principle of res judicata—whether a prior suit adjudicated or could have adjudicated the issues raised in a suit filed later—the majority now makes the lower court's decisions reviewable *de novo,* that is, removing any requirement that this Court give any deference to the lower court's consideration of the proper application of the law to the facts of a particular case. In that regard, the majority opinion now opens the door to this Court systematically reviewing all such decisions of lower courts without regard to the reasonable discretion of the trial courts and their view of the applicable facts.

3. Lastly, this Court imperially found in the majority opinion that the law of Virginia on the issue of res judicata has been clearly settled from 1998 through 2002. Any fair review of the cases in Virginia and the course of development of Virginia law demonstrates beyond doubt that Virginia law in that time frame would not deprive the Circuit Court of Boone County of venue in the cause before us to hear and determine and grant the relief **"Massey's conduct warranted...."** *Caperton,* 2007 WL 415960, Slip Op. at 13 (No. 33350, filed November 21, 2007), *withdrawn.*

## I. DISCUSSION OF THE FACTS

Nothing so completely highlights the errors of the majority opinion and the outright injustice of its result as a thorough review of the evidence admitted in the trial of this case. In the forty-page order denying Appellants (Defendants below) judgment as a matter of law or a new trial, that is, refusing to overturn the jury verdict in this case, the lower court found that there was sufficient evidence from which the jury could have found that the coal supply agreement containing the forum selection clause was but one factor in a far-reaching scheme by which Massey set out to ruin Harman Mining and its owner Hugh Caperton-beginning before Massey's involvement with the coal supply agreement and ending after Massey's brief ownership of a company party to that agreement.

In its order, the Circuit Court of Boone County said "[T]he weight of the evidence at trial fairly established and was clearly sufficient for the Jury" to conclude that:

> **Massey chose to acquire [United Coal Company] in order to eliminate a competitor and to gain more access to LTV [Steel Corporation], ... [while] fully cognizant of Harman's long-term coal supply agreement with Wellmore and LTV's preference for the UCC/Harman blend.**

In paragraph 4 of that order, the trial court further said that the weight of the evidence at trial fairly established and was clearly sufficient for the jury to further conclude that:[1]

[a] The Corporate Plaintiffs (collectively "Harman") formerly were in the business of mining and selling high quality metallurgical coal produced from the Harman Mine. The Defendants (collectively "Massey") are also in the business of mining and/or selling metallurgical coal. Harman and Massey were competitors.

[b] Massey desired, among other things, to gain LTV Steel Corporation ("LTV") as a new customer.

[c] For years, LTV had purchased substantial amounts of metallurgical coal from United Coal Company ("UCC"). The coal that LTV preferred and purchased from UCC was a premium blend of Harman coal and other, lesser quality coals (the "UCC/Harman blend") Coal from the Harman Mine is metallurgical coal with very favorable cooking characteristics prized by steelmakers like LTV.

[d] For many years, Harman sold all of its coal to one of UCC's subsidiaries, Wellmore Coal Corporation ("Wellmore"), which was, in turn, supplied to LTV as part of the UCC/Harman Blend. During the relevant time period, Harman had a long-term coal supply agreement with Wellmore. Harman was almost exclusively reliant on that contract. Wellmore's management had always encouraged Harman to mine and sell to it as much coal as it possibly could. Harman had been supplying Wellmore with its high quality metallurgical coal on a continuous basis for many years.

[e] For years, Massey wanted the LTV business and tried to increase sales of coals from its production sources ("Massey Mines") to LTV, but with little success. So Massey chose to acquire UCC in order to eliminate a competitor and to gain more access to LTV, but fully cognizant of Harman's long-term coal supply agreement with Wellmore and LTV's preference for the UCC/Harman blend. In a document written prior to Massey's purchase of UCC, Massey characterized the situation as follows:

> In layman's terms, the UCC metallurgical coal quality is equivalent to Massey's premium Marfork coal, but is further enhanced by having a higher inerts level and a lower sulfur content. UCC had achieved a particularly enviable supplier relationship with LTV Steel Corporation ("LTV") that has now been in place for over 10 years. Surprisingly, the LTV relationship is not secured by a long-term contract, but rather by annual purchase orders that are consistently renewed at favorable pricing levels because of LTV's high regard for the UCC coal quality.

\* \*

> UCC's decree [sic] of dependence on the Harman mining coal is obviously a sensitivity, since that source represents about 40% of the annual shipment level at Wellmore No. 7, and has become a fairly critical ingredient in the LTV coal blend. The term of the Harman mining purchase commitment runs through the year 2001....

[f] Massey knew that there were risks associated with its acquisition. In a pre-acquisition document assessing those risks, Massey stated, "The most significant risk associated with this transaction is that the plus–10–years–old supplier relationship between LTV and UCC may not continue under Massey ownership."

[g] In that same document, however, Massey noted that it would enjoy a very favorable economic outcome if it could cause LTV to purchase coal from Massey Mines, instead of the UCC/Harman Blend, at the price LTV was paying for UCC/Harman coal.

[h] Recognizing that Harman coal was a critical ingredient in the coal blend that LTV

---

**1.** This opinion will now directly quote extensively from the lower court's very thorough order. It will not cite to particular pages or utilize in all cases the conventional means of indicating quotations, such as quotation marks, double indentations, and single spacing. However, the full text of the order is attached to this dissenting opinion as an appendix. We are grateful to Judge Jay Hoke of the 25th Judicial Circuit, sitting in the Circuit Court of Boone County, for his exhaustive review of the evidence.

preferred, and knowing that LTV in the past had chosen not to purchase much coal from Massey, Massey nonetheless went ahead and purchased UCC. Further, recognizing that "LTV is extremely reluctant to change a long-established, successful coal blend", Massey nonetheless went ahead and marketed coals from Massey Mines to LTV to replace the Harman blend that LTV preferred.

[i] Massey provided LTV with firm price quotes for coal mainly from Massey Mines, not Harman coal, and insisted that LTV make Massey its sole-source provider via a long-term coal contract, despite the fact that, historically, LTV preferred multiple suppliers and did not utilize multi-year, long-term coal supply contracts. The price that Massey quoted for it is [sic] coals to LTV constituted a "handsome improvement" over the prices it had been receiving for its coals.

[j] Massey's marketing strategy resulted in a loss of the LTV business–a risk that it fully appreciated, acknowledged and understood prior to its marketing efforts and even prior to its purchase of UCC. Only after Massey's marketing efforts caused the loss of LTV's business did Massey direct Wellmore to declare *"force majeure"* against Harman, a declaration which Massey knew would put Harman out of business. Massey acknowledged Wellmore was readily able to purchase and sell the Harman coal, but instead chose to have Wellmore declare *"force majeure"* based upon a cost benefit analysis Massey performed which indicated that it would increase its profits by doing so. Furthermore, before Massey directed the declaration of *"force majeure"*, Massey concealed the fact that the LTV business was lost and Massey delayed Wellmore's termination of Harman's contract until late in the year, knowing it would be virtually impossible for Harman to find alternate buyers for its coal at that point in time. Once Wellmore suddenly stopped purchasing Harman's output, Harman had no ability to stay in business. In the meantime, Massey sold Wellmore.

[k] After Harman shut down operations, "Massey took a series of steps to prevent Plaintiffs, both corporately and personally, from pursuing legal remedies arising out of Massey's misconduct. Massey's CEO threatened the Plaintiffs not to undertake legal action. Massey offered to purchase the assets of Harman at a distressed sale price. Massey then delayed and ultimately collapsed the transaction in such a manner so as to increase the Plaintiffs' financial distress. Instead, utilizing confidential information obtained from Plaintiffs for the alleged purpose of negotiating a settlement of their disputes, Massey purchased a narrow band of coal reserves surrounding much of the Harman Mine for the purpose of making Harman unattractive to others and to decrease its value to all but Massey, and Massey planned to acquire Harman in the long run."

### A. Actions Against Plaintiff Caperton Personally

The trial court identified, by way of example, specific actions which the jury could find were directed by Defendants against Plaintiff Caperton in his personal capacity, as follows:

[i] Massey's conduct in "negotiating" directly with Caperton and under the February 9, 1998 letter agreement: Massey submitted a letter agreement to Mr. Caperton as President of Sovereign and Harman in which Massey and Wellmore expressly agreed to "pursue good faith negotiations toward concluding the described transactions." The transaction described in the agreement was intended to settle all issues relating to 1997 Coal Supply Agreement between the parties and permit Massey to acquire Caperton's interest in the Corporate Plaintiffs.

[ii] Massey's conduct in negotiating a letter of intent with Grundy: In the letter of intent, Massey agreed to purchase the note held by Grundy. Massey entered into the letter of intent with Grundy with full knowledge of Caperton's personal guarantee on the Grundy note.

[iii] Massey's conduct affecting Caperton's Terra obligations: Knowing Caperton's personal responsibilities for reclamation obligations to Terra, Massey agreed to replace the Terra reclamation bond with a Massey bond. During negotiations, Massey internal documents reflect that Caperton's personal guarantees were discussed and, as a consideration for the

transaction, the parties specifically negotiated the release of "his personal guarantee obligations." Recognizing Caperton's personal interest in the negotiations, Massey required Caperton to be a signatory to the closing documents, sought a far-reaching release from Caperton personally, and agreed to give Caperton a personal release in return.

[iv] Massey's duty to mitigate based upon knowledge of Caperton's actions taken in detrimental reliance: Massey knew through confidential information exchanged during the December 1997 and January 1998 discussions with Caperton, about Caperton's plans to shut down Harman as a result of Massey's wrongfully declaration of *"force majeure"*. Massey further knew that, in reliance upon an agreement in principle reached concerning the key terms and a proposed closing date of January 31, 1998, Caperton intended to shut down Harman's operations on January 19, 1998. Massey was also aware of the impact Massey's failure to close as planned would have on Caperton personally (based on his personal guarantees, likely AVS violator listing, etc.). Unknown to Caperton, Massey made an internal decision *not* to close the transaction by the agreed-to date of January 31, 1998, but chose instead to let Caperton move forward with his plans based upon his mistaken belief concerning the closing date.

**2.** The three causes of action and their essential elements are identified in the order as follows:

1. Tortious interference with Plaintiffs' advantageous business relationships:
(a) the existence of a contractual or business relationship or expectancy;
(b) an intentional act of interference by a party outside that relationship or expectancy;
(c) proof that the interference caused the harm sustained; and
(d) damages.
See, e.g., Syllabus Point 2, *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983);
2. The tort of fraudulent misrepresentation:
(a) that the act claimed to be fraudulent was the act of the defendant or induced by him;
(b) that it was material and false; that the plaintiff relied on it and was justified under the circumstances in relying on it; and
(c) that he was damaged because he relied on it.

## B. Additional Facts

In paragraph 6 of its order, the trial court took note of Massey's assertion that it had no "intent to interfere with Harman or to purposely cause financial distress for the Plaintiffs so that Massey would benefit in the long run. . . ." The lower court simply noted that "numerous pieces of documentary evidence authored by Massey belied that testimony. . . ."

In paragraphs 9 through 11 of the order, the lower court undertook a thorough review of the evidence supporting each of three causes of action upon which the case was tried and upon which the jury rendered its verdict: tortious interference, fraudulent misrepresentation and fraudulent concealment. The lower court identified the essential elements for each cause of action and analyzed the evidence adduced with respect to each such cause of action, finding a *prima facia* case established on each count.[2] In some respects, the evidence supporting an element in one count was the same evidence supporting an element of another count, findings which we will endeavor not to repeat except where the context requires it. However, the facts the lower court found to be supported by the evidence paint in further detail a dastardly course of action by Defendants which will now go unredressed.

In paragraph 9, the trial court found *prima facia* proof that:

See, e.g., Syllabus Point 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981), citing *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737, 738 (1927).
3. Fraudulent concealment:
(1) that the act claimed to be fraudulent was the act of the defendant or induced by him;
(b) that it was material and false; that the plaintiff relied on it and was justified under the circumstances in relying on it; and
(c) that he was damaged because he relied on it."
See, e.g., Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981), citing *Horton v. Tyree*, 104 W.Va. 238, 242, 139 S.E. 737, 738 (1927).
The trial court also noted that:
A claim of fraudulent concealment "involves concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Pocahontas Min. Co. Ltd. Partnership v. Oxy USA, Inc.*, 202 W.Va. 169, 175, 503 S.E.2d 258, 264 (1998).

The evidence was clearly sufficient for the Jury to conclude that Defendants tortiously interfered with the Harman Plaintiffs' advantageous relationships with, among others, the United Mine Workers of America, with Penn Virginia Coal Company, with Terra Industries, Inc., with Grundy National Bank, and with Wellmore Coal Corporation. As for Plaintiff Caperton, the evidence was clearly sufficient for the Jury to conclude that Defendants tortiously interfered with, among others, his personal guaranty relationships with Grundy National Bank, his personal liability under the Terra reclamation bonds (and resulting listing on the Applicant Violator System, or "AVS"), and his personal relationship with United Bank. Further, the evidence was clearly sufficient for the Jury to conclude that Defendants engaged in this intentional interference for the specific purpose of financially destroying Plaintiffs, both corporately and personally.

(a) For example, Massey tried to persuade LTV to buy its coals in place of Harman coal, used *"force majeure"* and other threats, and otherwise interfered with Harman's contractual relations for the purpose of placing the Plaintiffs, corporately and personally, in great financial distress in order to have Harman, not Massey, bear the cost of Massey's failed marketing strategy with LTV.

(b) For example, Massey directed Wellmore to declare *"force majeure"* as a result of Massey losing LTV's business due to Massey's failed marketing attempts.

(c) For example, after directing the declaration of *"force majeure"*, the Defendants participated in settlement negotiations with Plaintiffs and with Penn Virginia Coal Company, the Lessor of Plaintiffs' reserves, not with the intention of settling disputes, but for the purpose of placing the Plaintiffs, corporately and personally, in greater financial distress.

(d) For example, after directing the declaration of *"force majeure"*, the Defendants dealt directly with Grundy National Bank pursuant to notes held by Grundy, for which Plaintiff Caperton had given his personal guaranty;

(e) For example, the Defendants obtained confidential information at their meeting with Plaintiff Caperton in November, 1997, and thereafter on the purported promise to purchase Caperton's interest in the Harman assets, the Defendants used that confidential information to acquire adjoining reserves, which the Defendants' own internal documents acknowledged would help to insure that Harman would only be valuable to the Defendants;

(f) For example, the Defendants intentionally acted in utter disregard of Plaintiffs' rights and ultimately destroyed Plaintiffs' businesses and caused Plaintiff Caperton's resultant AVS listing because, after conducting cost-benefit analyses, the Defendants concluded that it was in the Defendants' financial interest to do so[.]

In its order under discussion here, the trial court next commented on the evidence from which the jury might properly find that Defendants failed to establish their defense of "business justification" under section 767 of the *Restatement (Second) of Torts* and our case of *C.W. Development Inc. v. Structures, Inc. of West Virginia,* 185 W.Va. 462, 465, 408 S.E.2d 41, 44 (1991), finding that the evidence was clearly sufficient for the jury to conclude that:

[i] Defendants developed a plan to interfere with Plaintiffs' existing and prospective relations with Wellmore before A.T. Massey Coal Company acquired Wellmore.

[ii] Massey acquired UCC with the purpose of gaining access to LTV and to have the ability to interfere with the supply of Harman to LTV.

[iii] The Defendants' Chief Executive Officer (CEO), without ever reading the applicable long term Coal Supply Agreement, directed that Wellmore Coal Corporation ("Wellmore") threaten Plaintiffs with the declaration of "force majuere;"

[iv] At a meeting held in November, 1997 in West Virginia, the Defendants' CEO threatened the Corporate Plaintiffs and Mr. Caperton with long and protracted litigation in the event the Corporate Plaintiffs did not agree to give up the rights to their reserves;

[v] At the November, 1997 meeting the Defendants obtained confidential information and, thereafter, on the purported promise to purchase Caperton's interest in the assets of the Corporate Plaintiffs, instead used that confidential information to acquire adjoining reserves which the Defendants' own internal documents acknowledged would help to insure that the Plaintiffs' reserves would only be valuable to the Defendants;

[vi] Massey engaged in a cost-benefit analysis to determine whether it should direct Wellmore to declare *"force majeure"*;

[vii] On December 1, 1997, at the Defendants' direction and contrary to the recommendations of its management, Wellmore declared the occurrence of a *"force majeure"* event under the Coal Supply Agreement, which reduced Wellmore's commitment to purchase coal from Plaintiffs by over 60% beginning on January 1, 1998, with full knowledge that the 60% loss would be financially devastating to Plaintiffs;

[viii] After directing the declaration of *"force majeure"*, the Defendants participated in settlement negotiations with Plaintiffs and the Lessor of Plaintiffs' reserves, not with the intention of settling disputes, but for the purpose of placing the Plaintiffs, corporately and personally, in greater financial distress;

[ix] The Defendants misrepresented their intention to settle any disputes between the parties through an offered purchase and sale of Harman assets, and instead delayed the transaction and then reneged on their stated intention to purchase the Harman assets by collapsing the deal after the Harman operations were shut down in anticipation of the sale;

[x] The defendants intentionally acted in utter disregard of Plaintiffs' rights and ultimately destroyed Plaintiffs' businesses because, after conducting cost-benefit analyses, the Defendants concluded that it was in their financial interest to do so; and

[xi] The Defendants consistently attempted to use the disparity of resources and bargaining power between the Defendants and the Plaintiffs to its advantage, with little or no regard to the outcome of the Plaintiffs, either corporately or personally.

Returning to the evidence supporting the essential elements of the three counts, the trial court recited:

(k) That Defendants' negotiations with Plaintiff Caperton in the time period from November 1997 through March 1998 were conducted directly by Defendants' Chief Executive Office, Donald Blankenship, and not by Wellmore or any of its corporate officers;

(*l*) That Defendants, not Wellmore or any of its corporate officers, interfered with Plaintiff Caperton's management of the bankruptcy of the Corporate Plaintiffs by purchasing claims to obtain standing in the Bankruptcy Court and to have Caperton removed as the debtor-in-possession;

(m) That Defendants took numerous specific steps pursuant to its plan to wrongfully interfere with Plaintiffs' existing contractual relations with Wellmore before, during and after the short time that Defendant A.T. Massey Coal Company owned Wellmore.

The trial court further observed that any legitimate justification or privilege to interfere in the contractual relations of subsidiaries may be lost by wrongful conduct and further observed that the preceding recital established the evidence was sufficient to allow the jury to so conclude in this case, and then found further:

(p) That additional, substantial evidence of improper motive presented to the Jury included that, on August 1, 1997, one day after the acquisition of United Coal (the parent company of Wellmore), Wellmore's management recommended the purchase of Harman's entire production for the following year, but that Defendants' CEO, Donald Blankenship, overruled this recommendation and directed Wellmore to refuse to purchase more than the minimum tonnages because of a purported *"force majeure"*, that four days later, after having enacted Blankenship's directive, Blankenship put Wellmore up for sale in September of 1997[.]

In paragraph 10 of its order, the trial court found that: "The evidence was clearly suffi-

cient for the Jury to conclude that Defendants fraudulently misrepresented material information, that Plaintiffs, both personally and corporately, justifiably relied upon Defendants' fraudulent misrepresentations, and that Plaintiffs, both personally and corporately, were damaged because of that justifiable reliance." The order specifically noted eight examples of this sufficiency, five previously cited and the following three:

[i] While marketing their West Virginia coals to LTV, the Defendants intentionally created the false impression to Plaintiffs that they were actually trying to sell Harman coal to LTV;

[ii] In declaring "*force majeure*", Wellmore was directed by the Defendants' senior management to claim that the supposed event of "*force majeure*" was unforeseen, when Massey was well aware of and had in fact foreseen the event at least seven months before it occurred;

[iii] In declaring "*force majeure*", Wellmore was directed by Defendants' senior management to claim that a coke facility had shut down, when Defendants knew it had not[.]

With respect to the tort of fraudulent concealment, the trial court concluded that: "The evidence was clearly sufficient for the Jury to conclude that Defendants fraudulently concealed material information which they were under a duty to disclose, that Defendants were motivated to conceal material information and prevent the Plaintiffs, both personally and corporately, from discovering the information, and that Plaintiffs, both personally and corporately, were damaged because of Defendants' concealment." The lower court then gave thirteen examples, including these nine:

[i] While marketing their West Virginia coals to LTV, the Defendants intentionally created the false impression to Plaintiffs that they were actually trying to sell Harman coal to LTV;

[ii] During the months that the Defendants were trying to persuade LTV to buy coal blends containing exclusively Massey coals mined by the West Virginia Defendants in place of Harman coal, the Defendants concealed this fact from Plaintiffs;

[iii] The Defendants concealed the fact that it made numerous firm offers to sell the Defendants' West Virginia coals to LTV, but did not make firm price offers to sell Harman coal to LTV;

[iv] The Defendants purposely omitted to disclose the fact that it lost the LTV business, which it lost not because of any "*force majeure*" but because of Defendants' marketing strategy and dealings with LTV, particularly its insistence that LTV fill all of its coal requirements through Defendants' West Virginia operations via a sole supplier, long-term contract, and through its decision not to allow LTV to purchase Harman coal, LTV's preferred choice;

[v] Rather than tell Plaintiffs of its efforts to sell the Defendants' coals and its lack of effort in selling Harman coals, the Defendants' Representatives waited until shortly before year-end, when it is nearly impossible to make new coal supply arrangements for the following year, and then directed Wellmore to declare "*force majeure*" and effectively destroy the Plaintiffs' businesses.

\* \* \*

[vii] On December 1, 1997, at the Defendants' direction and contrary to the recommendations of its management, Wellmore declared the occurrence of a "*force majeure*" event under the Coal Supply Agreement, which reduced Wellmore's commitment to purchase coal from Plaintiffs by over 60% beginning on January 1, 1998, with full knowledge that the 60% loss would be financially devastating to Plaintiffs;

\* \* \*

[ix] The Defendants' declaration of "*force majeure*" was without any contractual basis as Defendants knew LTV was neither a customer of Wellmore, effective January 1, 1998, nor had the LTV Pittsburgh plant been directed to close by any governmental action, but instead was intended to place additional economic pressure upon

the Plaintiffs, both corporately and personally;

* * *

[xi] The Defendants concealed their true intention not to settle any disputed between the parties and reneged on its stated intention to purchase the Harman assets, and Defendants collapsed the deal after Plaintiffs had shut down operations in anticipation of a sale to the Defendants;

* * *

[xiii] The Defendants consistently attempted to use the disparity of resources and bargaining power between the Defendants and the Plaintiffs to its advantage, with little or no regard to the outcome of the Plaintiffs, either corporately or personally.

The lower court also found "[t]hat there was sufficient evidence to support a finding of a duty by Defendants to disclose the information concealed from Plaintiffs, both corporately and personally, including, for example, the submission of a letter agreement dated February 9, 1998, to Caperton, in both his personal and corporate capacities, agreeing to 'pursue good faith negotiations toward concluding the described transactions', and that Defendants concealed their true intention at that time not to settle any disputes between the parties and reneged on their stated intention to purchase the Harman assets, and Defendants collapsed the deal after Plaintiffs had shut down operations in anticipation of a sale to the Defendants[.]"

Finally, the trial court reviewed the evidence supporting the award of damages for the three tort claims. Again, the evidence was in part related to the coal supply agreement, but in a much larger part was completely different from that admissible in a contract action. After noting the proper measure of damages for each of the three torts, the trial court offered the following review of the substantial evidence, by way of example, from which the jury could reach its verdict on compensatory and punitive damages:

[i] Corporate Plaintiffs introduced testimony through a number of witnesses and introduced evidence through a number of exhibits, including the expert testimony of Alan Stagg who opined to a reasonable degree of professional certainty regarding the business plan put into place when Caperton took over the business in 1993 and who provided a valuation of the Harman coal reserves, and of Mark Gleason who opined to a reasonable degree of accounting certainty that the Corporate Plaintiffs suffered damages exceeding $29 million as a result of the destruction of their business, in response to which the jury could reasonably determine that there was sufficient evidence to show that the Corporate Plaintiffs' damages were caused by Defendants' tortious misconduct;

[ii] That Plaintiff Caperton introduced evidence through testimony on his own behalf, through his expert Daniel Selby, who opined to a reasonable degree of accounting certainty, through the testimony of Bobby Reece, an executive at Grundy National Bank, and through the introduction of exhibits all establishing his individual injuries, including injury to his personal and professional reputation resulting in the loss of income, benefits and business opportunities, personal injury by way of lost earnings and employment opportunities by way of his listing on the AVS, and personal injury by way of Defendants' tortious interference with his personal guaranty obligations in response to which the jury could reasonably determine that there was sufficient evidence to show that the Plaintiff Caperton's damages were caused by Defendants' tortious misconduct. Such evidence included, but was not limited to:

[iii] The Plaintiff Caperton was a business leader with whom his lenders and vendors were willing to do business before Defendants' tortious conduct;

[iv] The vendors and lenders with whom Plaintiff Caperton had previously done business now refuse to do business with him due to Defendants' tortious conduct;

[v] Due to the Defendants' tortious conduct, Plaintiff Caperton became a defendant in several lawsuits brought against him personally by the lenders and vendors

with whom he had previously enjoyed a beneficial relationship;

[vi] Due to the Defendants' tortious conduct, Plaintiff Caperton has had judgments and tax liens entered against him personally throughout the State of West Virginia;

[vii] Due to the Defendants' tortious conduct, Plaintiff Caperton's personal credit rating and creditworthiness have been destroyed;

[viii] Due to the Defendant's tortious conduct, Plaintiff Caperton was and is precluded from obtaining a mining permit and engaging in his livelihood as a result of his AVS listing;

[ix] The Plaintiff Caperton's AVS listing, according to testimony at trial by those in the mining industry, constitutes a "black-ball";

[x] Due to Defendants' tortious interference, Plaintiff Caperton's personal annual income went from in excess of $1.3 million to $60,000.00;

[xi] The Defendants' invaded Plaintiff Caperton's personal privacy, including the unwarranted trespass on his personal real estate to photograph his personal residence, and due to Defendants' tortious conduct, Plaintiff Caperton has suffered mental anguish and sleepless nights.

Lastly, in paragraph 13 of its order, the lower court took note of the arguments regarding choice of law, and in its analysis noted the following:

Under either the principle of *lex loci delicti* (the law of the place where the tort occurred governs) or under the principle of "most significant relationship" test set forth in the *Restatement (Second) of Conflicts of Law*, West Virginia law should govern because: (1) the Defendants are all citizens or residents of, or have substantial contacts, with West Virginia; (2) the Corporate Plaintiffs are either citizens or residents of, or have substantial contacts with West Virginia; (3) the Plaintiff Caperton is a citizen of West Virginia; (4) much of the correspondence and documents submitted as evidence either was sent from, or sent into, West Virginia; (5) the November, 1997, meeting in which many of Defendants' threats and misrepresenta-

tions were made occurred in West Virginia. On this issue as well it should be noted that:

(a) That Defendants' misconduct occurred in substantial part in the State of West Virginia, was for the purpose of benefiting Defendants' West Virginia operations, and substantially injured residents of the State of West Virginia;

(b) That, while the Coal Supply Agreement between Plaintiff Sovereign Coal Sales and Wellmore required Sovereign to pursue its breach of contact claims against Wellmore in the State of Virginia, the Defendant in that action (Wellmore) was a different entity than the Defendants here, that it was litigated and that jury awarded a verdict based upon a breach of contract only, and that the Virginia defendant's appeal was processed in the State of Virginia only;

(c) That, as the record to this case illustrates in great depth, the Plaintiffs alleged and proved to the jury's satisfaction that the torts occurred in the State of West Virginia[.]

## II. DISCUSSION OF THE APPLICABLE LAW

It is clear from the foregoing recital that Plaintiffs' claims in the West Virginia suit related to much more than just the coal supply agreement. Notwithstanding the fact that the improper declaration of *force majeure* gave rise to a legitimate contract action in Virginia directly related to the coal supply agreement, the entire course of dealings by Massey with Plaintiffs as revealed in the West Virginia action created additional causes of action in tort that properly could be pursued in a subsequent suit in West Virginia.

Nothing underlines this more than a fair consideration of the evidence introduced at trial of Massey's actions directed against Plaintiff Caperton in his individual capacity. He was never a party in his own right to the contract action in Virginia. The Massey actions against him personally reached far beyond the enforcement of the coal supply agreement.

Similarly, it cannot be legitimately argued that the entire course of dealings by Massey with Plaintiffs that established tortious inter-

ference by Massey with the Harman companies and Plaintiff Caperton was related to the coal supply agreement or involved facts to be properly asserted and proved in connection with the Virginia contract action on the coal supply agreement.

Moreover, while Massey's involvement in the declaration of *force majeure* under the coal supply agreement is related substantially to the tort of fraudulent misrepresentation found by the jury, it is inaccurate to say that the evidence necessary to prove that tort was in all respects the same as that necessary to show a valid contract claim in the Virginia contract action.

It is likewise clear from the trial court's recital that the coal supply agreement and the Virginia contract action were only tangentially involved in proving the fraud case and that the evidence necessary to the proof of the fraud claim in tort was in very large part quite different from any evidence properly necessary to the contract claim.

With this startling and deeply disturbing evidence in mind, from which the West Virginia jury drew its conclusion that the Massey Defendants were liable for compensatory and punitive damages, we move on to a discussion of the reasons why the majority opinion in this case is just plain wrong and is a complete denial of justice.

## A. Forum Selection Clause

The majority approached the forum selection clause issue in this appeal with the single-minded purpose of nullifying the work of the Boone County Circuit Court. In so doing, the majority unnecessarily formulated the law of this state regarding forum selection clauses in a variety of ways. The new law was created to achieve the ultimate result desired in the case before us and by so doing falls short of advancing justice in this case and no doubt in others to come.

3. The issue before the Court in *Keyser* was a choice of law clause rather than a forum selection clause.

4. The entire test of footnote two in *Keyser* reads as follows:

## 1. Standard of Review

At the outset, the majority furthered its cause by needlessly changing this state's law governing the standard of review applied to forum selection clauses. As related in the majority opinion, Appellants attempted to enforce the forum selection clause before the lower court by motion to dismiss based on venue. The majority correctly noted that this Court employs an abuse of discretion standard when reviewing motions to dismiss based on venue. Syl. Pt. 1, *United Bank, Inc. v. Blosser,* 218 W.Va. 378, 624 S.E.2d 815 (2005). With the ink hardly dry on the 2005 opinion announcing this standard, the majority proclaims—without expressing any reason for trumping the rule of stare decisis—that "review of the applicability and enforceability of a forum selection clause is *de novo.*" Syl. Pt. 2, *Caperton v. Massey,* 223 W.Va. 624, 679 S.E.2d 223 (No. 33350, filed April 3, 2008). For some inexplicable reason, the majority has decided that the deference this Court normally affords lower court decisions regarding application of the law to the facts is suspended when the matter under consideration involves "applicability and enforceability of a forum selection clause." *Id.*

## 2. Prior West Virginia Law Governing Forum Selection Clauses

We are equally perplexed with the majority's position that this Court has generally approved forum selection clauses. While this Court in *General Electric Company v. Keyser,* 166 W.Va. 456, 275 S.E.2d 289 (1981), acknowledged *in a footnote*[3] that such clauses are not *per se* invalid, it was further recognized in that footnote that even though "our law on this point is skeletal, it does indicate that [forum selection] contract clauses which affect such matters as jurisdiction and the like should be carefully analyzed." *Id.* at 461–62 n. 2, 275 S.E.2d at 292–93 n. 2. While omitting this portion of the footnote from its quotation[4] the majority did include the paragraph noting:

> We have had occasion, however, to discuss, indirectly, forum selection clauses. Although our law on this point is skeletal, it does indicate that contract clauses which affect matters

As the Federal court observed, West Virginia appears not to subscribe to the rule that choice of forum clauses are void per se. 'Rather the rule of most jurisdictions and the rule that this Court believes that West Virginia should and would adopt is that such clauses will be enforced only when found to be reasonable and just'. *Leasewell, Ltd. v. Jake Shelton Ford Inc.,* 423 F.Supp. 1011, 1015 (S.D.W.Va.1976). *See also, Kolendo v. Jerell, Inc.,* 489 F.Supp. 983 (S.D.W.Va.1980).

*See* Op. at 235. By selectively quoting from *Keyser,* the majority reaches the sweeping conclusion that the law of this state favors enforcing forum selection clauses. An objective reading of the entire footnote hardly supports such a conclusion. Moreover, there are no subsequent cases in our jurisprudence suggesting a move in that direction in this area of our law. The extensions of forum selection clause law in this case to cover and govern the tort claims brought in the West Virginia suit before us ignores the very spirit of a "reasonable and just" outcome contemplated by the Court in *Keyser.*

The majority likewise ignores the express caution in *Keyser* that forum selection clauses affecting "jurisdiction and the like"—e.g., venue—should be "carefully analyzed." 166 W.Va. at 461 n. 2, 275 S.E.2d at 292 n. 2. As a result of the majority's reliance on selective portions of a footnote, Mr. Caperton's individual right to due process and a fair and just determination of his claims has been foreclosed.[5] Mr. Caperton as an individual was not a party to the coal supply agreement (hereinafter also referred to as "CSA") and did not have standing in his individual capacity to enforce the CSA. The majority has left him without remedy or a place where one could be sought.

The long and the short of it is that the majority simply pushed right past the cautious and judicious language of *Keyser* to construct and apply sweeping new law clearly fashioned to unequivocally deprive Plaintiffs, both corporate and individual, of the relief to which they are entitled.

## 3. Scope of New Law Governing Forum Selection Clauses

Not only did the majority institute new law regarding forum selection clauses on doubtful precedent, it also applied the new law by

---

such as jurisdiction and the like should be carefully analyzed.

Unquestionably, forum selection clauses are not contrary to public policy in and of themselves for they are sanctioned in commercial sales agreements under W.Va.Code § 46–1–105(2). Although an early case in our jurisprudence held void a clause in a stock certificate requiring that stockholders bring suit in New York, *Savage v. People's Building, Loan and Savings Association,* 45 W.Va. 275, 31 S.E. 991 (1898), later cases have sanctioned, at least implicitly, forum selection clauses. *Axelrod v. Premier Photo Service, Inc.,* 154 W.Va. 137, 173 S.E.2d 383 (1970). *Board of Education v. W. Harley Miller, Inc.,* W.Va., 221 S.E.2d 882 (1975). Both *Axelrod* and *Miller* involved contracts which contained arbitration clauses. In *Axelrod,* we gave full faith and credit to a New York Court decision which confirmed an arbitration award made pursuant to the contract terms requiring arbitration. In *Miller,* we held valid a contract provision which made arbitration a condition precedent to suit in the West Virginia courts. The writer of the *Miller* opinion noted that the common law rule preventing parties from ousting the court of jurisdiction by their agreement was "archaic". 221 S.E.2d at 885.

As the Federal court observed, West Virginia appears not to subscribe to the rule that choice

of forum clauses are void per se. 'Rather the rule of most jurisdictions and the rule that this Court believes that West Virginia should and would adopt is that such clauses will be enforced only when found to be reasonable and just'. *Leasewell, Ltd. v. Jake Shelton Ford Inc.,* 423 F.Supp. 1011, 1015 (S.D.W.Va.1976). *See also, Kolendo v. Jerell, Inc.,* 489 F.Supp. 983 (S.D.W.Va.1980).

The factors to be weighed in determining the effectiveness of a forum selection clause are materially different from the factors a court will consider in determining the effectiveness of a choice of laws clause and speak to very different problems. *Leasewell, supra* at 1014. Choice of law clauses, however, are not automatically void either, as they too are sanctioned in commercial transactions by the West Virginia Code. W.Va.Code 46–1–105(1). Thus it appears that we should not per se invalidate a choice of law clause without analysis anymore than we should invalidate a choice of forum clause without careful scrutiny.

5. The parties named in the Virginia case were Harman Mining Corporation, Sovereign Coal Sales, Inc. and Wellmore Coal Corporation. *See Wellmore Coal Corp. v. Harman Mining Corp.,* 264 Va. 279, 568 S.E.2d 671 (2002).

consistently turning a blind eye toward the actual facts of this case. The majority continuously repeats its assertion that the forum selection clause in the 1997 CSA is the basis for the conflicts giving rise to this lawsuit,[6] yet the majority fails to explain how Massey's conduct, conduct subsequent to Wellmore's declaration of *force majeure*, is related to the CSA.[7] Moreover, the trial court specifically found that Massey's actions were not connected with the 1997 CSA, a factual finding that is entitled to deference by this Court. As determined by the trial court, some of Massey's unsavory conduct was performed prior to Massey's acquisition of United, Wellmore's parent company. It was also proven that even more of Massey's unsavory conduct was performed after Massey had sold Wellmore. Despite these proven facts, the majority says that all of Massey's conduct is somehow related to the CSA. The majority improperly substitutes its own judgment without acknowledging the relevant findings of the lower court or declaring the findings of the trial court to be clearly erroneous. The majority says that "[i]n the absence of the declaration of *force majeure*, the Harman Companies would not have been forced into bankruptcy and their prospective contractual relationships would not have been impeded by Massey." *Caperton*, 223 W.Va. at 643, 679 S.E.2d at 242. Not only is this argument circular-that is, in the absence of Massey's deceitful plan, Wellmore would have never declared *force majeure* and the Harman companies would not have been impeded by Massey—but it also does not reconcile with the facts of the case. Summarizing the findings of the circuit court, the majority

noted that subsequent to Wellmore's declaration of *force majeure*, Massey continued in negotiations with the Harman companies and Mr. Caperton for Massey's purchase of the Harman Mine, and the parties agreed to close the transaction on January 31, 1998. However, Massey delayed and, as the circuit court found, "ultimately collapsed the transaction in such a manner so as to increase [the Harman companies'] financial distress." In addition, Massey utilized the confidential information it had obtained from the Harman companies to take further actions, such as purchasing a narrow band of the Pittston coal reserves surrounding the Harman Mine, in order to make the Harman Mine unattractive to others and thereby decrease its value. During the negotiations for the sale of the Harman Mine to Massey, Massey had also learned that Mr. Caperton had personally guaranteed a number of the Harman companies' obligations. **Subsequently, *the Harman companies filed for bankruptcy.***

The majority provides no explanation whatsoever as to how these acts committed by Massey are related to Wellmore's declaration of *force majeure*, and the failure to do so is because they bear no relationship to Wellmore's declaration of *force majeure*. Using the majority's line of reasoning, had Massey not entered into "sham" negotiations with the Harman companies and Mr. Caperton for Massey's purchase of the Harman Mine, the Harman companies may not have been forced into bankruptcy. Or had Massey not purposefully collapsed the transaction, after multiple delays, the Harman companies may

6. Specific supporting examples found in the majority opinion include: "[T]he circuit court erred in denying a motion to dismiss ... based upon the existence of a forum-selection clause contained in a contract that directly related to the conflict giving rise to the instant lawsuit." Op. at 229; "All of the injuries alleged in connection with the three aforementioned tort claims flow directly from Wellmore's declaration of *force majeure*, an event that is inextricably connected to the 1997 CSA." *Id.* at 241; "With respect to the Penn Virginia and UMWA contracts, it was Wellmore's declaration of *force majeure* that placed the Harman Companies and Mr. Caperton in the position of being unable to fulfill their contractual obligations. Without the *force majeure*, those contractual relations would have been

unaffected by the actions of the Massey Defendants." *Id.* at 242; "In the absence of the declaration of *force majeure*, the Harman Companies would not have been forced into bankruptcy and their prospective contractual relationships would not have been impeded by Massey." *Id.*; "[B]ecause none of the relevant claims asserted in the amended complaint would have existed in the absence of Wellmore's declaration of *force majeure* under the 1997 CSA, these claims are all brought in connection with the 1997 CSA and, as a consequence, are within the scope of the forum selection clause contained therein." *Id.* at 242.

7. The majority also says that all damages incurred by the Plaintiffs resulted from Wellmore's declaration of *force majeure*.

not have been forced into bankruptcy. Or had Massey not improperly used Mr. Caperton and the Harman companies' confidential information for Massey's personal benefit, the Harman companies may not have been forced into bankruptcy.

To say that Massey's deceitful conduct "flowed from" Wellmore's declaration of *force majeure* is utterly unjustifiable. Wellmore's declaration may have made the Harman companies more vulnerable to this attack by Massey. However, it was Massey's *subsequent actions* that were the **proximate cause** of the Harman companies destruction.

With respect to the Harman companies' claim of tortious interference with existing business relationships, the majority says

> "Count I" of the amended complaint alleges tortious interference with existing contractual relations, and specifically identifies existing contracts with Wellmore (the 1997 CSA), Penn Virginia (the lease of the Harman Coal reserves), and the UMWA (a labor contract). Certainly a claim of interference with the 1997 CSA itself is related to that contract. With respect to the Penn Virginia and UMWA contracts, it was Wellmore's declaration of *force majeure* that placed the Harman Companies and Mr. Caperton in the position of being unable to fulfill their contractual obligations.

*Caperton*, 223 W.Va. at 642, 679 S.E.2d at 241.

Contrary to this assertion by the majority, the trial court specifically found that it was Massey's conduct subsequent to the *force majeure* declaration that affected the lease of the Harman Coal reserves and the labor contract. Had Massey not engaged in its deceptive conduct—pretending to carry on purchase negotiations in order to gain confidential information for use against the Harman companies and Mr. Caperton—who knows what the outcome may have been. Not surprisingly, that was the question presented to the Boone County jury: had Massey not engaged its deceptive actions, what position would Mr. Caperton and the Harman companies have been in? Stated another way, what injuries did Massey inflict on Mr. Caperton and the Harman companies by engaging in its deceptive actions?

Although unsupported by the evidence, the majority sweepingly states that "insofar as the claims asserted in this action all flow from the allegedly wrongful declaration of *force majeure*, they would require interpretation of the contract to determine whether the declaration was indeed wrongful." *Caperton*, 223 W.Va. at 643, 679 S.E.2d at 242 n. 24. The majority inaccurately indicates that a wrongful declaration of *force majeure* is necessary to the claims presented in this case. According to the majority, had Wellmore rightfully declared *force majeure*, the Harman companies and Mr. Caperton would not have a claim against Massey. The majority's new formulation of the law now permits companies to enter into "sham" negotiations and thereby acquire confidential information, only to use that information to drive their competitors out of business.

### 4. Due Process

The manner in which the majority applied its newly announced four-part test for determining whether a forum selection clause should be enforced violates the due process rights of not only Mr. Caperton, but the corporate appellees as well. As the majority points out by reference to multiple pages of authority, retroactive application by courts of a newly announced law is not a *per se* violation of due process. However, when a new burden is placed on a party as part of that new law and the party charged with carrying the burden is not permitted an opportunity to go forward with evidence to meet the burden, procedural due process guarantees are violated. "[A] State may not deprive a person of all existing remedies for the enforcement of a right, which the State has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." *Brinkerhoff–Faris Trust & Sav. Co. v. Hill*, 281 U.S. 673, 682, 50 S.Ct. 451, 74 L.Ed. 1107 (1930); *see also Harper v. Virginia Dept. of Taxn.*, 509 U.S. 86, 101, 113 S.Ct. 2510, 125 L.Ed.2d 74 (1993). There is absolutely no way that the corporate appellees or Mr. Caperton could have heretofore attempted to meet the burden the new standard imposes in order to overcome the presumption of enforceability. The majority af-

fords no opportunity after announcing the new standard for the affected parties to meet the newly established burden. Obviously, Appellees' rights to due process have been abridged.

### 5. Contractual Rights of Third-parties

To attain its objective in this case, the majority has also ignored one of the most basic principles of contract law, that being "the primary purpose and function of the court in interpreting a contract is to ascertain the parties' intention so as to give effect to that intention." 11 *Williston on Contracts* § 32:2 at 397 (4th ed.1999); *see also Restatement (Second) of Contracts* § 201. Courts are obligated to interpret and give effect to the mutual intention of the parties at the time of contracting. Parties to a contract may create rights in third parties by manifesting an intention to do so within the contract or by the circumstances surrounding the making of the contract. "However, in order to be entitled to relief as a third-party beneficiary, the protection afforded must have been in the contemplation of the parties at the time of the execution of the contract." 17B C.J.S. *Contracts* § 621 (1999); *see also* W.Va.Code § 55-8-12 (1923) (Repl.Vol.2000). It is inconceivable that any of the parties to the CSA could have or should have foreseen or expected at the time of contracting that Massey would unlawfully undertake to do irreversible harm to the Harman mining operation, and to Mr. Caperton as an individual, since he was not a party to the contract in his individual capacity. Even though the contract played a role in different facets of the case brought in West Virginia, Appellees' tort claims against Massey embraced more than the obligations and duties arising out of the CSA or conduct undertaken pursuant to the CSA.

In syllabus point eleven, the majority announces a new rule, that "[a] defendant who is a non-signatory to a contract containing a forum-selection clause may enforce that clause when it is shown that the claims against him or her are closely related to the contract." In the first case cited by the majority in support of this rule, *Hellenic Inv. Fund, Inc. v. Det Norske Veritas*, 464 F.3d 514, (5th Cir.2006), the reviewing court enforced a forum selection clause against a non-signatory to the contract on the basis that the non-signatory benefitted from *performance* of the contract. The same cannot be said for the instant case where Massey benefitted from the *destruction* of the 1997 CSA.

The trial court found that Harman Development and Wellmore had formed a strong coal supply relationship with LTV Steel—a relationship that Massey desperately wanted, and apparently would stop at nothing to get. Massey developed and executed a very risky plan to obtain LTV's business[8], and when that plan failed, Massey refused to accept responsibility for it actions. Massey admits that it did a "cost-benefit" analysis and determined that it was in its best interest to declare *force majeure*. However, it does not seem the declaration was in Wellmore's best interest, as the trial court found that Wellmore sold and shipped nearly two-thirds of the coal purchased from the Harman companies to LTV Steel. The majority's casting of the Wellmore–Massey relationship as being closely connected in interest is simply not correct according to the facts. Even though Massey owned Wellmore for a brief period of time—less than eight months—Massey did not further the interests of Wellmore by destroying Wellmore's relationship with LTV Steel and then with the Harman companies.

The majority emphasizes that Mr. Caperton or the Harman companies could reasonably foresee that they would be bound by the forum selection clause. However, could Mr. Caperton or the Harman companies reason-

---

8. After years of trying, unsuccessfully, to obtain LTV Steel's business, and knowing that Wellmore was one of LTV Steel's primary customers for its Pittsburgh plant, Massey decided to acquire Wellmore. Massey purchased Wellmore on July 31, 1997, despite LTV's July 19, 2007, announcement that it intended to close the Pittsburgh coke plant for EPA reasons. Massey's internal memos introduced at trial in West Virgi-

nia clearly showed that Massey realized that in doing this, there was a high risk that LTV Steel would simply end the relationship with Wellmore, which happened. In its final order, the circuit court found that "[o]nly after Massey's marketing efforts caused the loss of LTV's business did Massey direct Wellmore to declare 'force majeure' against Harman...."

ably foresee that Massey would acquire Wellmore's parent company of United Coal for a brief eight-month period, by which Massey would be able to enforce the forum selection clause? Could Mr. Caperton or the Harman companies reasonably foresee the actions Massey took after it had sold Wellmore—which removed any type of contractual relationship whatsoever between the parties—would still fall within the forum selection clause in the 1997 CSA? Apparently the majority believes Mr. Caperton and the Harman companies should have anticipated all of the peculiarities arising in this case. Ultimately, by placing such unrealistic requirements as to foreseeability on contracting parties, the majority makes West Virginia a truly vulnerable place to do business.

Another basic tenet of contract law is that the parties approach the contracting process act with good faith and the intent to deal fairly. As summarized by one authority,

> there is an implied covenant of good faith and fair dealing in every contract, whereby neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract....
>
> The scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract.

17A Am.Jur.2d *Contracts* § 370. Initially, Harman had included in its Virginia suit a claim sounding in contract for breach of the duty of good faith and fair dealing,[9] but withdrew the claim before the trial in that case. Withdrawal of the claim is fully understandable because only Wellmore, as a party to the CSA, could be bound by the *contractual* duty of good faith and fair dealing. As the lower court herein concluded from the evidence before it, manipulation of the CSA and its forum selection clause was just one of many tools Massey used both before, during and after its ownership of Wellmore. The aim of Massey's plan was either to directly cause the demise of the Harman corporations and the financial ruin of Mr. Caperton as an individual, or at least use the Harman coal

operation and Mr. Caperton as pawns to force United to accept the lower grade Massey coal for the premium coal produced from the Harman mine. There was no indication that Wellmore was aware of Massey's plan to eliminate the Harman mining operation or could have foreseen the implementation of such a plan when it entered and renewed the CSA with the corporate appellees. Essentially, the majority, by extending the right to enforce a forum selection clause under the circumstances of this case to Massey as a non-signatory to the CSA, has created a loophole whereby a non-party to a contract may gain the benefit of enforcing a forum selection clause without having the burden of accountability for acting in good faith and dealing fairly. Massey and others like Massey can simply ride the coattails of good business citizens in order to accomplish covert, questionable and reprehensible acts. We hardly find this conducive to promoting trust in the contracting process or otherwise furthering commerce and business interests—nor does it foster trust in the judicial process.

**6. Weaknesses of the Announced Forum Selection Clause Test**

Even if one acknowledges the suitability—in the abstract—of the test made applicable to forum selection clauses by the majority opinion, two very serious problems are readily apparent with the application to the case sub judice of the new test announced by the majority in syllabus point six. First, as mentioned earlier, retroactive application of this test does not allow parties the opportunity to overcome the newfound presumption of enforceability, thereby depriving the parties opposing enforcement of the clause their due process rights. Our second concern rests with the new test not giving trial courts, charged with weighing the evidence regarding forum selection clause issues, the freedom to decide that the presumption of enforceability has been rebutted purely on the circumstances as revealed in the record before them. This flexibility, placed in the hands of our capable trial court judges,

---

**9.** The majority mis-characterized this claim as a tort claim, but the corporate appellees made it

clear during oral argument that no claims sounding in tort were filed in Virginia.

would serve to eliminate unnecessary expenditure of time and resources in appropriate cases.

We fear that the readily apparent flaws in the new standards embraced by the majority as governing enforcement of forum selection clauses in this state represent only the tip of the iceberg of problems which will surface upon pragmatic application of the standards in the courtrooms of this state. All lawyers know that the law can be read and written to accommodate the needs of a situation, and that the law has to be malleable in order to address a variety of ever-evolving circumstances. Consequently, good, enduring and meaningful law must be written in such a manner as to promote the noble cause of the larger good and not merely support the agenda of a few. Unfortunately, the new law governing forum selection clause issues which the majority has designed in this case reaches unreasonable and unjust results not only for the affected parties, but also for the judge and jury who heard this case and all businesses and individuals who will be impacted by anticipated as well as unexpected results.

## B. Res Judicata

Dismissal on res judicata grounds was unnecessary and again exemplifies the majority's results-driven approach to this appeal.

Because the law of Virginia controls the application of res judicata in this case, a close examination of the decisions of the Supreme Court of Virginia *governing the relevant time period*[10] is essential. This study, however, must be undertaken with the understanding that the pertinent cases were decided at a time when common law and equity pleading

were not merged in Virginia.[11] Such recognition is necessary because the separation of law and equity often affected whether one or more of the four elements necessary to invoke application of the doctrine of res judicata[12] was present under the facts of a given case. For example, some remedies were only available in actions brought in the chancery side of the courts while others were only obtainable on the law side of the courts.[13] Moreover, the discussion in the cases does not always address the law-equity distinction when examining the presence or absence of the elements substantiating application of res judicata, and sometimes reasoning based on the distinction is applied in cases where the basis of the two suits is not split between common law and equity. As a result, the status of the applicable law involving res judicata in Virginia simply was not as clear as the majority opinion leads one to believe. This is particularly true in Virginia's Supreme Court cases involving the meaning of the element of "identity of cause of action." A review of these cases, all decided no later than the time that the final judgment was entered in the Virginia suit, does not support the majority's conclusion that Virginia would have applied the transactional approach to the res judicata cause of action element. Instead, such review discloses that this area of Virginia's jurisprudence was in a state of flux at the time the final judgment order was entered against Wellmore in the breach of contract suit brought in Virginia.

More than one test has been employed over the years in Virginia to determine whether the element of "identity of cause of action" has been satisfied. One approach

---

**10.** The relevant time period would logically be when the tort claim could have been joined with the contract claim filed in Virginia. Thus the relevant period would be May 21, 1998, when the contract case was filed, until no later than when the final judgment order in Virginia was entered on May 7, 2001.

**11.** Common law and equity procedure were not merged in Virginia until January 1, 2006. *See* W. Hamilton Bryson, *The Merger of Common-law and Equity Pleading in Virginia*, 41 U. Rich. L.Rev. 77 (2006).

**12.** The elements necessary to justify application of the doctrine of res judicata in Virginia are:

"(1) identity of remedies sought; (2) identity of the cause of action; (3) identity of the parties; and (4) identity of the quality of the persons for or against whom the claim is made." *Wright v. Castles*, 232 Va. 218, 349 S.E.2d 125, 128 (1986); *Mowry v. City of Virginia Beach*, 198 Va. 205, 93 S.E.2d 323 (1956).

**13.** This is not to say as the majority suggests that the law/equity distinction is the only factor considered in Virginia to determine whether the same remedy is available for res judicata purposes.

most commonly applied involves an analysis of the evidence. The extended vitality of this approach was attested to in the 1988 case of *Flora, Flora & Montague, Inc. v. Saunders,* 235 Va. 306, 367 S.E.2d 493 (Va.1988), in which it was stated that for res judicata purposes,

> [t]he principal test to determine whether claims are a part of the same cause of action is whether the same evidence will support both claims. *Brown v. Haley,* 233 Va. 210, 216, 355 S.E.2d 563, 567 (1987)[ ("The test to determine whether claims are part of a single cause of action is whether same evidence is necessary to prove each claim.") ]; *Jones [v. Morris Plan Bank],* 168 Va. [284] at 290–91, 191 S.E. [608] at 609–610 [ (1937)] [ ("One of the principal tests in determining whether a demand is single and entire, or whether it is several, so as to give rise to more than one cause of action, is the identity of facts necessary to maintain the action. If the same evidence will support both actions, there is but one cause of action.") ]; *see also Wright v. Castles,* 232 Va. 218, 223–24, 349 S.E.2d 125, 129 (1986) [ (relying on *Jones v. Morris Plan Bank* to apply the same evidence test) ]; *Bates [v. Devers],* 214 Va. [667] at 672, 202 S.E.2d [917] at 922 [ (1974) (applying same evidence test) ].

*Saunders* at 495–96. Some additional older cases in which the "same evidence test" was employed to determine whether claims were part of a single cause of action are *Kelly v. Board of Public Works,* 66 Va. 755, 25 Gratt. 755, 763, 1875 WL 5640, *4 (1875) ("The two claims ... are distinct divisible claims, depending on separate contracts, made at different times and upon different principles; and the evidence to support one is not necessary to support the other, but much of it that would be material to sustain the one would be irrelevant to the other."), *Cohen v. Power,* 183 Va. 258, 32 S.E.2d 64, 65 (1944) ("The test generally applied in the application of the doctrine of res adjudicata is to determine whether the facts essential to the maintenance of the two actions are the same. If the same facts or evidence would sustain both actions ... subsequent action based upon the same facts [is barred]."), and *Feldman v.*

*Rucker,* 201 Va. 11, 109 S.E.2d 379, 384 (1959) (second suit found to be a different cause of action because its outcome "was dependent upon different proof and principles of law.") Since the same evidence test did not always serve justice, other factors were also considered by the high court of Virginia when deciding the presence or absence of similarity between causes of action. In *Smith v. Ware,* 244 Va. 374, 421 S.E.2d 444 (1992), the Virginia Supreme Court found that different causes of action existed because different *rights* were asserted in each suit, one based in equity and the other based in law. In another case in which one suit was filed in the chancery court and the other was filed in the law court, the examination of the cause of action element turned on whether the *purposes and issues* in both suits were the same. *Worrie v. Boze,* 198 Va. 533, 95 S.E.2d 192, 197 (1956). Yet another approach used in Virginia to vary the result achieved by strict application of the same evidence rule was to look at the transaction from which the suits arose.

It was in the 1974 case of *Bates v. Devers*—a case earlier noted as applying the same evidence test—that the Virginia Supreme Court first referred in a footnote to the term "transaction" in relation to the res judicata element of cause of action. The footnote from *Bates* was elevated to the body of the discussion in *Allstar Towing, Inc. v. City of Alexandria,* 231 Va. 421, 344 S.E.2d 903 (1986), in the following manner:

> For the purposes of res judicata, a 'cause of action' may be defined broadly 'as an assertion of particular legal rights which have arisen of a definable factual transaction.' *Bates v. Devers,* 214 Va. 667, 672 n. 8, 202 S.E.2d 917, 921 n. 8 (1974).

*Allstar* at 905–06. Since the same evidence test was thereafter touted in the 1988 case of *Saunders* as the principal test in this regard, a fair reading of *Allstar* is that the result the high court of Virginia believed would serve justice could not be attained by strict application of the same evidence test. Although the two suits which were the subject of the res judicata inquiry in *Allstar* would have relied upon the same evidence, the spin the Virginia Supreme Court placed on the same evidence

test in *Allstar* allowed the high court to reach the conclusion that the second suit should proceed because some of the relevant events had not occurred until after the first suit was decided. The *Allstar* court did not approach the matter before it using the transactional analysis method in order to find that the facts supported an inseparable amalgam constituting but one cause of action. Rather, the Court in *Allstar* relied upon the term "definable factual transactions" to separate the interrelated facts before it and find two identifiable causes of action. *Id.* Furthermore, there was no indication in the body of the *Allstar* opinion that prior decisions were overruled, superseded or should be read in light of the adoption of a new standard for determinations of causes of action for res judicata purposes. Thus the principal insight *Allstar* provides is that the Supreme Court of Virginia would not strictly adhere to a test for cause of action which would serve to eliminate a party's right to a full and fair hearing on matters which had not previously been adjudicated.

Although decided outside of the relevant time period of the case sub judice, the later case of *Davis v. Marshall Homes, Inc.*, 265 Va. 159, 576 S.E.2d 504 (2003), supports this reading of *Allstar* while serving as further testament that the law in this area remained unsettled in Virginia until the Supreme Court of Virginia adopted Rule 1:6 of the Rules of the Supreme Court of Virginia in 2006. The majority and dissenting opinions filed in the *Davis* case nicely summarize the differing viewpoints on the proper test to apply in this regard.

The majority simply ignores the unsettled status of this area of law in Virginia in 2001 when the Virginia suit was concluded and instead looks to what the Virginia Supreme Court eventually did to resolve the dilemma. It also ignores the Virginia high court's overarching concern with achieving justice when faced with a decision of what constituted an identity of cause of action for res judicata purposes. The only Virginia cases within the relevant time period upon which the majority

squarely relies are *Allstar* and the unpublished *circuit court case* of *Cherokee Corporation v. Richardson*, 1996 WL 1065553 (Va. Cir.Ct.1996). This reliance could have only been used to substantiate the Virginia Supreme Court's later adoption in 2006 of a transactional analysis rule.[14] It is noteworthy for due process purposes that the Supreme Court of Virginia prospectively applied the new rule only to those cases brought on or after the effective date of July 1, 2006. To say that the parties knew, should have or even could have known that the high court of Virginia would—some five years after the final judgment was entered in the Virginia contract case—adopt a transactional analysis approach as the sole means to define cause of action for res judicata purposes is to assume that the parties had access to a crystal ball or possessed prescient abilities.

Significantly, the majority could not have followed the precedential law of Virginia and applied the same evidence test in any form since the entire record of the Virginia proceeding was not admitted into the record of this appeal, making a comparison of evidence between the Virginia suit and the West Virginia suit impossible. This serves to further demonstrate the majority's dogged pursuit of a course which would produce the results it desired in whatever available manner.

Even if the transactional analysis test was the controlling law of Virginia in 2001, the matters raised in the West Virginia suit went beyond what the majority found to be central to the transaction: the CSA.[15] The evidence introduced in the Boone County suit proved that Massey developed its plans to undermine the Harman Mine operations and to place Mr. Caperton's individual interests in jeopardy before the first CSA was signed, that is before Massey had any ownership interest in Wellmore, and carried that effort forward long after Massey sold Wellmore. Furthermore, the purposes of the transactional analysis approach have been frustrated by the way that the majority undertook to

---

14. *See* Rule 1:6, Rules of Supreme Court of Virginia, regarding res judicata claim preclusion and therein defining "cause of action" for res judicata purposes.

15. The coal supply agreement was part of the record in this appeal.

apply it in the instant case. It is recognized in the federal courts which have adopted the transactional analysis test that "[n]o simple test exists to determine whether causes of action are identical for claim preclusion purposes, and each case must be determined separately within the conceptual framework of the doctrine." *Pittston Co. v. U.S.*, 199 F.3d 694, 704 (4th Cir.1999); *see also* Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, 18 Fed. Prac. & Proc. Juris.2d § 4407 nn. 53–54 (2002) (citing cases finding either no definition possible or no definition desirable). It is further recognized that the utility of the transactional analysis test is that it affords flexibility in examining cases which are more complex, and has been used to justify separating claims in such circumstances even though the claims arise from a common background. As summarized by one authority commenting on how the federal courts have applied the transactional analysis test in complex cases:

> One of the most general reasons for separating claims is that a broad course of completed unlawful conduct has included a clearly separable event that gave rise to distinctive injury. Thus the victim of a long conspiracy to destroy a business was permitted to follow an action for libel with an antitrust action in which the libel was merely one piece of evidence to prove the overall conspiracy. In like fashion, a trustee in bankruptcy was permitted both to recover a judgment against the controlling stockholder for breach of fiduciary responsibilities in a specific transaction, and later to subordinate the stockholder's rights to the rights of other stockholders on the basis of continuing breach of its responsibilities throughout the entire period of ownership. Despite the relationship among the facts of these separate actions in origin and motivation, these decisions seem to respond well to pragmatic considerations of trial efficiency and do not pose any substantial threat to interests of repose.

18 *Wright, Miller, & Cooper*, 18 Fed. Prac. & Proc. Juris.2d § 4408, 195–196 (footnotes omitted).

The majority failed to closely examine whether there were clearly separable events and distinctive injuries arising in the instant case, and did not consider the pragmatic implications of joining all claims into one trial. Regrettably, it appears the majority was more committed to the aim of reaching a desired conclusion rather than arriving at a just result—which the transactional analysis approach would clearly support under the facts presented in this case.

## III. SUMMATION

Although the majority opinion made substantial additions to the opinion vacated as a result of granting the rehearing motion, the omissions from the original decision overshadow the additions. Specifically, despite the disagreements among the individual Justices in the vacated opinion, all five did agree on one point:

> **[A]t the outset, we wish to make perfectly clear that the facts of this case demonstrate that Massey's conduct warranted the type of judgment rendered in this case.**

*Caperton v. A.T. Massey Coal Co., Inc.*, 2007 WL 4150960, Slip Op. at 13 (No. 33350, filed November 21, 2007), *withdrawn.*

As amply demonstrated by the preceding analysis, the majority could have readily allowed the work of the Boone County Circuit Court to stand. Instead, the majority consciously chose to decide this case in such a way as to allow wrongdoers to skirt the consequences of their actions. In pursuit of its desired outcome, the majority did not apply the controlling law of Virginia and instead rigidly applied a test unknown to the parties at the time the litigation was pending in Virginia, and did so without regard to the inherent flexibility of the rule. The new test was applied in such a way as to ignore the complexities of the transaction and with gross disregard for the due process rights of the litigants. Not only is the majority opinion unsupported by the facts and existing case law, but it is also fundamentally unfair. Sadly, justice was neither honored nor served by the majority.[16]

---

**16.** Mr. Caperton raised a further issue regarding possible disqualification of Justice Benjamin.

While it gives us no pleasure to write this dissent, we recognize a duty to do so in the name of justice. Indeed, embodied in our constitution is the clear statement that "[f]ree government and the blessings of liberty can be preserved to any people only by a firm adherence to justice, moderation, temperance, frugality and virtue, and by a frequent recurrence to fundamental principles." W. Va. Const. Art. 3, § 20. Regrettably, the majority has radically strayed from the fundamental principles of fairness and justice in maintaining its course of setting aside the Boone County decision in this case, a course to which we wholeheartedly and fervently dissent.

BENJAMIN, Acting C.J., concurring:

(Filed July 28, 2008)

Roscoe Pound offered the following pertinent comments as to a judge's responsibility when setting forth an opinion:

> The opinions of the judge of a highest court of a state are no place for intemperate denunciation of the judge's colleagues, violent invective, attributings of bad motives to the majority of the court, and insinuations of incompetence, negligence, prejudice, or obtuseness of fellow members of the court.

Roscoe Pound, *Cacoethes Dissentiendi: The Heated Judicial Dissent*, 39 A.B.A. J. 794, 795 (1953). There is an important difference between a thoughtful, well-reasoned separate opinion or order and one which is grounded in the political manipulation of legal doctrine; and in the case of ensuring a stable, predictable and fair judicial system, that difference

matters. Judges who use their opinions and orders simply as sensationalistic bombast by which to convey partisan agendas or who pander to emotion rather than legal reason do a disservice to the rule of law and to the institution they serve.

It is a testament to the strength of our justice system that judges may disagree and do so openly in separate opinions. A well-reasoned and legally sound separate opinion carries with it the opportunity for pointing out differences with the opinions of the other members of the court without undermining public confidence in the judiciary. Hon. Ruth Bader Ginsburg, *Speaking in a Judicial Voice*, 67 N.Y.U.L.Rev. 1185, 1196 (1992). By furthering positive progress in the development of law, a well-honed opinion serves as an invaluable instructional tool to judges, lawyers, legal scholars, law students and even to a judge's colleagues. "[T]he effective judge ... strives to persuade, and not to pontificate. [He] speaks in 'a moderate and restrained' voice, engaging in a dialogue with, not a diatribe against ... [his] own colleagues." *Id.* at 1186 (internal quotations omitted). A separate opinion should never "generate more heat than light," but rather should " 'stand on its own footing,' ... spell[ing] out differences without jeopardizing collegiality or public respect for and confidence in the judiciary." *Id.* at 1194, 1196 (internal quotations omitted).

If the touchstone of a judicial system's fairness is *actual* justice, which I believe it is, its legitimacy is measured in actualities, not in the manipulation of appearances or the vagaries of sensationalism.[1] Actual justice

---

The majority did not address this issue, likely because it is the practice of this Court, as it is the practice of the United States Supreme Court and other federal courts, to leave decisions on disqualification motions for each judge to decide individually. Unfortunately, with true regret, we are unable to stand silent in the present circumstances. Upon reviewing the cases of *Aetna Life Insurance Company v. Lavoie*, 475 U.S. 813, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986), and *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955), it is clear that both actual and apparent conflicts can have due process implications on the outcome of cases affected by such conflicts. On the record before us, we cannot say with certainty that those cases have application here. It is now clear, especially from the

last motion for disqualification filed in this case, that there are now genuine due process implications arising under federal law, and therefore under our law, which have not been addressed.

1. As a basic premise of this concurrence, I submit that the goal of any legitimate judicial system is actual justice. Actual justice presupposes stability and predictability in the judicial system by the measured application of the rule of law. Actual justice is not measured by whether the end-result of the case, *i.e.*, who wins and who loses, meets with the acceptance of partisan constituencies or those with vested interests in specific outcomes in given cases. Rather, it is justice firmly rooted in the rule of law. Appearance-or politically-driven judging is subject to

derives from actual impartiality in decision-making and is conveyed in well-written *legal* opinions which are founded in the rule of law—not in orders, opinions or public pronouncements by judicial officers reflecting partisanship, contempt for other members of this Court, or their staff, bias toward or against the parties, or a pre-judging of the issues.[2]

It is an unfortunate truth that judicial officers in West Virginia must stand for office in political elections.[3] Notwithstanding this political selection method, the public's confidence in our system of justice is necessarily undermined and the stability and predictability of the rule of law is compromised when politics cross the threshold of our Court. The most important factors therefore affecting the public's perception of actual justice in this Court necessarily are the actual decisions of this Court, and its members, over time, the professional demeanor of this

Court's members, and the quality of the written opinions and orders which we produce in specific cases.[4]

By baiting emotions, I believe the Dissenting opinion adopts a distinctly "political voice" rather than a "judicial voice." With due respect to my dissenting colleagues, this case does not present a close call on the basis of the rule of law. Because the Majority decision possesses such a deep strength of legal authority, I do not believe that the Dissenting opinion in any way weakens the authority or substance of the Court's decision.

The law governing the Court's decision of this case is clear. Accordingly, the focus of this concurrence is limited to four specific topics: the proper view of the facts on appeal, the transactional approach to *res judicata*, the proper standard of review for a forum-selection clause, and the issue of recusal.[5]

---

the manipulation of information and opinion via innuendo, half-truths, suggestive claims, and so on. Such judging is contrary to a judge's duty to resist public clamor and fear of criticism. W. Va. Rules of Judicial Conduct, Canon 3B(2) ("A judge shall not be swayed by partisan interests, public clamor, or fear of criticism.").

2. The politicization of one's judicial office is perhaps the gravest threat to the independence of the judiciary, because the use of one's judicial office for partisan purposes utterly destroys the impartiality and fairness which is necessary for actual justice. A judicial officer's public actions in ridiculing selected litigants or fellow jurists, particularly during the pendency of a case or an election, necessarily conveys to the public a fundamental bias within the Court incompatible with fairness. The notion of "political" or "appearance-driven" justice in West Virginia conveys the message that appearances and rhetoric—particularly when contrived—mean more than actualities, that the manipulation of facts is more important than the facts themselves, that cases are decided to a predetermined politically-correct result, and that ends justify means. Public confidence is directly affected by the manner in which a judge or justice accords himself or herself in public, by the collegiality which he or she shares with other judicial officers, and by the quality of his or her legal reasoning.

3. The West Virginia Constitution requires that judicial officers in West Virginia be elected by the People. *See* W. Va. Const. art. VIII, §§ 2, 5, 10 and 16. The West Virginia Legislature has, by statutory law, required such elections to be partisan. W. Va.Code § 3–5–4.

4. *See* Charles S. Trump IV, *The Case in Favor of the Nonpartisan Election of Justices of the Supreme Court of Appeals of West Virginia*, The West Virginia Lawyer, 24 (May 2000) ("Upon the bench we hope to see jurists who will decide cases upon a dispassionate reading of the law and the reasoned application of the law to the facts before them.")

5. As an aside, I pause briefly to note that the Dissenting opinion begins by quoting from the Majority opinion that was filed in this action on November 21, 2007, prior to the rehearing of this case. Notably, however, that opinion no longer has any force or effect. *See State ex rel. Moats v. Janco*, 154 W.Va. 887, 901, 180 S.E.2d 74, 83 (1971) ("As a general rule, when a rehearing is granted, the status of the case is the same as though no hearing had occurred.... The granting of a rehearing withdraws an opinion previously rendered and destroys its force and effect unless it is subsequently adopted by the same tribunal.... By reason of the rehearing heretofore granted[,] the Majority opinion[, the concurring,] and the dissenting opinions heretofore filed in this case are withdrawn and held for naught." (internal citations omitted)). *See also Miller v. Burley*, 155 W.Va. 681, 698, 187 S.E.2d 803, 813 (1972) (same); *Atlantic Greyhound Corp. v. Public Serv. Comm'n of W. Va.*, 132 W.Va. 650, 665, 54 S.E.2d 169, 177 (1949) ("The granting of a rehearing withdraws an opinion previously rendered and destroys its force and effect unless it is subsequently adopted by the same tribunal.").

# I.

## REVIEWABLE FACTS LIMITED TO PRE–TRIAL RECORD

Turning first to the more substantive issues of the case, the Dissenting opinion launches into a lengthy, twenty-two page discussion of the evidence admitted during the trial of this matter and certain determinations made by the circuit court based upon that evidence. The dissent then uses this trial evidence and associated court rulings to justify its position on how the instant case should have been resolved. I do not believe this analysis by the dissent to be legally sound. Due to the posture of the instant appeal, *i.e.*, the dispositive matters actually before this Court on appeal, this Court's review is limited. As a court of appeals, this Court simply cannot consider issues not appealed by the parties or the evidence that was admitted during trial on such non-appealed issues. Specifically, there were two dispositive issues before this Court for review: (1) the circuit court's denial of the Massey defendants' *pre-trial* motion to dismiss for improper venue in light of the forum-selection clause contained in the 1997 CSA, and (2) the Massey defendants' motion for summary judgment based upon the doctrine of *res judicata*.

With respect to the Massey Defendants' pre-trial motion to dismiss based upon the forum-selection clause, the Majority opinion correctly limits its review to the facts that were before the circuit court at the time of its ruling on the motion. Indeed, the Majority opinion correctly observes that "the forum-selection clause issue was addressed below in the context of a motion to dismiss; therefore, we consider the claims as they were asserted in the complaint." Maj. op. at 241. *See also* Maj. op. at 248 n. 30 ("The proper question ... is whether enforcement of the forum-selection clause was unjust or unreasonable *at the time of the Massey De-*

*fendants' motion to dismiss based upon the forum-selection clause.*" (emphasis added)).[6] *Cf. Powderidge Unit Owners Ass'n v. Highland Props., Ltd.,* 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996) ("Although our review of the record from a summary judgment proceeding is *de novo*, this Court for obvious reasons, will not consider evidence or arguments that were not presented to the circuit court for its consideration in ruling on the motion. *To be clear, our review is limited to the record as it stood before the circuit court at the time of its ruling.*" (emphasis added)).

With respect to the Massey defendants' motion for summary judgment based upon the doctrine of *res judicata*, the Majority opinion correctly observes that the circuit court properly denied the Massey Defendants' original motion for summary judgment as there was no final order in the Virginia action at the time that the original summary judgment motion was made to the circuit court. However, the Majority opinion goes on clearly to explain that the summary judgment issue could be raised for the first time on appeal, and appropriately addresses the issue in the same manner that the circuit court would have had the Virginia case been final at the time the Massey Defendants' original summary judgment motion was made before the circuit court. Therefore, the Dissenting opinion's reliance upon facts developed during the eventual trial of this matter to support its position herein is simply wrong because those facts were not before the circuit court at the time the summary judgment motion was filed and ruled upon.

# II.

## TRANSACTIONAL APPROACH TO *RES JUDICATA*

In ascertaining the proper test to be applied to the element of *res judicata* requiring identity of the cause of action, the Majority

---

6. The Majority opinion further points out that only three of the claims asserted in the amended complaint were ultimately presented to the jury for a verdict, indicating that there was insufficient evidence to support the remaining claims. Accordingly, in deciding whether the claims asserted below were "brought in con-

nection with" the 1997 CSA, we will limit our consideration to only those three claims that ultimately went to the jury. Those three claims, all sounding in tort, were (1) tortious interference; (2) fraudulent misrepresentation; and (3) fraudulent concealment. Maj. op. at 241.

properly applies the transactional test, which was in place in Virginia at the time the complaint in the action underlying this appeal was filed in the Circuit Court of Boone County: October 1998.[7] Indeed, in April

7. Nevertheless, I note that Virginia has a long history of applying the transactional approach, beginning as early as 1884. *See Wohlford v. Compton*, 79 Va. 333, 338–39, (1884) ("When a matter is adjudicated and finally determined by a competent tribunal, it is considered as forever at rest. This is a principle upon which the repose of society materially depends, and it therefore prevails, with very few exceptions, throughout the civilized world. This principle embraces not only what was actually determined, but also extends to every other matter which the parties might have litigated in the suit."). *See also Blackwell's Adm'r v. Bragg*, 78 Va. 529, 539 (1884) (" 'The doctrine of res judicata applies to all matters which existed at the time of giving the judgment, or rendering the decree, *and which the party had the opportunity of bringing before the court* .... There is no relief prayed for in this which the appellants could not have obtained in that suit; if entitled thereto. There are no material averments in the bill in this case which could not have been investigated and passed on in that, and which in effect were not passed on by the final decree in that case.' " (citations omitted) (emphasis added)); *McCullough v. Dashiell*, 85 Va. 37, 6 S.E. 610, 612 (1888) ("[A]lthough this court may be of opinion that it is only necessary to notice certain questions as they are decisive of the case, yet all questions involved in the appeal are finally adjudicated, whether distinctly raised and passed on below and here or not. If they are involved, and might have been passed on, it is enough.... *The doctrine of res judicata applies to all matters which existed at the time of giving the judgment or rendering the decree, and which the party had the opportunity of bringing before the court.*" (emphasis added) (citations omitted)); *Fishburne v. Furguson*, 85 Va. 321, 7 S.E. 361, 362–63 (1888) ("It is necessary, first, to consider whether this suit is concluded by the suit referred to in Franklin county; for, if the question is res adjudicata, the whole matter ends there; for, when a matter is adjudicated and finally determined by a competent tribunal, it is considered as forever at rest. This is a principle upon which the repose of society materially depends, and it therefore prevails with very few exceptions throughout the civilized world. *This principle not only embraces what actually was determined, but also extends to every other matter which the parties might have litigated in the case;* and when the facts which constitute the cause of action or defense have been between the same parties submitted to the consideration of the court, and passed upon by the court, they cannot again be the proper subjects for an action or defense, unless the finding and judgment of the court are opened up or set aside by competent authority. This principle of law extends still further in quieting litigation. A party cannot relitigate matters which he might have interposed, but failed to do in a prior action between the same parties, or their privies, in reference to the same subject-

matter." (emphasis added) (citations omitted)); *Beale's Adm'r v. Gordon*, 21 S.E. 667, 669 (Va. 1895) ("When a judgment or decree has been rendered by a court of competent jurisdiction in a suit, it is a bar to any further action between the same parties upon the same matter of controversy.... The decree in the first cause is not only final as to the matters actually determined, but *as to every matter which the parties might have litigated, within the scope of the pleadings in the cause, and which might have been decided.*" (emphasis added) (citations omitted)); *Brunner v. Cook*, 134 Va. 266, 114 S.E. 650, 651 (1922) (" 'When the second suit is between the same parties as the first, and on the same cause of action, the judgment in the former is conclusive on the latter not only as to every question which was decided, but also as to every other matter which the parties might have litigated and had determined, within the issues as they were made or tendered by the pleadings or as incident to or essentially connected with the subject-matter of the litigation, whether the same, as a matter of fact, were or were not considered. As to such matters a new suit on the same cause of action cannot be maintained between the same parties.' " (quoting 15 R.C.L. "Judgments," § 438, p. 962)); *Gimbert v. Norfolk S.R. Co.*, 152 Va. 684, 148 S.E. 680, 682–83 (1929) (same); *Choate v. Calhoun*, 153 Va. 52, 149 S.E. 470, 471 (1929) (same); *Kemp v. Miller*, 166 Va. 661, 186 S.E. 99, 103 (1936) (same); *Jones v. Morris Plan Bank of Portsmouth*, 168 Va. 284, 191 S.E. 608, 610 (1937) ("The well established rule forbidding the splitting of causes of action is clearly stated in 1 Am.Jur., 'Actions,' § 96. It is there said: 'One may bring separate suits on separate causes of action even if joinder of the separate causes in one action is permissible, subject, however, to the power of the court to order consolidation. On the other hand, one who has a claim against another may take a part in the satisfaction of the whole, or maintain an action for a part only, of the claim, although there is some authority to the effect that a part of a demand cannot be waived for the purpose of giving an inferior court jurisdiction. But after having brought suit for a part of a claim, the plaintiff is barred from bringing another suit for another part. The law does not permit the owner of a single or entire cause of action or an entire or indivisible demand, without the consent of the person against whom the cause or demand exists to divide or split that cause or demand so as to make it the subject of several actions. The whole cause must be determined in one action. If suit is brought for a part of a claim, a judgment obtained in that action precludes the plaintiff from bringing a second action for the residue of the claim, notwithstanding the second form of action is not identical with the first, or different grounds for relief are set forth in the second suit. This principle not only embraces what was actually determined, but

1996, relatively close in time to the period

also extends to every other matter which the parties might have litigated in the case. The rule is founded upon the plainest and most substantial justice, namely, that litigation should have an end and that no person should be unnecessarily harassed with a multiplicity of suits.' "); *Pickeral v. Federal Land Bank of Baltimore*, 177 Va. 743, 15 S.E.2d 82, 85 (1941) (" 'Hence, when an issue going to the merits of two or more actions arising from the same transaction is determined upon the hearing of the first action, judgment therein may be pleaded as res judicata to the subsequent ones.' " (quoting American and English Encyclopedia of Law, Second Edition, volume 24, page 779)); *Royall v. Peters*, 180 Va. 178, 21 S.E.2d 782, 787 (1942) ("There must at some time be an end to controversies. Courts are for the purpose of furnishing a speedy end to litigation and not as a forum for endless contentions. Carelessness or after-thought on the part of litigants ought not to be allowed to affect the conclusiveness of a proceeding which has been determined after ample opportunity for a hearing of every question which might have been litigated."); *Griffin v. Griffin*, 183 Va. 443, 32 S.E.2d 700, 703 (1945) ("The appellant not only had the opportunity of bringing this ground for divorce between the court in the first suit but she had the opportunity, and *it was her duty to bring before the court in the first suit any other ground for divorce that existed at that time.* There was a final decree in the first cause rendered by a court of competent jurisdiction on the merits. It necessarily bars the appellant from conducting a subsequent suit involving the same cause of action."); *Shepherd v. Richmond Eng'g Co.*, 184 Va. 802, 36 S.E.2d 531, 534–35 (1946) ("The law does not permit the owner of a single or entire cause of action or entire indivisible demand, without the consent of the person against whom the cause or demand exists, to divide or split that cause or demand so as to make it the subject of several actions. The whole cause must be determined in one action. If suit is brought for a part of a claim, a judgment obtained in that action precludes the plaintiff from bringing a second action for the residue of the claim, notwithstanding the second form of action is not identical with the first, or different grounds for relief are set forth in the second suit. This principle not only embraces what was actually determined, but also extends to every other matter which the parties might have litigated in the case.... That appellee must stand or fall by its election of remedies is fundamental."); *Eason v. Eason*, 204 Va. 347, 131 S.E.2d 280, 282 (1963) ("When the second suit is between the same parties as the first, and on the same cause of action, the judgment in the former is conclusive of the latter, not only as to every question which was decided, but also as to every other matter which the parties might have litigated and had determined, within the issues as they were made or tendered by the pleadings, or as incident to or essentially connected with the subject matter of the litigation,

pertinent to this action, the Supreme Court

whether the same, as a matter of fact, were or were not considered. As to such matters a new suit on the same cause of action cannot be maintained between the same parties ...." (quotations and citation omitted)); *Hagen v. Hagen*, 205 Va. 791, 139 S.E.2d 821, 823 (.1965) (same); *Bates v. Devers*, 214 Va. 667, 202 S.E.2d 917, 920–21 & n. 8 (1974) ("A valid, personal judgment on the merits in favor of defendant bars relitigation of the same cause of action, *or any part thereof which could have been litigated*, between the same parties and their privies." (citing Restatement of Judgments §§ 47, 62 & 83 (1942)); and "A 'cause of action', for purposes of res judicata, may be broadly characterized as an assertion of particular legal rights *which have arisen out of a definable factual transaction*." (emphasis added)); *Allstar Towing, Inc. v. City of Alexandria*, 231 Va. 421, 344 S.E.2d 903, 905 (1986) ("When the second suit is between the same parties as the first, and on the same cause of action, the judgment in the former is conclusive of the latter, not only as to every question which was decided, but also as to every other matter which the parties might have litigated and had determined, within the issues as they were made or tendered by the pleadings, or as incident to or essentially connected with the subject matter of the litigation, whether the same, as a matter of fact, were or were not considered. As to such matters a new suit on the same cause of action cannot be maintained between the same parties ...." (quotations and citation omitted)); *Flora, Flora & Montague, Inc. v. Saunders*, 235 Va. 306, 367 S.E.2d 493, 495 (1988) ("A valid, personal judgment on the merits ... bars relitigation of the same cause of action, or any part thereof which could have been litigated, between the same parties and their privies.... A claim arising from an indivisible contract cannot be split and made the subject of separate actions, ... but, being a single cause of action, must be litigated in one suit.... The law does not permit the owner of a single or entire cause of action or an entire or indivisible demand ... to divide or split that cause or demand so as to make it the subject of several actions. The whole cause must be determined in one action. If suit is brought for a part of a claim, a judgment obtained in that action precludes the plaintiff from bringing a second action for the residue of the claim, notwithstanding the second form of action is not identical with the first, or different grounds for relief are set forth in the second suit. This principle not only embraces what was actually determined, but also extends to every other matter which the parties might have litigated in the case." (quotations and citations omitted)); *Waterfront Marine Constr., Inc. v. North End 49ers Sandbridge Bulkhead Groups A, B & C*, 251 Va. 417, 468 S.E.2d 894, 904 (1996) ("[E]ven though the first demand described only specific defects, the doctrine of res judicata applies to all claims which could have been brought, thereby preventing a party from splitting his cause of action.").

of Virginia applied the transactional approach to the issue of *res judicata* in the case of *Waterfront Marine Construction, Inc. v. North End 49ers Sandbridge Bulkhead Groups A, B and C*, 251 Va. 417, 468 S.E.2d 894, 904 (1996), wherein the Supreme Court of Virginia observed that "even though the first demand described only specific defects, the doctrine of res judicata applies to *all claims which could have been brought*, thereby preventing a party from splitting his cause of action." (Emphasis added). Furthermore, Virginia courts have recognized that, both traditionally and during the period of time relevant to this case, Virginia has applied the transactional approach.

> The Virginia Supreme Court applies the ... transactional analysis in considering the scope of a transaction for the application of res judicata.... In *Trout v. Commonwealth Transp. Commissioner*, 241 Va. 69, 73, 400 S.E.2d 172 (1991), the Supreme Court discussed this broad transactional concept:
>
> > An "action" and a "cause of action" are quite different. "Action" is defined by Code § 8.01–2, as noted above.[8] We defined "cause of action" in *Roller v. Basic Construction Co.*, 238 Va. 321, 327, 384 S.E.2d 323, 326 (1989), as "a set of operative facts which under the substantive law, may give rise to a right of action."
>
> Virginia follows the transaction rule set forth in the Restatement of Judgments 2d, § 24 for purposes of defining "cause of action." One "cause of action" may give rise to myriad rights of action, *e.g.*, breach of contract, breach of warranty, negligence, and statutory claims; however, if the rights of action arise from the same operative set of facts and could legally be asserted therein, they are all the same "cause of action" for purposes of the application of the doctrine of res judicata.

*Lake Holiday Country Club, Inc. v. Teets*, Nos. 00–44, 00–46, 00–47, & 00–70, 2001 WL 34037926, at *7 (Va.Cir.Ct.2001). *See also Cherokee Corp. of Linden, Virginia, Inc. v.*

*Richardson*, Chancery No. 95–130, Chancery No. 96–34, now Law No. L–96–148, 1996 WL 1065553, at * 1 (Va.Cir.Ct. June 5, 1996) ("As can be seen, Virginia follows the transaction rule set forth in the Restatement of Judgments 2d, § 24 for purposes of defining 'cause of action.'"); *Davis v. Marshall Homes, Inc.*, 265 Va. 159, 576 S.E.2d 504, 515 (2003) (Kinser, J., dissenting) (observing, in case which post-dated the present action, that majority opinion overruled transactional approach that previously applied, commenting "[i]n truth, the effect of the majority's explicit rejection of a transactional approach is to overrule our decision in *Allstar Towing*. However, the majority does not explain why this precedent should be cas[t] aside.").

The dissent argues that the transactional approach was not so clearly established in Virginia; however, the dissent points to no case that would apply to the instant action and require application of a rule other than the transactional approach. Furthermore, the dissent contains notable error. For example, the dissent represents that the case of *Flora, Flora & Montague, Inc. v. Saunders*, 235 Va. 306, 367 S.E.2d 493 (1988), applied the best evidence test. To the contrary, *Saunders* actually set out the transactional approach as the appropriate test:

> A valid, personal judgment on the merits ... bars relitigation of the same cause of action, or any part thereof which could have been litigated, between the same parties and their privies A claim arising from an indivisible contract cannot be split and made the subject of separate actions, ... but, being a single cause of action, must be litigated in one suit.... The law does not permit the owner of a single or entire cause of action or an entire or indivisible demand ... to divide or split that cause or demand so as to make it the subject of several actions. The whole cause must be determined in one action. If suit is brought for a part of a claim, a judgment obtained in that action precludes the plaintiff from bringing a second action for the residue of the claim, notwithstanding the

---

8. Pursuant to Va.Code Ann. § 8.01–2, "'Action' and 'suit' may be used interchangeably and shall include all civil proceedings whether upon

claims at law, in equity, or statutory in nature and whether in circuit courts or district courts."

second form of action is not identical with the first, or different grounds for relief are set forth in the second suit. This principle not only embraces what was actually determined, but also extends to every other matter which the parties might have litigated in the case.

*Saunders,* 367 S.E.2d at 495 (quotations and citations omitted).

The dissent also incorrectly implies that *Bates v. Devers,* 214 Va. 667, 202 S.E.2d 917 (1974), utilized the same evidence test. *Bates,* in fact, applied the transactional approach as demonstrated by that Court's finding that "[a] valid, personal judgment on the merits in favor of defendant bars relitigation of the Same [sic] cause of action, *or any part thereof which could have been litigated,* between the same parties and their privies." (Citing Restatement of Judgments §§ 47, 62, 83 (1942)). 202 S.E.2d at 920–21. In a footnote, the *Bates* Court went on to state that "[a] 'cause of action', for purposes of res judicata, may be broadly characterized as an assertion of particular legal rights *which have arisen out of a definable factual transaction.*" 202 S.E.2d at 921 n. 8 (emphasis added).[9]

As the Majority opinion correctly notes, the Boone County action is barred by *res judicata* under the transactional approach that is applied pursuant to Virginia law, because the claims asserted in the instant action arise from the same operative set of facts involved in the earlier Virginia action.

## III.

### *DE NOVO* REVIEW OF FORUM–SELECTION CLAUSES[10]

The Dissenting opinion also finds fault with the *de novo* standard of review set out by the Majority opinion. Again, the Dissenting opinion is incorrect. To the extent that a determination of the applicability of a forum-selection clause may require this Court to review factual determinations made by a circuit court, our review of those specific determinations is under the "clearly erroneous standard." Syl. pt. 2, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997) ("[W]e review the circuit court's underlying factual findings under a clearly erroneous standard."). Nevertheless, this Court often applies multi-faceted standards of review. Thus, while certain elements of an analysis, should they exist, might require deferential scrutiny, our overarching review of the general "applicability and enforceability" of a forum-selection clause is *de novo.* Syl. pt. 2, Maj. op.; *See also Phillips v. Audio Active Ltd.,* 494 F.3d 378, 384 (2d Cir.2007) ("Where the district court has relied on pleadings and affidavits to grant a Rule 12(b)(3) motion to dismiss on the basis of a forum selection clause, our review is *de novo.* In analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, we view all the facts in a light most favorable to plaintiff. Contract interpretation as a question of law is also reviewed *de novo* on appeal." (internal citations omitted)); *Cowatch v. Sym–Tech Inc.,* 253 Fed.Appx. 231, 232 (3d Cir.2007) ("Our review of the District Court's construction of the forum selection clause is plenary." (quoting *Foster v. Chesapeake Ins. Co.,* 933 F.2d 1207, 1216 (3d Cir.1991))); *Kochert v. Adagen Med. Int'l, Inc.,* 491 F.3d 674, 677 (7th Cir. 2007) ("The district court's order granting Adagen's Rule 12(b)(3) motion for improper

---

**9.** The dissent is also erroneous in its assertion that "[i]t was in the 1974 case of *Bates v. Devers* . . . that the Virginia Supreme Court first referred in a footnote to the term 'transaction' in relation to the res judicata element of cause of action." Dissent. op. (Albright, J.) at 50. Instead, the Virginia Supreme Court utilized the term "transaction" in this manner as early as 1941. *See Pickeral v. Federal Land Bank of Baltimore,* 177 Va. 743, 15 S.E.2d 82, 85 (1941) (" 'Hence, when an issue going to the merits of two or more actions arising from *the same transaction* is determined upon the hearing of the first action, judgment therein may be pleaded as res judicata to the subsequent ones.' " (emphasis

added) (quoting, American and English Encyclopedia of Law, Second Edition, volume 24, page 779)).

**10.** In addition to criticizing the standard of review applied to forum-selection clauses, the Dissenting opinion takes issue with various other aspects of the forum-selection clause analysis of the Majority opinion. Though I choose to clarify this particular point, the Dissenting opinion's analyses of other issues appear to be more result-driven than legally meritorious, and will therefore not be discussed herein.

venue based on the contractual forum-selection clause is subject to de novo review." (citation omitted)); *Calix–Chacon v. Global Int'l Marine, Inc.*, 493 F.3d 507, 510 (5th Cir.2007) ("[T]he enforcement of a forum selection clause is an issue of law, and we review the district court's conclusions of law de novo." (quoting *MacPhail v. Oceaneering Int'l, Inc.*, 302 F.3d 274, 278 (5th Cir.2002))); *Preferred Capital, Inc. v. Associates in Urology*, 453 F.3d 718, 721 (6th Cir.2006) ("We also note that 'the enforceability of a forum selection clause is a question of law that we review de novo.'" (quoting *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1104 (6th Cir.1997))); *American Soda, LLP v. U.S. Filter Wastewater Group, Inc.*, 428 F.3d 921, 925 (10th Cir.2005) ("We review the enforceability of a forum selection clause de novo." (citing *K & V. Scientific Co. v. BMW*, 314 F.3d 494, 497 (10th Cir.2002))); *Silva v. Encyclopedia Britannica, Inc.*, 239 F.3d 385, 387 (1st Cir.2001) ("We review a district court's dismissal based on a forum-selection clause de novo."); *Terra Int'l, Inc. v. Mississippi Chem. Corp.*, 119 F.3d 688, 691–92 (8th Cir.1997) ("In the case at hand, neither party challenges the validity of the forum selection clause; rather, they contest the specific meaning of the language used in the forum selection clause.... [W]e conclude that de novo review is the appropriate standard for reviewing a district court's interpretation of the specific terms contained in a forum selection clause ..."). In the instant case, the forum-selection clause was reviewed in the context of a motion to dismiss. In this context, there simply were no factual determinations made by the circuit court that required deferential review. Thus, the Majority's *de novo* review of the circuit court's forum-selection clause ruling is proper.

## IV.

### DISQUALIFICATION AND DUE PROCESS

In footnote 16 of the Dissenting opinion, reference is made to the motions filed by the Appellees seeking my disqualification from this case—especially the last such motion filed by Appellees.[11] Specifically, the Dissenting opinion contends that "both actual *and apparent* conflicts can have due process implications on the outcome of cases affected by *such* conflicts" and "[i]t is now clear, especially from the last motion for disqualification ... that there are now [such] due process implications" in this case. Dissenting Op., at 284 (emphasis added). The Dissenting opinion provides no legal analysis for this contention. Nor does the Dissenting opinion, or the Appellees herein, claim any actual bias or prejudice on my part in this case.[12] Indeed, neither the Dissenting opin-

---

**11.** This last motion seeking my disqualification was filed March 28, 2008, three-and-a-half years after my 2004 election, over seventeen months after the filing of this appeal on October 24, 2006, over four months after the initial decision of this Court on November 21, 2007 (in which I voted with the majority against the interests of the Appellees), and over two weeks after oral arguments were heard on the reconsideration of this appeal. The primary basis of this last disqualification motion was a survey taken by the Appellees which can best be described as a "push-poll"; *i.e.,* a survey wherein limited and selective background information is conveyed to individuals, the purpose or result of which is to "push" the individual being surveyed to a negative inference or response against a public individual. "Push-polls" are unlawful in West Virginia when used in elections. W. Va.Code § 3–8–9(a)(10) (1999). The motion was denied as being untimely and because "push-poll"-type surveys of this kind, are, as a matter of law, neither credible nor sufficiently reliable to serve as the basis for an elected judge's disqualification.

**12.** The Dissenting opinion uses the phrase "both actual and apparent conflicts" in describing the type of conflict to which the Dissenting opinion believes that due process implications may attach. The Dissenting opinion, however, omits any legal analysis to define what it contends is meant by the term "apparent." If "apparent" means "obvious," the phrase would simply mean those conflicts which are *both* actual *and* obvious. Such a meaning comports with a legitimate concern for "actual" conflicts (such as *actual* biases and prejudices which directly implicate due process) which are also plainly evident to the judicial officer and the public (implicating a duty to recuse and a concern for public confidence). Conversely, though, the Dissenting opinion may instead intend the term "apparent" to be a wholly separate form of conflict, distinct from an *actual* conflict. In that sense, the Dissenting opinion's footnote would refer to either of two separate and distinct types of conflicts which may implicate due process considerations: actual conflicts and appearance-driven conflicts (conflicts subjectively-defined according to criteria which may vary from observer to observer). The

ion nor the Appellees herein point to any actual conduct or activity on my part which could be termed "improper."[13] Rather both the Dissenting opinion and the Appellees focus on appearances—some generated by the media, some generated by a recused member of this Court with a history of verbal discourtesies toward Appellant Massey, and some generated herein by the Appellees, themselves.

By its inclusion of Footnote 16, one must conclude that the Dissenting opinion advocates that the concept of "appearance-driven" judging should bring about a different substantive outcome in this matter. That is disappointing. Justice should not be determined more by the popularity, or lack thereof, of a given litigant or a given result than by the rule of law. Rather, justice must always emphasize the importance and definiteness of the law in the resolution of disputes. In that manner, my participation herein was wholly consistent with due process.[14] Because of the reference to the disqualification issue in Justice Albright's Dissenting opinion, I feel obligated to comment on this matter of "apparent conflict."

## A. The Measure of Fairness: Actual Justice

The fundamental question raised by the Appellees and the Dissenting opinion herein

---

very notion of appearance-driven disqualifying conflicts, with shifting definitional standards subject to the whims, caprices and manipulations of those more interested in outcomes than in the application of law, is antithetical to due process.

Although the Dissenting opinion provides no legal analysis to define the phrase, it would seem that the dissenters advance an inconsistent subjective standard. Because both the Dissenting opinion and the Appellees in essence concede that there is no objective "actual" conflict or improper actions or conduct herein with respect to me, the Dissenting opinion proposes that a conflict sufficient to implicate due process considerations for which disqualification is necessary may be *either* an "actual objective conflict" (which is not applicable herein) or a "conflict created by or defined by subjective appearances" (which they perceive is present herein).

**13.** Canon 2A, of the W. Va.Code of Judicial Conduct, prohibits judges from engaging in activities which are improper or which give the appearance of impropriety. Often, this term is taken out of context by omitting reference to the term "activities." That some form of action by a judge is necessary in context with the term "appearance of impropriety," is evident from the Commentary to Canon 2A which focuses on "irresponsible or improper *conduct* by judges." (Emphasis added.) Furthermore, Canon 2A specifically applies to activities or conduct of the judge, himself or herself, not activities or conduct of third-parties or litigants which are outside the judge's control. While challenges to a judge because of the independent activities of a third-party may be an acceptable practice in a system focused on "political or appearance-based justice," it finds no basis in Canon 2A. Unless the dissenters or Appellees herein contend that the act of lawfully running for elective office or the required duty of judging a case is an activity within the purview of Canon 2A, the dissenters and Appellees must necessarily contend that appearances caused by the past activities of third-parties over which a judge or a judicial candidate exercises no control, from which he or she seeks no benefit, and for which he or she will obtain no current or future benefit may nevertheless serve as a basis for disqualification. *See* Footnote 15, *infra* (West Virginia is a "duty to judge" judicial system). *See also State ex rel. Billings v. City of Point Pleasant*, 194 W.Va. 301, 460 S.E.2d 436 (1995) (running for office is a fundamental right). Such a scenario, particularly where the supposed conflict occurred in the past with no potential for current or future benefit to the judge based upon his or her decision, would serve to open the judicial system to easy manipulation by external forces and would lead to a destruction of public confidence in our judiciary.

**14.** In a judiciary founded on the rule of law rather than political artifice, it is an extraordinary and unprecedented argument which contends that "*apparent* conflicts" alone can have such an effect on the outcome of a case that due process considerations are implicated. While appearances should be considered in a discussion of public confidence in the judiciary, appearances alone, subject as they are to manipulation by partisan elements (including litigants), should never alone serve as the basis for a due process challenge to an otherwise well-founded legal opinion of a court of law. Public confidence is enhanced by a system founded on actualities and the rule of law. Appearance-based criteria for judicial disqualification emphasizes the importance of "public confidence" in the judiciary as its most important value, not judicial independence, the accuracy of justice, or stability and predictability in our judicial system. Public confidence is a legitimate concern for our judicial system—but not in a vacuum. Concerns within the judicial system must be balanced. In the long run, I believe that judicial independence, the accuracy of justice and the stability and predictability of our judicial system are far more important to the public's long-term confidence in our judicial system.

is whether, in a free society, we should value "apparent or political justice" more than "actual justice." The latter is dependent on the quality of the law applied by a court and is measured by the critical analyses of a court's written decisions. Actual justice is based on actualities. Through its written decisions, a court gives that transparency of decision-making needed from governmental entities. Apparent or political justice is based instead on appearances and is measured not by the quality of a court's legal analysis, but rather by the political acceptability of the case's end-result as measured by dominant partisan groups such as politicians and the media, or by the litigants, themselves. Apparent or political justice is based on half-truths, innuendo, conjecture, surmise, prejudice and bias. Since all cases will generally have a winner and a loser, a system based upon "apparent or political justice" will be the subject of constant criticism—all partisan, little academic.

To assuage attacks on itself, a court immersed in "apparent or political justice" will find it necessary to curry favor with those groups or individuals with the loudest or shrillest voices, as well as those groups or individuals with the most radical means of gaining public attention. In doing so, decisions not only will be biased toward certain groups and their favored positions, but decision-making will necessarily take on an inductiveness, where the desired end-result for a case determines the manner in which the court conducts its legal analysis. Since justice then would be determined by the ebb and flow of political opinion, justice will become more actively policy-driven, and our judges, like terriers jumping for treats, will promote a judicial system decidedly unstable and unpredictable.

In direct opposition to the drive to appearance-based judging is Canon 3B(2), of the Code of Judicial Conduct, which requires that "[a] judge shall be faithful to the law and ... not be swayed by partisan interests, public clamor, or fear of criticism." This ethical admonition succinctly dispels any contention that appearance-based judging should supercede judging based on actualities. Simply stated, a decision which is firmly rooted in legal substance should not yield to a collateral partisan attack which manipulates appearances. Rather, it should rise or fall on its own substantive merits.

Proper legal decisions should never be mere rationalizations fronting for political correctness. Nor should actual justice be fettered by the political expediencies of the day. Partisan rhetoric and resorts to emotion-laden rants betray a contempt for the judiciary's role in a constitutional government. Sadly, such political considerations have, it seems from recent behaviors, institutionalized and entrenched themselves in our Court. This politicization of our judiciary must be ended. Our judicial system should be resolutely founded on the rule of law, administered by conscientious and dispassionate judges, and legitimized through well-reasoned legal opinions. We must do *actual* justice to achieve *actual* justice. Public confidence requires no less.

### B. Recusal and Due Process

West Virginia's judicial officers have a duty to hear such matters as are assigned to them except those in which disqualification is required. Canon 3B(1).[15] This "duty to sit"

---

15. Canons 3A and 3B(1) of the W. Va.Code of Judicial Conduct require that "[a] judge shall hear and decide matters assigned to the judge except those in which disqualification is required" and that the "judicial duties of a judge take precedence over all the judge's other activities." Canon 3E(1) provides that "[a] judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might *reasonably* be questioned ..." (Emphasis added.) The use of the qualifier, "reasonably," presupposes a knowledge of all facts material to an impartiality determination. It implies a thoughtful, impartial and well-informed observer. Furthermore, this qualifier helps to ensure that illegitimate attempts to remove an elected judge are unsuccessful. *See* Footnotes 11, *supra,* and 48, *infra* (use of push-poll-type survey conveying limited information legally insufficient as basis for disqualification of publicly-elected judge). Although some specific examples are given of situations in which a judge should recuse himself or herself, the standard itself is indefinite in recognition of the balancing of interests which must occur when a judge considers recusal. Extreme cases are clear under any standard. The key consideration appears to be that a judicial officer should not judge a case where his or her own personal interests could be preferred over the rule of law. The rule is certainly not an invitation for litigants

is not optional. As Judge John Sirica eloquently stated:

> [T]he Court cannot overlook the fact that it has an obligation to deny insufficient recusal motions. There is as much obligation upon a judge not to recuse himself when there is no occasion as there is for him to do so when there is.... After such study as I could give the matter, I reached the conclusion that whether a judge should recuse himself in a particular case depends not so much on his personal preferences or individual views as it does the law. I have no choice in this case ... In the absence of a valid legal reason, I have no right to disqualify myself and must sit.

*U.S. v. Mitchell,* 377 F.Supp. 1312, 1325–26 (D.C.Cir.1974) (internal citations omitted), *aff'd sub nom. Mitchell v. Sirica,* 502 F.2d 375 (D.C.Cir.1974) *(en banc), cert. denied,* 418 U.S. 955, 94 S.Ct. 3232, 41 L.Ed.2d 1177 (1974).

Matters related to a state's method for selection and disqualification of its judicial officers belong appropriately to the individual states. "[M]ost matters relating to judicial disqualification [do] not rise to a constitutional level." *FTC v. Cement Inst.,* 333 U.S. 683, 702, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948). *See Tumey v. Ohio,* 273 U.S. 510, 523, 47 S.Ct. 437, 441, 71 L.Ed. 749 (1927) ("[M]atters of kinship, personal bias, state policy, [and] remoteness of interest, would seem generally to be matters merely of legislative discretion."); *Bracy v. Gramley,* 520 U.S. 899, 904–05, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997) ("[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard."). *See also Wheeling v.*

*Black,* 25 W.Va. 266, 270 (1884) (disqualification of judicial officer from duty to judge because of an actual interest in a cause of action deemed to be a matter of legislative discretion). The focus is on what actually affects a judge's decision-making.

The Due Process Clause simply does not establish a "uniform standard," such as the Appellees and the Dissenting opinion seek to portray herein. It establishes a "constitutional floor." *Bracy,* 520 U.S. at 904–05, 117 S.Ct. at 1797. This due process "floor" is "a 'fair trial in a fair tribunal,' before a judge with no *actual* bias against the defendant *or interest in the outcome of* his particular case." *Id.,* at 904–05, 117 S.Ct. at 1797 (quoting *Withrow v. Larkin,* 421 U.S. 35, 46, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)) (citations omitted) (emphasis added).[16]

It has long been recognized that there is "a presumption of honesty and integrity in those serving as adjudicators." *Withrow,* 421 U.S. at 47, 95 S.Ct. at 1464. Due process therefore requires recusal only in those rare cases wherein a judge or justice has a "direct, personal, substantial [or] pecuniary interest" in the outcome of the case. *Aetna Life Ins. Co. v. Lavoie,* 475 U.S. 813, 821–22, 106 S.Ct. 1580, 1585, 89 L.Ed.2d 823 (1986) (quoting *Tumey,* 273 U.S. at 523, 47 S.Ct. at 441).

The Dissenting opinion's conjoining of real and apparent conflicts mistakenly suggests an equality between actual conflicts and appearance-driven conflicts unsupported by the law with respect to claims of constitutional violations. A proper ordering of claimed conflicts is necessary to define a due process framework that separates legitimate claims of actual constitutional impairment from ille-

---

to attempt to manipulate the system for strategic reasons, nor is it a means by which judges may avoid difficult cases.

**16.** "Due process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). It is "not a technical conception with a fixed content unrelated to time, place and circumstances." *Cafeteria & Restaurant Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961). Thus, its "very nature

... negates any concept of inflexible procedures universally applicable to every imaginable situation." *Id.* Here, the Appellees and the Dissenting opinion would render all relevant facts and policies related to an individual judge's recusal consideration and a state's balancing of interests in election laws and judicial ethics immaterial in favor of a static rule of disqualification determined by appearances which are themselves subject to ready manipulation by litigants and third persons with an interest in the outcome of a given case.

gitimate claims; especially where illegitimate claims serve to divert attention from the legal certainty of a court's decision and the inability substantively to challenge that decision. Under the self-serving due process standard of disqualification proposed by the Appellees and the Dissenting opinion herein, the actual purpose of due process would be frustrated by litigants who would hold a near-veto power over the composition of a publicly-elected court, by those who could wage public relations campaigns designed to malign judicial officers in order to manufacture "apparent conflicts," and by those who would challenge a decision not by its legal correctness, but by its political correctness. The long-lasting negative effect on public confidence in our courts caused by an appearance-driven due process standard for disqualification of a judicial officer would be incalculable.

The Dissenting opinion's passing reference, without analysis, to *Aetna* and *In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955), fails to support its contention that there are due process implications herein based simply on subjective perceptions of "appearances." *See Aetna*, 475 U.S. at 822–24, 106 S.Ct. at 1585–87 (due process required disqualification of state supreme court justice because he had a "direct, personal, substantial, [and] pecuniary interest" in deciding a case in such a manner as to "enhanc[e] both the legal status and the settlement value of" the judge's own similar pending lawsuits); *In re Murchison*, 349 U.S. at 133–39, 75 S.Ct. at 624–27 (due process required disqualification of judge who served as a "one-man grand jury" and then presided over the criminal trial of the man whom he had prosecuted). *See also, Offutt v. United States*, 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11 (1954) (due process implicated where a judge who harbored actual bias against an attorney nevertheless sat in judgment of the attorney in a contempt proceeding); *Tumey*, 273 U.S. at 523, 535, 47 S.Ct. at 441, 445 (due process violated where mayor who presided over mayor's court had a direct financial interest in convicting defendants and in imposing fines). Indeed, the phrase used by the Dissenting opinion, "both actual and apparent conflicts," appears nowhere in either *Aetna* or *In re Murchison*.

Neither Appellees nor the Dissenting opinion have presented any evidence consistent with the *Aetna* standard for implication of the Due Process Clause of the Fourteenth Amendment. Rather, they rely on subjective, after-the-fact speculations and assumptions. "The decision whether a judge's impartiality can 'reasonably be questioned' is to be made in light of the facts as they existed, and not as they were surmised or reported." *Cheney v. United States District Court*, 541 U.S. 913, 914, 124 S.Ct. 1391, 1392, 158 L.Ed.2d 225 (2004) (Scalia, J.) (Memorandum on Motion for Disqualification) (quoting *Microsoft Corp. v. United States*, 530 U.S. 1301, 1302, 121 S.Ct. 25, 147 L.Ed.2d 1048 (2000)) (Rehnquist, C.J.) (Memorandum regarding recusal). Reliance on cases such as *Aetna* and *In re: Murchison* for the contention that disqualifications of a publicly elected judicial officer may be based solely upon after-the-fact appearance-based or politically-driven conflicts is consequently misplaced. Unlike the judges in *Aetna and Tumey*, I have no pecuniary interest in the outcome of this matter. Unlike the prosecutor/judge in *In re Murchison*, or the judge/mayor in *Tumey*, I have no conflicting dual role in this matter. Unlike the judge in *Offutt*, I have no personal involvement with nor harbor any personal antipathy toward any party or counsel herein.

Nor do the due process contentions of the Appellees and the Dissenting opinion find support in other venues. Although federal judges arguably no longer have a "duty to sit,"[17] the federal recusal statute at 28 U.S.C. § 455(a) (1990) does reference "appearances of impropriety." *See* Footnote 13, *supra*. Federal courts have consistently rejected the contention that appearance-driven

---

17. Although it has been asserted that changes in 1974 to the federal recusal statute, 28 U.S.C. § 455 (1990), were designed to eliminate a judge's "duty to sit" (*See Baker v. City of Detroit*, 458 F.Supp. 374 (E.D.Mich.1978), federal judges continue to have a duty not to disqualify themselves without a reasonable basis.) *See, e.g., Hall v. Small Business Admin.*, 695 F.2d 175 (5th Cir.1983).

conflicts, without more, raise due process implications. As recently recognized by the Third Circuit, no decision "has held or clearly established that an appearance of bias on the part of a judge, without more, violates the Due Process Clause." *Johnson v. Carroll*, 369 F.3d 253, 262 (3d Cir.2004), *cert. denied*, 544 U.S. 924, 125 S.Ct. 1639, 161 L.Ed.2d 483 (2005); *accord Callahan v. Campbell*, 427 F.3d 897, 928–29 (11th Cir.2005); *Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1371–82 (7th Cir.1994) (*en banc*). In *Johnson*, the Third Circuit concluded that, absent some other disqualifying conflict, appearances alone do not implicate due process considerations. In *Del Vecchio*, the Seventh Circuit similarly held that "bad appearances alone do not require disqualification" pursuant to the due process clause because "only a strong, direct interest in the outcome of a case is sufficient to overcome [the] presump-

tion of [the judge's] evenhandedness." *Del Vecchio*, 31 F.3d at 1372–74. "[T]he United States Supreme Court has never rested due process on appearance." *Id.* at 1372 n. 2. As pointed out in a concurrence in *Del Vecchio*, disqualification based upon appearance-based conflicts "is a subject for statutes, codes of ethics, and common law, rather than a constitutional command." *Id.* at 1391 (J. Easterbrook, concurring).[18]

### C. West Virginia Has Chosen to Select Judges in Partisan Elections

Historically, West Virginia has exercised its prerogative to regulate its judiciary and to elect judges and justices in partisan judicial elections through the enactment of constitutional and legislative standards, as well as by the Supreme Court of Appeals' adoption of ethical rules, that weigh and accommodate the competing interests at stake.[19]

**18.** The "apparent conflict" standard advanced by the Appellees and the Dissenting opinion would also lead to the rather bizarre situation in which a judge with an actual bias or interest in the outcome of a case would nevertheless sit in the case, while a judge with absolutely no bias, prejudice or interest in the outcome of a case could be forced off of the case by the manipulation of appearances outside of the judge's control. For example, if a judge develops an actual animosity toward a litigant or to counsel during a case, recusal is not required. *Liteky v. United States*, 510 U.S. 540, 550–51, 114 S.Ct. 1147, 1155, 127 L.Ed.2d 474 (1994). Therefore, under the standard set forth by the Dissenting opinion, a judge without any bias whatsoever could be disqualified so long as it could be claimed that there was an "apparent conflict", but a judge who had an actual bias could remain on a case so long as that bias developed during the pendency of the case. The same scenario is presented by the Rule of Necessity, in which justices with actual interests in the outcome of a case may nevertheless be required to hear the case. *See* (Syl. pt. 7), *State ex rel. Brown v. Dietrick*, 191 W.Va. 169, 444 S.E.2d 47 (1994)("The rule of necessity is an exception to the disqualification of a judge. It allows a judge who is otherwise disqualified to handle the case to preside if there is no provision that allows another judge to hear the matter.") Such inconsistencies highlight the fundamental flaws of the "apparent conflict" standard posed by the Dissenting opinion.

Furthermore, the only limitation to recusal motions based upon an appearance standard would be the imagination of a party. Would judges who are former legislators be subject to disqualification motions when reviewing legislation passed while they were members of the legislature? Would judges who are church mem-

bers be subject to disqualification in cases involving issues such as abortion or "church and state"? Would former prosecutors be subject to disqualification in criminal cases because they were "law and order" prosecutors?

**19.** *See* Footnote 3, *supra*. *See also Matter of Starcher*, 193 W.Va. 470, 475, 457 S.E.2d 147, 152 (1995) (reprimand of judge for violation of judicial ethics regarding improper *ex parte* communications with party during trial), wherein then-Chief Justice Neely, in dissent, stated, "In this State, judges get to be judges because they are political leaders ..." *Matter of Starcher*, 193 W.Va. at 475, 457 S.E.2d at 152 (Neely, C.J., dissenting). While there may be disagreement within this State on the proper method for selection of its judicial officers, especially on whether elections should be partisan, it is, I believe, a decision for the people of this State to make. I must disagree, however, with those who believe that politics and partisanship, particularly during an election cycle, have any place in this Court or anywhere in West Virginia's judicial system. *See contra State ex rel. Rist v. Underwood, infra*, 206 W.Va. 258, 282, 524 S.E.2d 179, 203 (Starcher, C.J., concurring, at Appendix A, n. 8: "[J]udges make policy as a matter of choice as well as function, for most know that sweeping issues are involved and they act upon their personal values in resolving those issues.") *See also State ex rel. Carenbauer v. Hechler, infra*, 208 W.Va. 584, 609, 542 S.E.2d 405, 430 (Starcher, J., dissenting: "It is utterly absurd to suggest that judges just 'apply the law,' and do not make decisions that are influenced by their philosophies—or their 'prejudices'—the unfortunate term that the majority chooses to use."). In a system wherein judicial officers believe it appropriate to harbor political biases and prejudices and to bring those "per-

Incumbent in any state system which selects its judicial officers through the electoral process, particularly through partisan elections, are potential problems. In spite of such potential problems, the citizens of West Virginia, like the citizens of many other states,[20] have decided that all state judicial offices must be subject to the electoral process. *See* W. Va. Const. art. VIII, § 2 (Supreme Court Justices must be elected by voters); W. Va. Const. art. VIII, § 5 (circuit court judges must be elected by voters); W. Va. Const. art. VIII, § 10 (magistrate court magistrates must be elected by voters); W. Va. Const. art. VIII, § 16 (family court judges must be elected by voters). Insofar as all state judicial offices are filled through the electoral process, every judicial officer in this state is subject to having to decide the merits of a case that involves a party or attorney who contributed to or supported, or, conversely, opposed his or her campaign for office. This now includes those who contribute to or support so-called Independent Expenditure Groups who engage in political campaigns completely independent of candidates of office.

West Virginia has a compelling and permissible interest in regulating its elections, the political activities of its judicial officeholders and candidates, and the manner in which its judicial offices are filled. *State ex rel. Carenbauer v. Hechler*, 208 W.Va. 584, 599, 542 S.E.2d 405, 420 (2000). In fashioning its rules regarding judicial campaigns, West Virginia's legislature and this Court have balanced the necessary contributions and mechanisms for support which are involved in all public elections with the need to protect the system through rules of conduct

to guard against improprieties in the election process. *See Carenbauer, supra.*

For example, Canon 5 of the West Virginia Code of Judicial Conduct establishes specific limitations on a judge's or judicial candidate's political activity. Included in these limitations is a specific limitation which prohibits a judge or judicial candidate from personally soliciting or accepting campaign contributions. Canon 5C(2), W. Va.Code of Judicial Conduct. A similar limitation is placed on judges and judicial candidates seeking publicly stated endorsements. *Id.* Judges and judicial candidates may instead use committees within their campaigns, independent from personal knowledge or involvement of the judge or judicial candidate, to solicit campaign contributions and endorsements.[21] *Id.* *See In re Tennant*, 205 W.Va. 92, 516 S.E.2d 496 (1999) (judicial candidate admonished for personally soliciting campaign contributions); *Matter of Starcher*, 202 W.Va. 55, 501 S.E.2d 772 (1998) (admonishment of judge seeking election to Supreme Court of Appeals for personally soliciting publicly stated support); *In re: Hill*, 190 W.Va. 165, 437 S.E.2d 738 (1993) (political endorsement of another judicial candidate by judge running for reelection not prohibited under Canon 7A(1)(b) of former-Judicial Code of Ethics (conduct now proscribed by Canon 5A(1)(b) of the current-Code of Judicial Conduct, effective January 1, 1993)).

West Virginia has adopted other limitations on judicial elections. For example, in *Carenbauer*, this Court ruled that a sitting justice is ineligible to run for a different seat on the Supreme Court prior to the expiration of his or her term. *Carenbauer*, 208 W.Va. at 598–600, 542 S.E.2d at 419–21. In *Carenbauer*, former-Justice Warren McGraw, who

---

sonal values" to bear in the determination of cases, one might question whether public pronouncements by such judicial officers are politically-driven and are designed not to serve the rule of law but rather to affect the outcome of litigation or an election thereby elevating "apparent-or political-justice" over actual justice. The long-term negative impact on the public's perception of the judiciary caused by judicial officers who use their offices to serve political ends or who pander to partisan prejudices is deeply troubling. *See IV. A. "The Measure of Fairness: Actual Justice"* herein.

**20.** *See generally Adair v. State, Department of Education*, 474 Mich. 1027, 709 N.W.2d 567 (2006).

**21.** A "Finance Committee" was used by all of the Supreme Court judicial candidates for the 2004 election. There were no allegations of any ethical issues related to the funding of any of such candidates' campaigns. Campaign finance reports from the 2004 Supreme Court election may be viewed at the website of the West Virginia Secretary of State. *See* http://www.wvsos.com.

had been elected in 1998 to complete the remaining half of his judicial office's term, sought to run again in 2000 for another seat on the Court with a full twelve-year term. In ruling former-Justice McGraw ineligible to run for a separate seat on the same court on which he was already sitting, this Court concluded that the State had a compelling and permissible interest in regulating political activities in judicial offices. *Id. See also Matter of Codispoti,* 190 W.Va. 369, 438 S.E.2d 549 (1993) (public censure of judicial officer for violating Judicial Code of Ethics related to misleading campaign advertisements).

In *State ex rel. Rist v. Underwood,* 206 W.Va. 258, 524 S.E.2d 179 (1999), this Court considered a challenge to the Governor's appointment of the then-current Speaker of the House of Delegates as a Justice on this Court pursuant to the Governor's appointment powers for vacancies on this Court. *See* W. Va. Const. art. VIII, § 7. This Court ruled that, under the Emoluments Clause of the West Virginia Constitution, the appointment was prohibited where, during the Speaker's current term of office, the Legislature had enacted a pay increase with respect to such judicial office. W. Va. Const. art. VI § 15.

West Virginia has enacted other rules applicable to judicial races.[22] For example, committees for candidates for the office of Justice of the Supreme Court of Appeals must file periodic verified financial statements detailing campaign contributions and expenditures with the Secretary of State. W. Va.Code § 3–8–5 (2007). West Virginia limits the contribution which an individual may give to a campaign to $1000 per election cycle. W. Va.Code § 3–8–12(f) (2005). Campaign contributors who contribute $250 or more must be identified by more detailed information, including address and business affiliation. W. Va.Code § 3–8–5a(a)(3) (2007). West Virginia, thus, achieves a measure of transparency in campaign funding in judicial races. Anonymous contributions are prohibited. W. Va.Code § 3–8–5a(I) (2007). Furthermore, corporations are prohibited from contributing to a candidate's campaign. W. Va.Code § 3–8–8(a) (2006). So-called Independent Expenditure Groups (or Section 527 Groups) are also subject to regulation, including registration requirements. W. Va.Code § 3–8–12(g) (2005).[23]

## D. The 2004 West Virginia Supreme Court of Appeals Election

The Appellees and the dissenters take the position that, notwithstanding a judge's duty to hear cases in West Virginia and the lack of any actual disqualifying basis, due process compels my disqualification because of "appearances" they contend exist from my election some four years ago. Specifically, the Appellees and the dissenters contend the following: (I) in 2004, a political Independent Expenditure Group (or "527" Group) called And for the Sake of the Kids ("ASK") independently campaigned against former-Justice McGraw, in part with contributions made to it by Mr. Blankenship; (ii) I won election; and (iii) this case involves Mr. Blankenship's employer, Appellant Massey. While this self-serving and oversimplified account of the 2004 election may advance an "apparent conflict" standard, its omission of material facts of what actually occurred in 2004 is disturbing.

The Appellees fail to consider the following: (I) the decision herein was issued over three years after my election [24]; (ii) in West Virginia, elected judges have a duty to hear cases unless disqualification is required [25];

---

**22.** Candidates for the office of judge of the circuit court must have at least five years of active practice within the State. W. Va. Const. art. VIII, § 7; *State ex rel. Haught v. Donnahoe,* 174 W.Va. 27, 321 S.E.2d 677 (1984). Candidates for the office of justice of the Supreme Court of Appeals must have at least ten years of active practice within the State. *Id.*

**23.** *See Rist,* 206 W.Va. at 285, 524 S.E.2d at 206 (J. Starcher, concurring: "West Virginians are ahead of the curve in judicial campaign finance

regulation.... [C]ampaign finance committees insulate judicial candidates from fundraising.")

**24.** Massey sought appeal of this case on October 24, 2006, nearly two years after my election. On March 15, 2007, this Court deferred consideration of Massey's petition seeking appeal. The said appeal was unanimously granted by the Court on April 5, 2007.

**25.** W. Va.Code of Judicial Conduct, Canons 3A, 3B(1). This "duty to hear" is also referred to as a "duty to sit."

(iii) I neither have, nor at any time have ever had, any direct, personal, substantial or pecuniary interest, real or otherwise, in the outcome of this case; (iv) my campaign was completely independent of any independent expenditure group or individual, such as ASK [26]; (v) the outcome of the 2004 election was due primarily to my campaign's message of fairness, stability and predictability in decision-making, the importance of the rule of law to courts, and the need for judges to exercise civility, integrity and personal professionalism [27]; (vi) the campaign of my opponent, former-Justice McGraw, was devastated by a speech which he gave at Racine, West Virginia, on Labor Day, and by the effective publication of this speech to the people of West Virginia by the Benjamin campaign [28]; (vii) no improper act or conduct, and no appearance of an improper act or conduct with respect to this case, or any other case, has occurred on my part; (viii) nothing in my history as a jurist (including a number of cases involving Massey and/or its subsidiaries) reveals any bias or prejudice for or against any of the parties in this case; [29] (ix) no attorneys, other than the counsel in this case,[30] have ever sought my recusal in a matter involving Massey—including the current administration and West Virginia's Attorney General [31]; and (x) former-Justice McGraw was, and had been for several decades, a colorful and controversial politician [32]

**26.** Appellees merely presume the positive effectiveness of ASK and omit consideration of ASK's campaign against Attorney General Darrell McGraw's race in 2004—which apparently came from the same budget. They give no consideration to the negative reaction which ASK may have had on many voters. Because they are independent, groups such as ASK and Consumers for Justice can both help and hurt candidates.

**27.** Additional significant material factors regarding the 2004 Supreme Court race were omitted from the Appellees' motions seeking my disqualification. For example, regarding the respective candidates' qualifications for office, *see* West Virginia State Bar Survey, http://www.wvbar.org/barinfo/announce/04JudQualPoll.htm. Furthermore, challenger Benjamin was endorsed over former-Justice McGraw by every major daily newspaper in West Virginia which did an endorsement in the race, except one newspaper. Former-Justice McGraw's refusal to debate was also a significant factor in his defeat.

**28.** In this speech, former-Justice McGraw made a number of controversial claims which became a matter of statewide discussion in the media, on the internet, and elsewhere. *See* Footnotes 35 and 38, *infra*.

**29.** The Dissenting opinion would contend that due process considerations apply here, a case in which I voted for Massey's position, but strangely the Dissenting opinion makes no mention of its application in the other significant Massey cases wherein I voted against Massey's position. Indeed, the instant case may represent the only decision in which I have voted in favor of Appellant Massey's position and certainly does not represent the highest dollar value at issue for a case involving Massey. *See U.S. Steel Mining Co., LLC v. Helton*, 219 W.Va. 1, 631 S.E.2d 559 (2005); *Helton v. Reed*, 219 W.Va. 557, 638 S.E.2d 160 (2006); *Massey Energy v. Wheeling–Pittsburgh Steel Corp.*, No. 080182 (05/22/08). *See also Conflict*, Charleston Gazette, 02/26/08

("Four times since 2005, [Justice Benjamin] has voted against Massey's interest in cases.")

**30.** Since I have been a Justice on this Court, the attorneys involved in this case are the only counsel who have sought my recusal in a Massey matter (noting that counsel for Appellee Harmon Mining is also counsel of record in *Wheeling–Pittsburgh Steel Corp.*, see Footnote 29 above, and, with local counsel, also moved for my disqualification therein on same grounds as set forth herein.)

**31.** Although the same facts upon which the Appellees seek my disqualification in this case have been present at all times since my election, the State of West Virginia, by the Attorney General, Hon. Darrell McGraw, has never sought my disqualification. *See, e.g., Helton v. Reed, supra* or *U.S. Steel Min. Co., LLC v. Helton, supra.* Attorney General McGraw is a former member of this Court and is the brother of former-Justice Warren McGraw. Furthermore, the Department of Environmental Protection of the State of West Virginia has also declined to seek my disqualification in potential appellate environmental litigation involving Massey. According to a 11/03/2005 article by Ken Ward, Jr., in The Charleston Gazette, one year after my election, state regulators saw "no reason" to ask me to recuse myself. According to Perry McDaniel, chief of the Department of Environmental Protection's Office of Legal Services, DEP Secretary Stephanie Timmermeyer told him that she "would not have entertained" the idea of seeking my disqualification. Mr. McDaniel stated, "There are clearly no grounds ... for us to ask a Supreme Court justice elected by the people to step down in this matter." Such conclusions, as well as a jurist's actual record of decisions and behavior in office, are arguably material to a "perception" argument regarding recusal.

**32.** "[McGraw] is one of the most polarizing figures in West Virginia politics today." Hoppy

702

in West Virginia and had an extremely contentious Democratic primary race in 2004 where significant electoral support went to his opponent, Circuit Judge Jim Rowe.[33] The law simply does not support the Appellees' position. As such, the disqualification issue herein gives the appearance of being a diversion away from the solid basis for the majority's opinion herein.

Under the rules of this Court, the determination of whether a Justice should recuse him/herself from a case is left to the discretion of the individual Justice.[34] Of course, this discretion is tempered by the decision in *Aetna*, which held that " 'it certainly violates the Fourteenth Amendment ... to subject [a person's] liberty or property to the judgment of a court the judge of which has a direct, personal, substantial, pecuniary interest in reaching a conclusion against him in his case.' " *Aetna*, 475 U.S. at 821–22, 106 S.Ct. at 1585 (quoting *Tumey*, 273 U.S. at 523, 47 S.Ct. at 441). Although I declined to recuse myself from this case, this Court did not invoke its authority under *Aetna* to remove

me from the case. Simply put, I do not have, nor was there any evidence to show that I had a "direct, personal, substantial, pecuniary interest" in this case.

### 1. The Speech at Racine, West Virginia

During the 2004 general election, I ran as the Republican nominee for a seat on this Court. My incumbent opponent, former-Justice Warren McGraw, was the Democratic nominee. In the election, I received 382,036 votes (or 53.3%) and former-Justice McGraw received 334,301 votes (or 46.7%). *See*, West Virginia Secretary of State, http://www.wvsos.com/ elections/history/results/allgeneral04.pdf.

Contrary to some who seek to minimize or dismiss it, the pivotal moment of the 2004 campaign was a Labor Day speech delivered by former-Justice McGraw at Racine, West Virginia. During that speech, Justice McGraw spoke in a screaming and unflattering manner.[35] Excerpts from the Racine speech were extensively aired as campaign advertisements by the Benjamin campaign

Kercheval, *Hoppy's Commentary for Tuesday*, MetroNews, April 20, 2004.

**33.** This primary race was controversial. *See* Footnote 47, *infra*. "According to media reports published just after the May 11 primary election, [Independent Expenditure Group] Consumers for Justice was identified as having 'attacked' Greenbrier County Circuit Judge Jim Rowe, who was seeking to unseat incumbent ... Justice Warren McGraw." Juliet Terry, *Political Groups' Donations Questioned—Consumer Attorneys Group Gave More than $500, 000 to state 527 Organization*, The State Journal, 09/03/04. *See also* Footnote 41, *infra*. Former-Justice McGraw defeated Circuit Judge Jim Rowe in the Democrat primary by a margin of 147,030 (56.7%) to 112,199 (43.3%). *See* West Virginia Secretary of State, http://www.wvsos.com/ elections/history/results/04lmocrat_statewide " offices.pdf. Immediately after the primary, Forest J. Bowman, professor *emeritus* of the West Virginia School of Law, stated, "Benjamin does have a shot against McGraw because he stands to capture much of the 'Rowe vote.' " Juliet Terry, *McGraw Looks to November; Benjamin Faces Uphill Battle*, The State Journal, 05/14/04. This sentiment was echoed by Steve Roberts, president of the West Virginia Chamber of Commerce, "The latest numbers indicate about 110, 000 Democrats said 'no thank you' to McGraw. That sends a very strong message that they are dissatisfied with the direction the McGraw court has taken." *Id.* Ac-

cording to one political commentator, if the general election were held immediately after the primary, "Benjamin could already expect to have about 40 percent of the vote." Chris Stirewalt, *Surprises are hard to come by*, Charleston Daily Mail, June 8, 2004.

**34.** *See* Rule 29 of the West Virginia Rules of Appellate Procedure.

**35.** In this speech, former-Justice McGraw said, among other things: "My opponents want to portray the people of my party as if we are evil people. They want to tell you that the issue of abortion is one which is promoted by the Democrats. I say to you that's false! They want to tell you that members of my party have opposed school prayer. False! Not so! It's the Republican Party! The members of the Republican Party on the United States Supreme Court, and President of the United States, who gave you those issues when they control the Court and the people over in Washington. Not the Democrats. And just this year, not more than six months ago, the United States Supreme Court approved gay marriage! Not Democrats! And you people ought to know that! And the Republicans ought to know that!" The entire Racine speech by former-Justice McGraw is available on the internet. *See* http://hillary.repeatable.com/watch-video/ TQ6nQaE2FM8/WVCALA/warren-mcgraws-rant-in-racine.html

throughout the State.[36] In the relevant text of the speech, Justice McGraw was screaming that people were following him "looking for ugly." [37] The McGraw speech at Racine soon became the subject of much conversation around West Virginia.[38] In the final analysis, former-Justice McGraw simply could not defend himself against his own words.[39]

## 2. Section 527 Independent Expenditure Groups

The primary thrust of the Appellees' argument is not that I should be disqualified because a party or attorney to the instant case directly contributed to my campaign. The Appellees' argument is that I should be disqualified because, without my knowledge, direction or control, an independent nonparty organization, ASK, received contributions from people or groups that included an employee of a party in this case, and ASK independently used its contributions to wage a campaign against my opponent four years ago.[40] If the Appellees' argument became

**36.** The Benjamin campaign's advertisement may be heard at http://easylink.ovsmedia.com /online-videoservice/aapc/2005/ovs51–RacineRant.wax.

**37.** An analysis of the 2004 campaign is available at Hon. Brent Benjamin, Speech at the Annenberg Public Policy Center Symposium: Judicial Advertising, National Press Club, 05/25/07 (pp. 41–51). *See* http://www.annenber gpublicpolicy-center.org/NewsDetails.aspx?myId=219.

**38.** Shortly after political advertisements focusing on former-Justice McGraw's Racine speech was aired, the following observations of the speech were given by a statewide radio host and political commentator:

> ... Last week, Supreme Court Justice Warren McGraw gave a campaign speech at the annual Labor Day picnic in Boone County that has given his opponents ammunition. Gant and Dean gave their opponents short sound bites; McGraw gave his opponents a whole speech. McGraw sounded as though he was coming unhinged as he ranted about his opponents following him around to take pictures of him to make him look ugly. He charged, erroneously, the "U.S. Supreme Court had approved gay marriage."
>
> A political consultant I talked with, known to be supportive of McGraw, told me the tirade by McGraw was "deeply disturbing." The consultant said the speech was "way over the top."
>
> In fact, it was.... McGraw's rants sound deranged, not passionate. His normally populist tone has been replaced by an angry tirade.
>
> ... Yesterday when I talked about the speech on "Talkline" and played the GOP commercial, the phone lines were jammed with callers, mostly agreeing McGraw sounded on the verge of losing his mind.

Hoppy Kercheval, *Warren McGraw Unhinged*, MetroNews Talkline, September 15, 2004, http://w ww.freerepublic.com/focus/f-news/1263046/posts. *See also* Matt Bieniek, *Commentary: Paranoid Politics*, The Martinsburg Journal, September 27, 2004 ("[McGraw] said that the United States Supreme Court (which he pointed out is dominated by Republicans) had approved gay marriage. A complete falsehood coming from a man who obviously knew better [sic].... But then when McGraw is given an opportunity to speak to the public and debate his opponent, he doesn't take advantage of it.")

**39.** Prior to the speech at Racine, former-Justice McGraw declined an invitation to a debate sponsored by the League of Women Voters. Shortly after the speech, a spokesman for former-Justice McGraw defended the remarks at Racine: "[T]hey don't understand that that's just the southern way of campaigning.... Criticizing him for the way he talks is pure Yankeeism. He's not insane or losing his mind. That's just campaigning, southern-style." Juliet Terry, *Benjamin Camp Says McGraw Defeat Possible*, The State Journal, 09/24/04.

> Former–Justice McGraw, himself, has acknowledged the impact which his speech at Racine had on his campaign. During the primary, Justice McGraw was involved in an automobile accident. Subsequent to his defeat, Justice McGraw filed a personal injury lawsuit against the other driver in which he claimed that this accident caused him to act as he did at Racine four months later:
>> Due to the defendants' negligence in causing the automobile accident and severely injuring the plaintiff, plaintiff was portrayed in an extremely negative light due to the footage [from] the political rally filmed after the accident. Due in part to defendants' actions, Mr. McGraw lost the election, whereby [sic] losing his job and his yearly salary for the 12–year term.
>
> Chris Dickerson, *Former Supreme Court Justice McGraw Suing Active Member of Navy*, West Virginia Record, September 6, 2006.

**40.** The Appellees focus upon the amount of the contributions that Mr. Blankenship made to ASK. All such contributions and expenditures were completely independent of the Benjamin campaign, were lawful, were limited to the judicial election, and were apparently fully reported. Assuming, for the sake of argument, that the amount of a contribution given to a Section 527 political organization is to be the yardstick for

the law, every judicial officer in this state would be disqualified from any and every case in which an independent nonparty organization over which the judicial officer had no control received contributions from individuals or groups which included a person or entity affiliated with a party or an attorney in the case, when the independent nonparty organization used its contributions to wage a campaign against the judicial officer's electoral opponent. Conversely, such a standard would likely require a judge also to recuse himself or herself when an independent expenditure group operated against the judge or supported the judge's opponent. Our judicial system would break down under such a standard for disqualification.

Two primary "Section 527" Independent Expenditure Groups operated during the 2004 Supreme Court election. The first, Consumers for Justice, stridently opposed my candidacy.[41] Five weeks after Consumers for Justice filed its first campaign finance report, IRS documents indicate that ASK was founded on August 20, 2004, as a Section 527 independent political organization by Carl Hubbard and Dr. Daniel J. McGraw. *See* 26 U.S.C.A. § 527 (Supp.2008). The United States Supreme Court has made the following observations regarding Section 527 political organizations:

> *per se* disqualification, what amount should act as the minimum necessary for disqualification? Should that amount be $1 million dollars, $500 thousand dollars, $100 thousand dollars, $50 thousand dollars, $10 thousand dollars, or $1 thousand dollars? Further, should any purported minimum amount be the same for both Supreme Court Justices, who must run a state-wide campaign, and other state judicial officers, who only have to run in a few counties at most? Finally, if such a minimum amount is to be established, who should set this minimum amount, the judiciary or the legislature? In addition, should any such contribution require disqualification forever? Or for only a certain period? Or for only those cases actually pending before the Supreme Court of Appeals at the time of the contribution? Or for only those cases pending somewhere in the West Virginia judicial system at the time of the contribution? Or for those cases which *might* be contemplated to be filed somewhere in the West Virginia judicial system at the time of the contribution?

**41.** The first Section 527 independent expenditure group formed during the 2004 Supreme Court race was a group which called itself, Consumers

Section 527 political organizations are, unlike § 501(c) groups, organized for the express purpose of engaging in partisan political activity. They include any party, committee, association, fund, or other organization (whether or not incorporated) organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures for the purpose of influencing or attempting to influence the selection, nomination, election, or appointment of any individual to any Federal, State, or local public office.

*McConnell v. Federal Election Comm'n*, 540 U.S. 93, 174 n. 67, 124 S.Ct. 619, 678 n. 67, 157 L.Ed.2d 491 (2003) (internal quotations and citation omitted). A Section 527 "political organization need not declare contributions, dues, or fund-raising proceeds as income if the organization uses this money for the influencing or attempting to influence the selection, nomination or appointment of any individual to any Federal, State or local public office." *Mobile Republican Assembly v. United States*, 353 F.3d 1357, 1359 (11th Cir.2003) (internal quotations and citation omitted).

According to documents filed by ASK with the IRS, during the period from August 20, 2004, to December 31, 2004, ASK received

for Justice. Although it later turned out that Consumers for Justice was created as early as April 1, 2004, and began collecting and spending funds as early as April 13, 2004 (a few weeks before the end of the primary election), Consumers for Justice did not file its required paperwork notifying the IRS of its tax-exempt 527 status until June 30, 2004. Juliet Terry, *527 Groups to Play By New Rules*, The State Journal, 02/03/06. IRS rules require a 527 group to generally file its paperwork within 24 hours of being established. *Id.* According to a campaign finance report dated July 12, 2004, corporate contributions were the largest source of contributions to Consumers for Justice. Juliet Terry, *Political Groups' Donations Questioned—Consumer Attorneys Group Gave More Than $500, 000 to state 527 Organization,* The State Journal, *supra.* Five weeks after this filing, by Consumers for Justice, ASK established itself as a 527 group on August 20, 2004. Juliet Terry, *527 Groups to Play by New Rules*, The State Journal, *supra.* Consumers for Justice raised and spent approximately $2 million in the 2004 campaign against opponents of former-Justice McGraw. *See* http://forms.irs.gov/political OrgsSearch/ search/gotoSearchDrillDown.action?pacId='22659' & criteriaN-

contributions that totaled $3,623,500.[42] Public records show that out of the total contributions received by ASK, Mr. Blankenship personally contributed $2,460,500. The remaining contributions, totaling $1,163,000, were given by other individuals and organizations. According to ASK founder, Dr. Dan McGraw, "We are transparent about who we are and who we receive money from. . . . We are allowing Warren McGraw's record to come under scrutiny." Juliet Terry, *Attack Ads Dominate Court Race*, The State Journal, 10/22/04.

ASK spent an unknown amount of its contributions during the general election period "running ads assailing [Justice] McGraw's vote in a 3–2 court edict that reinstated probation for convicted child rapist Tony Dean Arbaugh." Mannix Porterfield, *For the Sake of Kids gets $2.5 Million*, Register–Herald, October 15, 2004.[43] In *Arbaugh*, the Court's majority opinion indicated that defendant would be allowed to work as a janitor in a local Catholic school, but after school officials learned of the defendant's sexual assault record, he was prevented from working at the school. *See State v. Arbaugh*, 215 W.Va. 132, 595 S.E.2d 289 (2004).[44]

As a result of ASK's efforts to defeat Justice McGraw[45], and because of Mr. Blankenship's contributions to ASK, the Appellees contend that these indirect and independent acts constitute grounds for my recusal from the instant case. I disagreed with the Appellees' motions seeking to have me recuse myself because I had no role and no control in anything that ASK did during the campaign; nor did I have any role in causing Mr. Blankenship or anyone else to contribute to ASK or otherwise do or not do anything in the 2004 Supreme Court election. The federal statute under which ASK operated expressly permitted it to obtain donations that could be used to attempt to defeat anyone running for a local, state, or federal office. *See McConnell v. Federal Election Comm'n*, 540 U.S. at 174 n. 67, 124 S.Ct. at 678 n. 67, 157 L.Ed.2d 491. The fact that ASK invoked its federal right to take a position against Justice McGraw is not a valid evidentiary basis upon which to establish that I could not fairly and impartially decide the merits of the instant case.

**E. Lawful Campaign Contributions by Party or Attorney Not Sufficient to Disqualify Judicial Officer from Case**

In this case neither ASK nor Mr. Blankenship are parties. Even if they were, the mere fact that they contributed money to defeat Justice McGraw is an insufficient reason alone to disqualify me, much less to require disqualification on a constitutional basis. On this point, the law is clear.

"[C]ampaign contributions by parties with cases pending before the judicial candidate or by attorneys who regularly practice before them is not so irregular or 'extreme' as to violate the Due Process Clause of the Fourteenth Amendment." *Public Citizen, Inc. v. Bomer*, 115 F.Supp.2d 743, 746 (W.D.Tex. 2000).[46] This is to say that "a judge is not

---

ame='West + Virginia + Consumers + for + Justice'.

**42.** This information is available to the public through the website of the Internal Revenue Service. *See* http://forms.irs.gov/politicalOrgs Search/search/gotoSearchDrillDown. action?pacId='22903' & criteriaName='And + For + The + Sake + Of + The + Kids.'

**43.** Reproduced at http://www.wvcag.org/news/fair_use/2004/10_15.htm.

**44.** Although the *Arbaugh* case had an impact, the speech at Racine had a more fundamental impact on the general election. The *Arbaugh* decision was used during the Democratic Primary by those opposed to former-Justice McGraw's election, but former-Justice McGraw nevertheless defeated his opponent, Circuit Judge Jim Rowe, in the Democratic Primary.

**45.** In failing to understand the fundamental role which the speech at Racine had in former-Justice McGraw's defeat, Appellees simply presume the absolute effectiveness of ASK's campaign.

**46.** Courts considering disqualification motions related to direct contributions to the campaigns of judicial candidates have consistently recognized that ". . . judges are not required to disqualify themselves based solely upon the allegation that an attorney or litigant has made a campaign contribution to the political campaign of the judge or the judge's spouse. As long as the citizens . . . require judges to face the electorate, either through election or retention, 'the resultant contributions to those campaigns . . . are necessary components of our judicial system.' " *Nathanson v. Korvick*, 577 So.2d 943, 944 (Fla. 1991) (quoting *MacKenzie v. Super Kids Bargain Store, Inc.*, 565 So.2d 1332, 1335 (Fla.1990)).

required to disqualify himself or herself based solely on an allegation that a litigant or counsel for a litigant has made a legal campaign contribution to the political campaign of the trial judge." *Bissell v. Baumgardner*, 236 S.W.3d 24, 29 (Ky.Ct.App.2007) (citation omitted). *See also Cherradi v. Andrews*, 669 So.2d 326, 327 (Fla.Ct.App.1996) ("Judges are not required to disqualify themselves solely upon an allegation that an attorney for a party had made a campaign contribution to the judge's political campaign."); *City of Las Vegas Downtown Redevelopment Agency v. Eighth Judicial Dist. Court ex rel. County of Clark*, 116 Nev. 640, 644–45, 5 P.3d 1059, 1062 (2000) ("In the context of campaign contributions, we have recognized that a contribution to a presiding judge by a party or an attorney does not ordinarily constitute grounds for disqualification. Indeed, we commented that such a rule would 'severely and intolerably' obstruct the conduct of judicial business in a state like Nevada where judicial officers must run for election and consequently seek campaign contributions."); *In re Disqualification of Burnside*, 113 Ohio St.3d 1211, 1212–13, 863 N.E.2d 617, 619 (2006) ("[E]lected judges are generally not required to recuse themselves from cases in which a party is represented by an attorney who has contributed to or has raised money for the judge's election campaign."); *Aguilar v. Anderson*, 855 S.W.2d 799, 802 (Tex.App.1993) ("If a judge cannot sit on a case in which a contributing lawyer is involved as counsel, judges who have been elected would have to recuse themselves in perhaps a majority of the cases filed in their courts. Perhaps the next step would be to require a judge to recuse himself in any case in which one of the lawyers had refused to contribute or, worse still, had contributed to that judge's opponent.")

The issue of lawful direct contributions to a judicial candidate's campaign was exhaustively addressed in *Adair v. State, Department of Education*, 474 Mich. 1027, 709 N.W.2d 567 (2006), as follows:

That a judge has at some time received a campaign contribution from a party, an attorney for a party, a law firm employing an attorney for a party, or a group having common interests with a party or an attorney, cannot reasonably require his or her disqualification. For there is no justice in Michigan in modern times who has not received campaign contributions from such persons. Nor is there a justice whose opponents have not received campaign contributions from such persons. And, increasingly, "opposition" campaigns have arisen in which contributions are specifically undertaken against particular justices. It is simply impossible for the Supreme Court, as well as most other courts in Michigan, to function if a lawful campaign contribution can constitute a basis for a judge's disqualification. For if a contribution to a judicial candidate can compel a judge's disqualification, then a contribution to an opponent, or the funding of an opposition campaign, must operate in a similar fashion. If so, it would be a simple expedient for a party or a lawyer to "mold" the court that will hear his or her cases by tailoring contributions and opposition contributions.

Even more fundamentally, however, "We, the people, of the State of Michigan," through the Constitution, have created a system of judicial selection in our state in which candidates are nominated by, and elected through, a political process. It is a different system of judicial selection than that which exists in other states and in the federal system, and reasonable persons can debate the merits and demerits of this system. Each of us in different forums has urged various reforms of this system. Nonetheless, the present system has been ordained by our Constitution, and it defines the environment in which those aspiring to judicial office must undertake their efforts.

The premise of our system of judicial selection in Michigan is that judges will periodically be held accountable for their performance. There are no lifetime appointments to judicial positions, and there are no unaccountable committees who determine whether judges should be maintained in office. Thus, the most notable strength of our system of judicial selection is that it requires candidates for judicial office to go out among the electorate and explain why they should be placed in office. This system fosters

communication with the electorate, speech-making, debate, the search for support and endorsements, campaign advertising, expressions of judicial philosophy, and efforts to persuasively explain why the election of one or the other candidate ought to be preferred.

Such campaigns must be directed toward an electorate.... In the case of Supreme Court justices, such campaigns will typically involve the expenditure of hundreds of thousands, or even millions, of dollars on television, radio, newspaper, and other advertising, with opposition campaigns expending similar amounts. These expenditures are not funded magically, but are raised from among the electorate, and from organizations that represent those among the electorate.

Indeed, given the premise of our system of judicial selection that there *should* be periodic elections for judicial office, it would seem that it is better that campaigns be well-funded and informative, and that candidates be afforded the fullest opportunity to explain their differing perspectives on the judicial role, than that campaigns be poorly funded and result in candidates securing election on the basis of little more than a popular surname.

There will simply be no end to the alleged "appearance of impropriety" if every contribution to a candidate, or every contribution to an opposing candidate, or every independent opposition campaign, is viewed as raising an ethical question concerning a judge's participation in a case in which a contributor or an opposition contributor is involved. Again, while cogent arguments have been made in favor of judicial selection reform, until such reforms are adopted by the people of Michigan, there is little alternative to active judicial participation in the electoral process and the concomitant need to raise funds in order to effectively participate and communicate in this process. If justices of the Supreme Court, in particular, were to recuse themselves on the basis of campaign contributions to their or their opponents' campaigns, there would be potential recusal motions in virtually every appeal heard by this Court, there would be an increasing number of recusal motions designed to effect essentially political ends, and there would be a deepening paralysis on the part of the Court in carrying out its essential responsibilities. *Adair*, 474 Mich. at 1041–42, 709 N.W.2d at 579–81.

Direct contributions to a judicial candidate's campaign are an insufficient basis, alone, to require disqualification. Therefore, contributions by a third-person to a completely independent campaign—with no ties to the judicial candidate—do not rise to a due process requirement of disqualification.

### F. Conclusion

The integrity of judicial decisions is a direct extension of the integrity of the judicial role. The simple invitation to guess about hidden motivations of judges or colleagues on the bench caused by a selective recounting of facts or by the trafficking of innuendo and half-truths serves only to indulge suspicions and doubts concerning the integrity of elected officials. It serves only politics. It is drama. It is a diversion.

In many cases, including this one, publicity adverse to the judge or justice is a virtual certainty no matter what decision he or she makes. In such cases, judges insufficiently attuned to their judicial responsibilities might readily welcome a baseless request for disqualification as an escape from a difficult case—particularly in a state which selects its judges in partisan elections. The public is legitimately entitled to more—they are entitled to judicial integrity and courage. To surrender to such recusal temptations would justly expose the judiciary to public contempt. It is the obligation of officers of the court system to ensure that professionalism, not partisanship, guides their actions and that cases are decided on the basis of the law, not in spite of it.

The determination of the composition of an appellate court panel by a standard merely of "appearances" seems little more than an invitation to subject West Virginia's justice system to the vagaries of the day—a framework in which predictability and stability yield to supposition, innuendo, half-truths, and partisan manipulations. Actual justice would be replaced by a justice borne of political gimmickry such as push-polls and media campaigns—all designed to replace judicial inde-

pendence and integrity with something more to the liking of individual litigants or others with vested interests in specific outcomes. The rule of law would be replaced by the rule of expediency; judges would be forced to practice a "defensive" form of politically correct jurisprudence; and those without money or standing would be at the mercy of those with the power to manipulate and the willingness to impugn judges not to their liking.

It is perhaps an unfortunate aspect of timing that the pendency of the rehearing of this appeal has coincided with the pendency of a rigorous political campaign for two of five seats on this Court. During periods when change is possible in the philosophical direction of the Court, the temptation by pundits, members of the media, litigants, candidates, special interest groups, or even members of this Court to politicize this Court and its decision is present. Although this Court has endured for 145 years, election cycles can be unsettling to the stability and predictability of the rule of law.[47] This puts a heavy burden on the members of this Court to act in the highest standard of judicial professionalism, to refrain from exacerbating tensions, to avoid the highly emotional, to abstain from that which is deeply divisive, and to work judicially and judiciously.

Resort to appearance-based criteria alone in judging simply encourages the excesses often wrought on a judicial system during times of political struggle. "Especially ought the Court not reenforce needlessly the instabilities of our day by giving fair ground for the belief that Law is the expression of chance—for instance, of unexpected changes in the Court's composition and the contingencies in the choice of successors." *United States v. Rabinowitz,* 339 U.S. 56, 86, 70 S.Ct. 430, 444, 94 L.Ed. 653 (1950) (J. Frankfurter, dissenting), *overruled, in part, Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). *See also Rogers*

---

**47.** Recent election cycles involving seats on this Court have highlighted some of the difficulties incumbent in a system which incorporates partisanship or politics in its selection method, particularly when political rhetoric is generated from within this Court during an election cycle in which the Justice is not running. *See generally Matter of Starcher, supra* (admonishment of judicial candidate for Supreme Court of Appeals for personal solicitation of public support in violation of Code of Judicial Conduct) during 1996 election cycle; *State ex rel. Carenbauer v. Hechler,* 208 W.Va. at 600, 542 S.E.2d at 421 (Starcher, J., dissenting, n. 1: "As I file this dissent, there are eerie parallels between the majority's creation of a rule in the instant case that deprives the voters of West Virginia of their right to vote for a candidate—and the decision by a 5–to–4 majority of the United States Supreme Court to create a rule that prohibits the hand count of machine-rejected ballots in the Florida Presidential election, a procedure that is clearly authorized by state law and is as established and as American as apple pie!") during the 2000 election cycle; *Starcher Defends Behavior at Forum— Candidate Debate Turns Into Argument at State Bar Association Gathering,* The State Journal, March 25, 2004 (recounting shouting outburst from the back of the room by non-candidate Justice during 2004 Supreme Court candidate forum directed against candidate Judge Jim Rowe before members of the West Virginia Bar Association and the Kanawha County Bar Association, and also separate confrontation between same sitting Justice and candidate Judge Rowe in public mall. " 'I've got to admit. It kind of threw me a little. Starcher's back there scream-

ing, so what do you do? You move on,' Rowe said, 'I think it was totally inappropriate. And, in my opinion, it made him look bad.' " "The following week, Starcher said he does not regret speaking up the way he did.... Starcher believes his actions were completely within his rights. 'As a sitting justice, I don't park my rights at the courthouse,' he said.") during the 2004 election cycle.

Indeed, the frustrations caused to dedicated jurists by political rhetoric and partisan machinations from within the judiciary is not new, as reflected by Justice Scott, joined in the majority by Judges Jolliffe, Fox and Keadle (all imminently well-respected senior-and current-circuit court judges in this State):

Finally, we would be less than forthright if we did not acknowledge the effects this candidacy has had on the ability of this Court to conduct its constitutionally-required duties with the element of collegiality necessary to properly effect judicial decision-making. While the process of judicial decisions implies disagreement, it also implies that the parties to such decisions must approach dispassionately the business of dispute resolution without personal animosity and with a healthy respect for honest differences of opinion. Unfortunately, this candidacy has brought with it an unhealthy pall of partisanship. [Footnote omitted.] The author of this opinion has experienced first-hand that the loss of collegiality can only serve to promote disharmony and impede rational discourse.

*State ex rel. Carenbauer v. Hechler,* 208 W. Va. at 599, 542 S.E.2d at 420. Justice Starcher dissented.

*v. Bellei*, 401 U.S. 815, 837, 91 S.Ct. 1060, 1072, 28 L.Ed.2d 499 (1971) (J. Black, dissenting) (legal standards "should not be blown around by every passing political wind that changes the composition of this Court.").

Just as judges have a duty to the system, so too do counsel in cases appearing before the courts of this State. While counsel must endeavor to represent their clients zealously, they should do so with due regard to the profession they serve. I would be remiss if I did not acknowledge my disappointment in the material omissions from the motions for disqualification filed herein against myself. While such filings are appropriate when warranted, counsel should do so within the framework which has long served this judicial system. Such motions should include all facts material to the recusal decision. Omitted from the motions herein was any objective consideration of my actual record, my decisions and my behavior in over three years on this Court—the truest measure of a judge. Further, while the use of the term "support" is certainly permissible in a motion, the term, in a vacuum, can be misleading and its connotation remarkably subjective and indefinite. It is a term better given to political punditry and press releases than, in the context of this case, the objective certain-

ty needed in legal discourse. The well-drafted motion should acknowledge and discuss not only the motion's perceived strengths, but also the motion's actual weaknesses. The absence of such a critical analysis here, indeed the lack of even an acknowledgment of the motions' actual weaknesses, is directly relevant to the legal credibility of the said motions.[48] It is my purpose here to remind counsel appearing before this Court of their obligations to this Court and this judicial system.[49]

In conclusion, I observe the note of caution expressed by now-Justice Stephen Breyer, who, while a judge on the First Circuit Court of Appeals, noted that "the disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *In re Allied–Signal, Inc.*, 891 F.2d 967, 970 (1st Cir.1989) (emphasis in original) (citations omitted). For this reason, a "judge must still tread cautiously, recognizing, on the one hand, the great importance to the judicial institution of avoiding the appearance of partiality, while simultaneously remaining aware of the potential injustices that may

---

**48.** In a system dedicated to seeking actual justice, the absence of something so material as my actual record on this Court, my decisions and my behavior as a judge is so common-sense that its omission is disappointing. Further, the use of a survey which sounded more like a "push-poll", particularly long after the deadline for filing such a motion had passed and after the case was argued orally before this Court on rehearing, was not only disappointing, but also problematic if the purpose of the motion was legal in nature.

**49.** This election period saw a great deal of misinformation. For example, it was erroneously reported that this Court diverted from its traditional rotation for the position of Chief Justice. Specifically, it was reported that members of this Court improperly rotated myself into the Chief Justiceship after current-Chief Justice Maynard when that position should have instead gone to Justice Albright. Attached as Exhibit 1 is a chart by the Court's Clerk, Rory Perry, detailing the rotation and dispelling any contention that I was improperly placed in rotation before Justice Albright. Indeed, the contrary argument simply makes no sense. Since this rotation has been in place, no justice has waited

more than four years before becoming Chief Justice in their fifth year. As set forth by the current rotation, next year, my first as Chief Justice, will be my fifth year. Furthermore, the moment I took my place in rotation, Justice Albright became Chief Justice in 2005. At that point, the rotation was C.J. Albright (2005), J. Davis (2006), J. Starcher (2007), J. Maynard (2008) and J. Benjamin (2009). To contend that somehow Justice Albright should have left his Chief Justiceship at the end of 2005 and somehow moved to the middle of the rotation line to place him as Chief Justice in 2009 is, frankly, absurd.

Unfortunately, this misinformation has taken on a life of its own. Moreover, some have insinuated that there was some form of conspiracy to place me behind Justice Maynard in rotation to affect the selection of replacement judges herein for those justices who have recused themselves. Such assertions are disturbing and grossly unfair to the two outstanding jurists, Judges Fox and Cookman, who served on this case and who are among the most highly-regarded jurists this State has ever produced. Judges and attorneys have an obligation to deal in facts, not conspiracy theories, lest their motives in pleadings and pronouncements come into question.

arise out of unwarranted disqualification." *Id.*

For these reasons, I concur in the Majority opinion.

## Membership of Supreme Court of Appeals Each Year, 1972 - present
### Names in CAPITALS denote Chief Justice for that year
(1980 was first year of CJ rotation by seniority, per attached order of Dec. 6, 1979)

| Year | Members of the Court | | | | |
|------|------|------|------|------|------|
| 1972 | Berry | Caplan | Calhoun/Haden | Kessel | Carrigan |
| 1973 | Berry | Caplan | Haden | Sprouse | Neely |
| 1974 | Berry | Caplan | Haden | Sprouse | Neely |
| 1975 | Berry | Caplan | HADEN | Flowers | Neely |
| 1976 | BERRY | Caplan | Wilson | Flowers | Neely |
| 1977 | Miller | CAPLAN | McGraw | Harshbarger | Neely |
| 1978 | Miller | CAPLAN | McGraw | Harshbarger | Neely |
| 1979 | Miller | CAPLAN | McGraw | Harshbarger | Neely |
| 1980 | Miller | Caplan | McGraw | Harshbarger | NEELY |
| 1981 | Miller | McHugh | McGraw | HARSHBARGER | Neely |
| 1982 | MILLER | McHugh | McGraw | Harsharger | Neely |
| 1983 | Miller | McHugh | McGRAW | Harshbarger | Neely |
| 1984 | Miller | McHUGH | McGraw | Harshbarger | Neely |
| 1985* | MILLER | McHugh | McGraw | Brotherton | NEELY |
| 1986 | MILLER | McHugh | McGraw | Brotherton | Neely |
| 1987 | Miller | McHugh | McGRAW | Brotherton | Neely |
| 1988 | Miller | McHUGH | McGraw | Brotherton | Neely |
| 1989 | Miller | McHugh | Workman | BROTHERTON | Neely |
| 1990 | Miller | McHugh | Workman | Brotherton | NEELY |
| 1991 | MILLER | McHugh | Workman | Brotherton | Neely |
| 1992 | Miller | McHUGH | Workman | Brotherton | Neely |
| 1993 | Miller | McHugh | WORKMAN | Brotherton | Neely |
| 1994* | Miller/Cleckley | McHugh | Workman | BROTHERTON | NEELY |
| 1995* | Cleckley | McHUGH | Workman | ~ Albright | NEELY/Recht |
| 1996 | Cleckley/Davis | McHUGH | Workman | Albright | Recht |
| 1997 | Davis | McHugh | WORKMAN | Starcher | Maynard |
| 1998 | DAVIS | McCuskey | Workman | Starcher | Maynard |
| 1999 | Davis | McGraw | Workman/Scott | STARCHER | Maynard |
| 2000 | Davis | McGraw | Scott | Starcher | MAYNARD |
| 2001 | Davis | McGRAW | Albright | Starcher | Maynard |
| 2002 | DAVIS | McGraw | Albright | Starcher | Maynard |
| 2003 | Davis | McGraw | Albright | STARCHER | Maynard |
| 2004 | Davis | McGraw | Albright | Starcher | MAYNARD |
| 2005 | Davis | Benjamin | ALBRIGHT | Starcher | Maynard |
| 2006 | DAVIS | Benjamin | Albright | Starcher | Maynard |
| 2007* | DAVIS | Benjamin | Albright | Starcher | Maynard |
| 2008 | Davis | Benjamin | Albright | Starcher | MAYNARD |
| 2009 | Davis | BENJAMIN | Albright | | |
| 2010 | Davis | Benjamin | ALBRIGHT | | |
| 2011 | Davis | Benjamin | Albright | | |
| 2012 | Davis | Benjamin | Albright | | |
| 2013 | | Benjamin | | | |
| 2014 | | Benjamin | | | |
| 2015 | | Benjamin | | | |
| 2016 | | Benjamin | | | |

*Notes on 1985, 1994-1995 and 2007: In 1985, Richard Neely served as Chief Justice through June 28, when Thomas Miller took over for the remainder of the year. In 1994, William Brotherton served as Chief until he suffered a heart attack in September. Richard Neely was Acting Chief for the remainder of 1994, and continued as Chief in 1995 until his resignation on April 15, when Thomas McHugh took over as Chief for the remainder of the year. On October 26, 2006, the rotation order was changed when Robin Davis was designated as Chief for a second year (2007) and Elliott Maynard was designated as Chief for 2008.

Other notes: As of November 20, 2007, the Chief Justice has been designated through the close of 2010, to-wit: Maynard 2008; Benjamin 2009; Albright 2010. When a current Chief Justice is unable to act, the next chief in line serves as the Acting Chief Justice.

Compiled by Rory Perry
Updated on November 20, 2007

Exhibit 1